**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| VICTOR ZAVALA; EUNICE GOMEZ; ANTONIO FLORES; OCTAVIO DENISIO; HIPOLITO PALACIOS; CARLOS ALBERTO TELLO; MAXIMILIANO MENDEZ; ARTURO ZAVALA; FILIPE CONDADO; LUIS GUTIERREZ; DANIEL ANTONIO CRUZ; PETR ZEDNEK; TERESA JAROS; JIRI PFAUSER; HANA PFAUSEROVA; PAVEL KUNC; and MARTIN MACAK, on behalf of themselves and all others similarly situated, | : : : : : : : : : : : | Civil Action No. 03-5309 (JAG) |
| Plaintiffs, | : : | **O P I N I O N** |
| v. | : : : | |
| WAL-MART STORES, INC., | : : | |
| Defendant. | : : | |

**APPEARANCES:**

Gilberto M. Garcia
Mary Ann Kricko
GARCIA AND KRICKO
ATTORNEYS AT LAW
560 Sylvan Avenue
Englewood Cliffs, New Jersey 07632
-and-
James L. Linsey
Thomas N. Ciantra
Oriana Vigliotti
COHEN, WEISS AND SIMON LLP
330 West 42nd Street
New York, New York 10036

Attorneys for Plaintiffs

Robert H. Bernstein
REED SMITH LLP
The Legal Center
One Riverfront Plaza, First Floor
Newark, New Jersey 07102-5400
-and-
David P. Murray
Randy Branitsky
WILLKIE FARR & GALLAGHER LLP
1875 K Street, NW
Washington, D.C. 20006-1238

Attorneys for Defendant

Michaelene Loughlin
LOUGHLIN & LATIMER
131 Main Street, Suite 235
Hackensack, N.J. 07601

Attorney for *Amicus Curiae* Czech Republic

**GREENAWAY, JR., U.S.D.J.**

Plaintiffs are undocumented immigrants who have provided janitorial services at Defendant's retail stores nationwide.  By this action, they assert claims against Defendant Wal-Mart Stores, Inc. ("Defendant" or "Wal-Mart"), pursuant to the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d) (1996); the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 206 and 207 (1996); the Civil Rights Act of 1871 ("section 1985"), 42 U.S.C. § 1985(3) (1996); and common law.  Wal-Mart has moved to dismiss the entire complaint, pursuant to Fed. R. Civ. P. 12(b)(6).  The motion is granted as to Plaintiffs' RICO and Section 1985 claims, and denied as to Plaintiffs' FLSA and common law claims.

## BACKGROUND

Defendant Wal-Mart, by its own account, is the nation's largest private employer. (Defendant's Brief dated March 19, 2004 ("Def. Br."), at 2.)  The named plaintiffs are undocumented immigrants who worked as janitors in various Wal-Mart retail store locations across the country.  The allegations in the revised first amended complaint are accepted (and set forth below) as true for purposes of deciding this motion.[1]  See FED. R. CIV. P. 12(b)(6); Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 (3d Cir. 1994).

**I.     Law Enforcement Actions Against Wal-Mart**

On October 23, 2003, four months before Plaintiffs filed their amended complaint in this Court, the United States Immigration and Customs Enforcement ("USICE") officers raided Wal-Mart retail stores in 21 states. (Revised Amended Complaint dated October 28, 2004 ("RAC"),

---

[1] During oral argument, this Court granted Plaintiffs permission to file a Revised First Amended Class Action Complaint and Jury Demand in order to correct certain typographical errors.  Plaintiffs filed their revised pleading with this Court on October 28, 2004.

at ¶ 2.)  Federal agents who conducted these raids as part of "Operation Rollback" arrested

hundreds of janitors, including 12 of the named plaintiffs, for alleged immigration violations.

(RAC ¶ 2.)  Federal agents also raided Defendant's headquarters in Arkansas and seized

documents and materials in support of a criminal investigation by the United States Attorney of

the Middle District of Pennsylvania.[2]  (RAC ¶ 2.)

The janitors arrested as part of Operation Rollback were undocumented immigrants from

Mexico, the Czech Republic, Mongolia, Brazil, Uzbekistan, Poland, Russia, Georgia, and

Lithuania.  (RAC ¶ 2.)  The named plaintiffs resided in New Jersey, Texas, Alabama, Florida,

Virginia, Michigan, and Connecticut.  At least 10 of the immigrants arrested in Arizona and

Kentucky were employed directly by Wal-Mart.  (RAC ¶ 2.)  Others were employed through

maintenance contractors.  (RAC ¶ 2.)

Operation Rollback was not the first raid on Wal-Mart stores or on its headquarters.

Federal agents raided Wal-Mart stores in St. Louis, Missouri in 1997 and 1998 and arrested

janitors who had been working illegally in those stores.  (RAC ¶ 42.)

In addition, on June 7, 2002, the United States raided numerous Wal-Mart stores and filed

a Verified Complaint of Forfeiture ("Forfeiture Action"), in the Middle District of Pennsylvania

against various contractors.  (RAC ¶ 42.)  The United States asserted that the contractors

committed various criminal offenses – indeed, the very same violations that Wal-Mart allegedly

---

[2] By letters to this Court, the parties advised that, in March 2005, the United States
reached an $11 million global civil settlement with Wal-Mart in connection with this
investigation.  Wal-Mart did not admit any wrongdoing as part of the settlement.  Separately,
some of the contractors that provided cleaning services to Wal-Mart retail store locations
between 1998 and 2002 also agreed to a $4 million criminal forfeiture related to the hiring of
unauthorized aliens.

committed in this action.  See infra.  As a result of these raids, federal agents arrested roughly 80

janitors believed to be undocumented immigrants from Uzbekistan, Georgia, Armenia, Estonia,

Russia, Bulgaria, Mongolia, Lithuania, Poland, and the Czech Republic.  (RAC ¶ 42.)

This action is also not the first time that a Wal-Mart contractor is alleged to have

participated in immigration-related offenses.  (RAC ¶ 43.)  On June 4, 2001, one of Wal-Mart's

maintenance contractors pled guilty in federal court to charges that she had harbored illegal

aliens and committed related offenses.  The contractor received a 7 month sentence and was

fined $2,000.  (RAC ¶ 43.)  At that time, a spokesperson for Wal-Mart denied having any

knowledge of the company's use of undocumented labor.  (RAC ¶ 43.)

Plaintiffs allege that, based on this history, Wal-Mart was aware that it was, and has been,

employing unlawfully, hundreds of undocumented immigrants for janitorial positions,

notwithstanding its frequent and nationwide use of maintenance contractors.  (RAC ¶ 41.)

Because of this alleged pattern of conduct, Wal-Mart has been under investigation by federal law

enforcement authorities for over five years.  (RAC ¶ 42.)

## II.    The Alleged Criminal Enterprise

Plaintiffs allege that they were harmed by an ongoing "exploitative criminal enterprise"

(herein the "Wal-Mart Enterprise") comprised of Wal-Mart and its various maintenance

contractors, acting as Wal-Mart's co-conspirators or agents.  (RAC ¶¶ 1, 36, 40.)  Plaintiffs claim

that the Wal-Mart Enterprise systematically employed, harbored, and trafficked in the labor of

immigrants, aided and abetted violation of the immigration laws, failed to pay their wages and

overtime and benefits as required, and concealed their profits and practices from detection.

(RAC ¶¶ 1, 36, 57.)

4

More specifically, the Wal-Mart Enterprise operated as follows: participants in the Wal-Mart Enterprise violated the immigration laws to secure workers who could be exploited easily based on their undocumented status. It targeted, encouraged, harbored, trafficked, and employed undocumented aliens, specifically because they were a vulnerable population. (RAC ¶¶ 36, 39, 46, 47.) The Wal-Mart Enterprise exploited them in any number of ways – by obligating them to work in excess of the statutory maximum number of hours, every day of the week, denying them of lawful pay and benefits under the FLSA, as well as time for sick leave, meals or breaks, and paying them in cash without withholding payroll taxes. (RAC ¶ 41). The Wal-Mart Enterprise also easily could, and did, hide them from law enforcement authorities, by threatening them with deportation or locking them into the stores for the duration of their shifts. (RAC ¶ 41.)

Plaintiffs allege that, regardless of whether the janitors were hired directly by Wal-Mart or by a contractor, the terms of employment were illegal, and the same. (RAC ¶ 41.) Plaintiffs further allege that the Wal-Mart Enterprise used the mails and wire in order to operate the scheme, and concealed and prolonged the existence of the enterprise by money laundering. (RAC ¶ 41.)

## STANDARD OF REVIEW

On a motion to dismiss, pursuant to Rule 12(b)(6), the court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. See Oshiver, 38 F.3d at 1384. The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. See Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).

5

While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of actual allegations. See Mirce v. DeKalb, 433 U.S. 25, 27 n.2 (1977). Moreover, the claimant must set forth sufficient information to outline the elements of his claims or to permit inferences to be drawn that these elements exist. See FED. R. CIV. P. 8(a)(2); Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

In deciding a Rule 12(b)(6) motion, the court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record. See Pittsburgh v. W. Penn Power Co., 147 F.3d 256, 259 (3d Cir. 1998); see also 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1357 (3d ed. 2004). "Plaintiffs cannot prevent a court from looking at the texts of the document on which its claim is based by failing to attach or explicitly cite them." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).

## DISCUSSION

Defendant Wal-Mart has moved to dismiss the complaint in its entirety. There are five counts to the complaint, which seek relief pursuant to: (1) RICO, 18 U.S.C. § 1962(c) (Count 1); (2) RICO conspiracy, 18 U.S.C. § 1962(d) (Count 2); (3) 42 U.S.C. § 1985(3) (Count 3); (4) FLSA, 29 U.S.C. §§ 206 and 207 (Count 4); and (5) common law false imprisonment (Count 5). For the reasons set forth below, this Court grants Defendant's motion with respect to Counts 1, 2, and 3, and denies the motion with respect to Counts 4 and 5.

## I.   Count 1 – RICO Enterprise Claim

Plaintiffs allege that Wal-Mart and its contractors formed an unlawful "Wal-Mart

6

Enterprise," in the form of an association-in-fact, for "the purpose of profiting from a systematic violation of immigration and labor, wage and hour laws and other laws." (RAC ¶ 64.) Plaintiffs assert that the members of the Wal-Mart Enterprise conducted the affairs of the enterprise "by employing, harboring, and trafficking in the labor of the plaintiff immigrants, failing to pay their wages and overtime and benefits as required by federal and state law, and concealing their profits and practices from detection." (RAC ¶ 36.) More specifically, they allege that Wal-Mart and its maintenance contractors engaged in, or aided and abetted, various racketeering activities, including: harboring, transporting, and encouraging undocumented aliens; conspiring to commit these immigration law violations; committing these immigration law violations for financial gain; involuntary servitude; money laundering; and mail and wire fraud. (RAC ¶ 67.) These activities are alleged to constitute a "pattern of racketeering" within the meaning of RICO, and since 1996 and continuing to the present, "were related to each other by virtue of" common participants, victims, method of commission, and purpose. (RAC ¶ 68.) The alleged result of these activities has been to deny Plaintiffs the protection of wage and hour laws and other laws in order to "enrich Wal-Mart" at Plaintiffs' expense. (RAC ¶ 68.)

Wal-Mart argues that Plaintiffs lack standing to assert a RICO enterprise claim in Count 1 of the complaint, since the injuries were not caused proximately by the alleged RICO activities and because the plaintiffs were not harmed by, but in fact benefitted from, the alleged racketeering activity.[3] Wal-Mart further contends that Plaintiffs' RICO claim also fails because they failed to plead a "separate and distinct" enterprise, Wal-Mart's "operation or management"

_____

[3] "Civil RICO standing is usually viewed as a . . . question of stating an actionable claim, rather than as a . . . question of subject matter jurisdiction." See Anderson v. Ayling, 396 F.3d 265, 269 (3d Cir. 2005).

of the enterprise, and "viable predicate offenses," each of which are necessary for a RICO claim to survive.  (Def. Br. at 4.)

For the reasons set forth below, this Court concludes that Plaintiffs have not alleged two underlying predicate acts sufficient to state a RICO claim.  Accordingly, this Court need not address each of Wal-Mart's bases in support of dismissal of this claim at this time.  Wal-Mart's motion to dismiss Count 1 shall be granted, and Count 1 shall be dismissed without prejudice. Because this Court cannot conclude that amendment would be futile, Plaintiffs shall have the opportunity to amend Count 1, if they so choose, within 45 days of the entry of this Opinion.

### A.     Relevant Law

It is unlawful "for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."  18 U.S.C. § 1962(b); see also Lum v. Bank of Am., 361 F.3d 217, 223 (3d Cir. 2004) (stating that, to plead a RICO claim, a plaintiff must allege: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity).

A "person" is "any individual or entity capable of holding a legal or beneficial interest in property."  See 18 U.S.C. § 1961(3).  An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).

A "pattern of racketeering activity" requires "at least two acts of racketeering activity," as

defined at 18 U.S.C. § 1961(1).[4] See 18 U.S.C. § 1961(5). "Racketeering activity" includes any

act which is indictable under 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud); 18

U.S.C. § 1956 (money laundering); and 18 U.S.C. §§ 1581-1588 (peonage and slavery). See 18

U.S.C. § 1961(1)(B). It also encompasses "any act which is indictable under the Immigration

and Nationality Act, section 274 (relating to bringing in and harboring certain aliens), section 277

(relating to aiding or assisting certain aliens to enter the United States), or section 278 (relating to

importation of alien for immoral purpose) if the act indictable under such section of such Act was

committed for the purpose of financial gain." See 18 U.S.C. § 1961(1)(F).

**B.    Sufficiency of Allegations of Predicate Acts**

In order to state a claim for relief under RICO, Plaintiffs must allege that Wal-Mart

engaged in at least two underlying predicate acts of racketeering, as enumerated in the statute.

See 18 U.S.C. § 1961. Plaintiffs allege that Defendant engaged in the following predicate acts:

(1)   transporting undocumented aliens, 8 U.S.C. § 1324(a)(1)(A)(ii);
(2)   harboring undocumented aliens, 8 U.S.C. § 1324(a)(1)(A)(iii);
(3)   encouraging undocumented aliens to reside in the United States, 8 U.S.C. § 1324(a)(1)(A)(iv);
(4)   conspiring to transport, harbor, and encourage illegal aliens to reside in the United States, 8 U.S.C. § 1324(a)(1)(A)(v)(I);
(5)   aiding and abetting the transportation, harboring and encouraging of illegal aliens to reside in the United States, 8 U.S.C. § 1324(a)(1)(A)(v)(II);
(6)   committing the above offenses for financial gain, 8 U.S.C. § 1324(a)(1)(B)(i)[5];
(7)   engaging in a pattern and practice of hiring and employing illegal aliens, 8 U.S.C. § 1324(a)(3)(A);

---

[4] The elements of each of the predicate acts relevant to this action are set forth below as part of this Court's analysis of whether or not Plaintiffs have alleged sufficient facts to state a claim that Wal-Mart committed at least two predicate acts required for RICO enterprise liability.

[5] Wal-Mart correctly points out that this actually is not a separate predicate act, but rather a penalty provision, derivative of the other immigration predicate acts enumerated at Section 1324. (Def. Br. at 16 n.2.)

9

(8)    involuntary servitude, 18 U.S.C. § 1584;

(9)    money laundering of the proceeds of the criminal acts, 18 U.S.C. §§ 1956(a)(1)(A)(i); 1956(a)(1)(B)(i), 1956(a)(1)(B)(ii), 1956(a)(3)(A), 1956(a)(3)(B), and 1956(a)(3)(C); and

(10)   mail and wire fraud, 18 U.S.C. §§ 1341 and 1343.

(RAC ¶ 37.) Because Plaintiffs' allegations do not support the existence of at least two predicate acts to support a substantive RICO claim under § 1962(c), Wal-Mart's motion to dismiss the RICO claim is granted, and Plaintiffs' RICO enterprise claim is dismissed without prejudice.

## 1.    Immigration Predicate Acts

Plaintiffs assert that the "parties who make up the Wal-Mart Enterprise participated in its affairs" by committing various immigration-related predicate acts, including transporting, harboring, and encouraging Plaintiffs, aliens who are unlawfully present in the United States, as well as by conspiring to commit, and aiding and abetting, these predicate acts. (RAC ¶ 37.) More specifically, Plaintiffs allege that maintenance contractors transported, harbored, and encouraged Plaintiffs, and that Wal-Mart, with knowledge of Plaintiffs' unlawful status, "condoned" and "aided and abetted" these activities. (RAC ¶ 44.) The allegations that Wal-Mart, as part of the Wal-Mart Enterprise, engaged in, aided and abetted,[6] or conspired[7] to

---

[6] The aiding and abetting provision, 8 U.S.C. § 1324(a)(1)(A)(v)(II), prohibits "any person who aids or abets the commission of any of the preceding acts" and is a predicate act for purposes of stating a RICO claim. The "preceding acts" are defined at 8 U.S.C. §§ 1324(a)(1)(A)(I), (ii), (iii), and (iv). These paragraphs prohibit transporting, harboring and encouraging, as well as the act of knowingly bringing any alien into the United States at a place other than a designated port of entry.

For purposes of this analysis, this Court applies the parties' proffered definition of aiding and abetting, which occurs when: (1) the defendant associates with a criminal venture; (2) participates in the venture; and (3) seeks by action to make the venture succeed. (Def. Br. at 15; Pl. Br. at 27) (both citing United States v. Romero-Cruz, 201 F.3d 374, 378 (5th Cir. 2000), which sets forth the elements of aiding and abetting under 18 U.S.C. § 2). A defendant has "'associated' if he shared in the criminal intent of the principal, and . . . 'participated' if he

10

commit, these immigration predicate acts are insufficient to state a claim against Wal-Mart. The allegations that Wal-Mart also committed the predicate act of hiring ten or more employees who were brought illegally into the United States are also deficient. This Court addresses the deficiencies of each of these predicate acts below.

### a. **Transporting**

Violation of the prohibition against transporting requires proof that: (1) the alien was unlawfully present in the United States; (2) the defendant knew or recklessly disregarded the fact that the alien was in violation of the law; (3) the defendant knowingly transported or moved, or attempted to transport or move, the illegal alien "by means of transportation or otherwise"; and (4) the transporting or moving was done in furtherance of the alien's illegal presence in the United States. See 8 U.S.C. § 1324(a)(1)(A)(ii); United States v. Romero-Cruz, 201 F.3d 374, 378 (5th Cir. 2000); United States v. Diaz, 936 F.2d 786, 788 (5th Cir. 1991).

Based on a review of the complaint, it appears that Plaintiffs have not alleged sufficient facts from which this Court could infer that Wal-Mart violated the prohibition against transporting. Although Plaintiffs appear to have alleged sufficient facts concerning the first two elements of the offense of transporting (RAC ¶¶ 2, 3, 4, 40, 42, 44), their allegations with respect to the third and fourth elements fall short. More specifically, the allegations of transporting or attempted transporting of aliens unlawfully present in the United States, in furtherance of their

---

engaged in affirmative conduct designed to aid the venture." Romero-Cruz, 201 F.3d at 378.

[7] Conspiracy is established by demonstrating: (1) an agreement between two or more persons to commit an unlawful act; (2) who possess the intent to achieve the unlawful purpose or the knowledge of the conspiracy's unlawful purpose; and (3) an overt act by one or more members of the conspiracy in furtherance of the unlawful purpose. See United States v. Klein, 515 F.2d 751, 753 (3d Cir. 1975).

illegal presence, are insufficient, if not altogether absent. The allegation that most closely
approximates an assertion of transporting states:

> Upon [Plaintiff Kunc's] arrival he was met by a Wal-Mart contractor named Patrick
> (last name unknown) who transported Kunc to suburban Virginia where he was
> lodged and put to work at Wal-Mart. Wal-Mart management knew that Kunc was
> an alien without work authorization, yet, consistent with the aims of and tactics
> employed by the Enterprise, Wal-Mart continued to employ Kunc as a janitor in its
> stores. On information and belief, this contractor and many others operating in the
> Wal-Mart Enterprise, encouraged, assisted and facilitated the entry and transport of
> many other undocumented foreign nationals to the United States and employment in
> Wal-Mart.

(RAC ¶ 44.) Based on these allegations, this Court cannot conclude that Plaintiffs have stated a

claim of unlawful transporting against Wal-Mart.

Furthering an illegal presence, for purposes of stating the predicate act of transporting,

involves more than transporting the undocumented worker to his or her place of employment.

See, e.g., System Mgmt., Inc. v. Loiselle, 91 F. Supp. 2d 401, 411 (D. Mass. 2000); United States

v. Moreno-Duque, 718 F. Supp. 254, 258-59 (D. Vt. 1989) (both stating that allegations of

merely transporting aliens to work is insufficient for purposes of stating a claim of transporting);

see also United States v. Chavez-Palacios, 30 F.3d 1290, 1294 (10th Cir. 1994) (stating that

"mere transportation of an illegal alien is, without more, insufficient as a matter of law to support

a conviction under this statute"). Here, even if this Court assumes the truth of Plaintiffs'

allegations, namely, that Wal-Mart hired Plaintiffs, with knowledge or reckless disregard for

their unlawful immigration status, they are insufficient to support the claim that Wal-Mart

transported aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii).

Furthermore, Plaintiffs also have not alleged sufficient facts that reasonably suggest that

Wal-Mart conspired to further an alien's illegal presence or aided and abetted that illegal

12

presence. See 8 U.S.C. § 1324(a)(1)(A)(v)(I). According to the allegations related to Plaintiff Kunc, a Wal-Mart contractor "and many others . . . assisted and facilitated" the transport of undocumented workers and their employment at Wal-Mart stores. (RAC ¶ 44.) However, based on a review of the pleadings, it is unclear how Wal-Mart conspired to transport and further the illegal presence of aliens.

In addition, for purposes of alleging a claim of aiding and abetting, Plaintiffs must allege facts regarding Wal-Mart's participation in the offense, i.e., what "affirmative conduct" it undertook to "aid the venture." Romero-Cruz, 201 F.3d at 378; 8 U.S.C. § 1324(a)(1)(v)(II).[8] In Romero-Cruz, the court affirmed the defendant's convictions for transporting illegal aliens, because there was evidence that the defendant had engaged in "affirmative conduct designed to aid in the venture of transporting the aliens further north." 201 F.3d at 379. In Romero-Cruz, the trial evidence indicated that the defendant had driven a pickup truck to a motel, "conversed with a group of aliens after they signaled to him, and directed them to lie down in the truck . . . [and] retained control of the truck until [another person] arrived . . . [and] talked with someone in [a] blue car before climbing into the passenger cab of the truck." Id.

By contrast, in this case, Plaintiffs have not alleged sufficient facts to state a claim that Wal-Mart conspired to commit, or aided and abetted, this particular predicate act. In their opposition brief, Plaintiffs argue, in conclusory fashion, that "Wal-Mart . . . aided and abetted [immigration predicates]" (Pl. Br. at 28), but they do not allege facts in the complaint to show

---

[8] Plaintiffs have not contended, wisely, that the mere hiring of undocumented workers is a sufficient basis from which to infer that Wal-Mart engaged in, or conspired to, or otherwise aided and abetted, the transport or attempted transport, of illegal aliens in furtherance of their illegal presence in the country.

13

that Wal-Mart conspired to commit unlawful acts of transporting, or what affirmative steps or aid Wal-Mart provided to the unlawful transporting of aliens.

Accordingly, Plaintiffs cannot rely upon transporting, conspiring to transport, or aiding and abetting the transport of, undocumented workers as one of the predicate acts constituting a pattern of racketeering necessary to state a RICO claim.

### b.   Harboring

Plaintiffs also have not alleged sufficient facts to support the predicate acts of harboring, conspiracy to harbor, or aiding and abetting the harboring of, undocumented aliens. The predicate act of harboring requires a showing that the defendant: (1) knows or recklessly disregards the fact that an alien is illegally in this country; and (2) conceals, harbors, or shields, or attempts to conceal, harbor or shield, the alien from detection. See 8 U.S.C. § 1324(a)(1)(A)(iii).

Where, as here, the statute does not define certain of its terms, courts rely on the ordinary definitions of those terms. See, e.g., United States v. Zheng, 306 F.3d 1080, 1085 (11th Cir. 2002) (stating that terms of a criminal statute that are not defined statutorily are ascribed their ordinary or natural meaning, and relying on dictionaries and "common sense" to interpret undefined terms); United States v. Yoshida, 303 F.3d 1145, 1151 (9th Cir. 2002) ("In the absence [of a statutory definition], we construe a statutory term in accordance with its ordinary or natural meaning.") (quoting FDIC v. Meyer, 510 U.S. 471, 476 (1994)). Thus, to "harbor" is to "give shelter or refuge to" or "to be the home or habitat of"; to "conceal" is "to prevent disclosure or recognition of" or "to place out of sight"; and to "shield" is to "protect with or as if with a shield" or "provide with a protective cover or shelter" or "to cut off from observation" or "hide." See

14

Merriam-Webster On-Line Dictionary, http://www.merriamwebster.com.  None of the allegations sufficiently allege these acts.

It is difficult to determine which allegations address concealment or shielding.[9]  The relevant allegations concerning harboring, however, relate to the facts surrounding the conviction of a former Wal-Mart contractor (RAC ¶ 43), and to Plaintiff Kunc, who was "lodged" and then "put to work" by another Wal-Mart contractor.  (RAC ¶ 44.)

These allegations are insufficient.  For example, providing housing and employment may constitute "harboring" for "financial gain," but this is not what has been alleged against Wal-Mart.  Zheng, 306 F.3d at 1083 (involving undocumented aliens who lived in the defendant's house, without paying rent, and worked at the defendant's restaurant six days a week, twelve hours a day).  Harboring also might be alleged where, in addition to employing undocumented aliens, a store owner, for example, also provides a back room of the store as a residence.  See United States v. Singh, 261 F.3d 530, 533 (5th Cir. 2001).  Here, however, Plaintiffs allege that Wal-Mart hired, and continued to employ, Kunc, despite its knowledge that Kunc was not authorized to work in the United States, not that Wal-Mart harbored illegal aliens.  A contractor's "lodging" of an undocumented worker and "putting him to work" falls short of alleging that Wal-Mart sheltered undocumented aliens for the purposes of concealing them and avoiding their detection by immigration authorities.  While this Court might infer from the allegations in the

---

[9] Although there are allegations that some of the plaintiffs were locked into Wal-Mart stores, Plaintiffs allege these facts to support their claim of false imprisonment (RAC ¶ 92), and their assertion that Wal-Mart exercised its control over Plaintiffs as an employer for FLSA purposes (RAC ¶ 52), not to bolster their claims of concealment or shielding.  In their brief, Plaintiffs argue that the lock-ins helped to conceal or shield Plaintiffs from detection (Pl. Br. at 32) (citing RAC ¶¶ 7-15, 20-21, 52), but they actually do not allege these facts in their complaint.

15

complaint that Wal-Mart recklessly disregarded the illegal status of Plaintiffs when it employed

them as janitorial or maintenance workers at their various retail locations, it is unclear what

alleged conduct by Wal-Mart might constitute the concealing, harboring or shielding of illegal

aliens from detection.

Setting aside the insufficiency of the allegations concerning whether Wal-Mart was

involved directly in harboring Kune, or other plaintiffs in this action, it also is unclear how Wal-

Mart aided and abetted acts of harboring.  At most, Plaintiffs have alleged that Wal-Mart

"continued" its association with its maintenance contractors and its employment of

undocumented workers as janitors in its stores.  (RAC ¶ 43.)  In sum, these allegations are

insufficient to state a claim of harboring, conspiracy to harbor, or aiding and abetting harboring.

### c.   Encouraging

To state an encouraging claim, a plaintiff must allege that: (1) the defendant encouraged

or induced an alien to come to, or remain in, the United States; and (2) while knowing or

recklessly disregarding the fact that coming to, or remaining in, the United States would be, or is,

unlawful.  See 8 U.S.C. § 1324(a)(1)(A)(iv).  Various acts may amount to encouraging.  For

example, providing aliens with information at an airport about their departure for the United

States, concealing the baggage check claims of the aliens, and leading them to the boarding gate

for departure to the United States, taken together, has been sufficient to prove unlawful

encouraging under § 1324(a)(1)(A)(iv).  Yoshida, 303 F.3d at 1150-51.  Encouraging may also

consist of taking actions to "convince the illegal alien to come to this country or to stay in this

16

country." United States v. Oloyede, 982 F.2d 133, 137 (4th Cir. 1992).[10]

In this case, Plaintiffs allege that "contractors who supplied janitorial labor to Wal-Mart encouraged foreign nationals to enter the United States through promises of employment placed in various media outlets." (RAC ¶ 44.)  Plaintiffs further allege:

> [P]laintiff Kunc was encouraged to enter the United States to work illegally through media advertisements run in his native Czech Republic in February 2003 that promised employment in the United States for a fee of $1,500.  When Kunc responded to the ad, a Wal-Mart contractor instructed him to fly to Washington, D.C. . . . On information and belief, this contractor and many others operating in the Wal-Mart Enterprise, encouraged, assisted and facilitated the entry and transport of many other undocumented foreign nationals to the United States and employment in Wal-Mart . . . .

(RAC ¶ 44.)  These allegations implicate a particular Wal-Mart contractor, but do not state a claim against Wal-Mart for encouraging, conspiracy to encourage, or aiding and abetting the encouraging of illegal aliens.  See 8 U.S.C. § 1324(a)(1)(A)(v)(I)-(II).  As alleged, Wal-Mart hired undocumented workers to fill its janitorial and maintenance positions, but the complaint fails to allege, as it must, that Wal-Mart took affirmative steps to assist Plaintiffs to enter or remain unlawfully in the United States, or that Wal-Mart agreed to undertake conduct with the purpose of unlawfully encouraging undocumented aliens.

### d.   Hiring Aliens Brought into the United States

Plaintiffs also seek to allege that Wal-Mart hired aliens brought into the United States, in

---

[10] Oloyede concluded that the encouraging statute was not limited to activities directed to aliens living outside the United States, but also could apply to aliens already in the United States.  Oloyede found that the sale of fraudulent immigration documents was sufficient proof of encouraging, because these documents assured illegal aliens that "they could continue to work in the United States, that they would not be subject to the threat of imminent detection and deportation, and that they could travel back to their homeland without risk of being prevented from returning."  982 F.2d at 137.

17

violation of 8 U.S.C. § 1324(a)(3)(A).  Under this provision, any person "who, during any 12-month period, knowingly hires for employment at least 10 individuals with actual knowledge that the individuals are aliens described in subparagraph (B) shall be fined under Title 18, or imprisoned for not more than 5 years, or both."  Subparagraph (B) defines an "alien" as an alien who "is unauthorized . . . *and has been brought into the United States in violation of this subsection.*"  8 U.S.C. § 1324(a)(3)(B) (emphasis added).[11]

The allegations in support of this predicate act are insufficient because § 1324(a)(3)(A) reaches the employment of those aliens as defined in subparagraph (B), and Plaintiffs' allegations fall short of meeting the statutory definition of "alien" at subparagraph (B).

Subparagraph (B) requires Plaintiffs to allege that Wal-Mart had actual knowledge that the aliens not only were "unlawfully present in the United States," but also were "brought into the United States in violation of this subsection."  Here, Plaintiffs have not alleged sufficient facts to meet the latter element.  In Loiselle, 91 F. Supp. 2d at 408, the plaintiffs had asserted § 1324(a)(3) as a predicate act in support of their RICO claim against the defendant, but the claim was dismissed for the same deficiency.  Loiselle concluded that, although the plaintiffs had alleged that the defendant knew of the aliens' illegal status, they had omitted "any factual allegation as to how the aliens had been brought into the United States and that they were brought into the United States in violation of this employment provision."  Id.  Loiselle further decided that the claim had to be dismissed, because "for liability to attach . . . the aliens [must]

---

[11] It is worth noting that a separate provision, 8 U.S.C. § 1324a(f)(1), prohibits "any person or entity" from engaging "in a pattern or practice of violations of subsection (a)(1)(A) or (a)(2) of this section."  Also, 8 U.S.C. § 1324a(a)(1)(A) generally prohibits the hiring of unauthorized aliens.  These particular prohibitions against the hiring of unauthorized aliens, however, are not RICO predicate acts.

18

have been brought into the country by an employer for the purpose of illegal employment" and the plaintiffs were required to allege that the defendant "had knowledge of how the aliens had been brought into the United States and that they were brought into the United States in violation of this employment provision." Id. The latter requirement was justified because, as Loiselle observed, § 1324(a)(3) was part of Section 274 of the Immigration and Nationality Act ("INA"), which is entitled (and intended to reach) "Bringing and harboring certain aliens." Section 274 should be distinguished from Section 274a of the INA, which is entitled (and governs) "Unlawful employment of aliens," and which is not a RICO predicate act. Id. at 408-09.

This Court agrees that this particular predicate act requires a showing of actual knowledge that the aliens were brought into the United States for the purpose of obtaining unlawful employment. The text of § 1324(a)(3) itself requires that the defendant have actual knowledge that the employee is an alien -- *as that term has been defined in subparagraph (B)* -- which means that the defendant must have knowledge of not only the alien's unauthorized presence but also that the alien "has been brought into the United States in violation of this subsection." There are no such allegations in the complaint to support this latter element.

In addition, the fact that the provision falls within the section of the statute that covers the "bringing" of aliens to the United States reflects the importance of the requirement that the defendant have actual knowledge of the circumstances surrounding the alien's entry into the United States. As Loiselle noted, a separate provision already makes it unlawful for employers to knowingly hire aliens whose presence is unauthorized, see 8 U.S.C. § 1324a(a)(1)(A), but this statute is not a predicate act for purposes of stating a RICO enterprise claim. Plaintiffs are required to allege something more than the fact that Wal-Mart hired aliens whom they knew to

19

lack work authorization, in order to state a § 1324(a)(3)(A) predicate act.

2.  **Involuntary Servitude**

Plaintiffs also allege that Wal-Mart violated the prohibition against involuntary servitude, which also constitutes a predicate act of racketeering.  The federal law prohibiting involuntary servitude, 18 U.S.C. § 1584, provides:

> Whoever knowingly and willfully holds to involuntary servitude or sells into any condition of involuntary servitude, any other person for any term, or brings within the United States any person so held, shall be fined under this title or imprisoned not more than 20 years, or both.  If death results from the violation of this section, or if the violation includes kidnaping or an attempt to kidnap, aggravated sexual abuse or the attempt to commit aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title or imprisoned for any term of years or life, or both.

In United States v. Kozminski, 487 U.S. 931, 953 (1988), the Supreme Court, construing 18 U.S.C. § 1584, held that "involuntary servitude" meant " a condition of servitude in which the victim is forced to work for the defendant by the use of threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process" and "encompasses those cases in which the defendant holds the victim in servitude by placing the victim in fear of such physical restraint or injury or legal coercion."  The Court observed that it was "possible" that threatening an immigrant with deportation might amount to a "threat of legal coercion" that results in involuntary servitude, and that a person's special vulnerabilities may be a relevant consideration in determining whether a particular type of physical or legal coercion may be sufficient to hold a person in involuntary servitude.  Id. at 948; see also United States v. Veerapol, 312 F.3d 1128, 1132 (9th Cir. 2002).  At the same time, the Court also expressly endorsed Judge Friendly's observation in United States v. Shackney, 333 F.2d 475, 487 (2d Cir. 1964) (reversing convictions under § 1584):

20

The most ardent believer in civil rights legislation might not think that cause would be advanced by permitting the awful machinery of the criminal law to be brought into play whenever an employee asserts that his will to quit has been subdued by a threat which seriously affects his future welfare but as to which he still has a choice, however painful.

Kozminski, 487 U.S. at 950 (quoting Shackney).

In Shackney, the Court of Appeals concluded:

[W]e see no basis for concluding that because the statute can be satisfied by a credible threat of imprisonment, it should also be considered satisfied by a threat to have the employee sent back to the country of his origin, at least absent circumstances which would make such deportation equivalent to imprisonment or worse . . . a holding in involuntary servitude means to us action by the master causing the servant to have, or to believe he has, no way to avoid continued service or confinement . . . not a situation where the servant knows he has a choice between continued service and freedom, even if the master has led him to believe that the choice may entail consequences that are exceedingly bad . . . While a credible threat of deportation may come close to the line, it still leaves the employee with a choice, and we do not see how we could fairly bring it within § 1584 without encompassing other types of threat . . . Friction over employment punctuated by hotheaded threats is well known and inevitable. But the subjugation of another's will is more easily accused than accomplished.   There must be "law or force" that "compels performance or a continuance of the service" for the statute to be violated.

333 F.2d at 486-87 (internal citation omitted).

In the instant case, Plaintiffs allege that Wal-Mart's contractors threatened some of the undocumented janitorial workers with deportation. (RAC ¶¶ 20, 21, 47.) These allegations also include the claim that at least two plaintiffs were "abused" but do not identify who was directing or perpetrating the abuse, or the nature of the abuse that some of these plaintiffs may have endured. In addition, Plaintiffs allege that they were "forced to work" under threats of coercion.

These allegations of involuntary servitude are insufficient. As Shackney already observed, "[w]hile a credible threat of deportation may come close to the line, it still leaves the employee with a choice, and we do not see how we could fairly bring it within § 1584." 333

21

F.2d at 486 (also stating that "the servant [still] knows he has a choice between continued service and freedom, even if the master has led him to believe that the choice may entail consequences that are exceedingly bad"). Plaintiffs have not alleged that they did not have any way to avoid "continued service or confinement." Thus, the complaint fails to allege the predicate act of involuntary servitude.

### 3.    Mail and Wire Fraud

Plaintiffs allege that the "parties who make up the Wal-Mart Enterprise" committed mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343.[12] (RAC ¶ 37.) They further allege

---

[12] The mail fraud statute provides, in part, that:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1341.

The wire fraud statute provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

that "[u]se of the mails and wire were, on information and belief, essential to the operation of the

scheme." (RAC ¶ 41.)  Wal-Mart is alleged to have "furthered the aims and goals of the Wal-

Mart Enterprise through the routine use of the mails and means of wire communications." (RAC

¶ 60.)  The complaint alleges the following:

> On information and belief, contracts for janitorial services, movies, invoices, written
> and oral communications related to the provision of janitorial services were routinely
> sent by either mail or wire transmissions in interstate commerce throughout the time
> the Wal-Mart Enterprise flourished.  The use of the mails and wire transmissions are
> integral to the operation of the enterprise and the means participants in the Enterprise
> use to avoid detection and safeguard the proceeds of their illegal activities.  The
> documents and more specific information as to these mailings and wire transmissions
> are in the exclusive possession and control of Wal-Mart and its contractors (and
> possibly federal law enforcement officials in connection with the ongoing grand jury
> proceedings), and plaintiffs' counsel was unsuccessful in efforts to obtain these
> documents . . . more specific allegations as to this information by plaintiffs will have
> to await some discovery in this case.

(RAC ¶ 60.)  Based on these allegations, Plaintiffs assert that they can state a RICO claim against

Wal-Mart because they engaged in at least two predicate acts of racketeering -- mail and wire

fraud.  This Court disagrees.

Plaintiffs have failed to allege sufficient facts from which this Court could infer that Wal-

Mart may have engaged in mail or wire fraud as part of its involvement in the Wal-Mart

Enterprise.  As a general matter, the pleadings do not place Wal-Mart on notice of what it may or

may not have done, by way of mail or wire fraud, as part of an alleged pattern of racketeering.

See Driscoll v. Landmark Bank Sav., 758 F. Supp. 48, 52 (D. Mass. 1991) (stating that the

particularity required in pleading fraud protects defendants from unfair surprise, the use of fraud

claims as pretext to discover a wrong, and frivolous, but damaging, charges).

---

18 U.S.C. § 1343.

Moreover, the fraud-related predicate acts, as alleged in Count 1, fail to meet the standard of particularity set forth under the Rules. See FED. R. CIV. P. 9(b).[13]  The pleading standard set forth in Rule 9(b) is "particularly important in civil RICO pleadings in which the predicate racketeering acts are critical to the sufficiency of the RICO claim." See Balthazar v. Atlantic City Med. Ctr., 279 F. Supp. 2d 574, 591 (D.N.J. 2003).

In order to satisfy Rule 9 pleading standards, "plaintiffs must allege what happened to them." See Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644, 659 (3d Cir. 1998) (also noting that, prior to the certification of a class, the sufficiency of the allegations must be measured as against the particular plaintiffs in the action).  Allegations of fraud require "some measure of substantiation." Seville Indus. Machinery Corp. v. Southmost Machinery Corp., 742 F.2d 786, 791 (3d Cir. 1984); see also Rose v. Bartle, 871 F.2d 331, 356 n.33 (3d Cir. 1989) (stating that, when the predicate acts of a RICO complaint sound in fraud, Rule 9(b) applies). Accordingly, the plaintiffs should plead the "date, place or time" of the fraud or, through some other means, "inject[] precision and some measure of substantiation" into their allegations of fraud. Lum, 361 F.3d at 224 (involving a RICO claim based on mail and wire fraud).  The parties asserting fraud should allege "who made a misrepresentation to whom and the general content of the misrepresentation." See id.  Allegations generally asserting that defendants may

---

[13] See also Lum, 361 F.3d at 220 (stating that the district court properly dismissed a RICO claim predicated on mail and wire fraud where the fraud was not pled with specificity); Seville Indus. Machinery Corp. v. Southmost Machinery Corp., 742 F.2d 786, 791 (3d Cir. 1984); W. 79th St. Corp. v. Congregation Kahl Minchas Chinuch, No. 03-8606, 2004 WL 2187069, at *6 (S.D.N.Y. Sept. 29, 2004); Birch St. Recovery Corp. v. Thomas, No. 99-571, 2000 WL 1513799, at *8 (D.N.H. 2000).  By contrast, courts have applied the more liberal Rule 8 pleading standards to RICO actions not involving allegations of fraud. See, e.g., Williams v. Mohawk Indus., Inc., 314 F. Supp. 2d 1333, 1344 (N.D. Ga. 2004) (applying Rule 8 standards to RICO action based on immigration predicate acts).

24

have made misrepresentations and committed mail and wire fraud are not enough.  See A-Valey

Eng'rs, Inc. v. Bd. of Chosen Freeholders of Camden, 106 F. Supp. 2d 711, 716 (D.N.J. 2000).

Although courts should not "focus 'too narrowly' on the particularity language of Rule

9(b)" but rather, should take into account the "'general simplicity and flexibility contemplated by

the rules,'" see Boyle v. D'Onofrio, 99 F. Supp. 2d 541, 546-47 (D.N.J. 2000), "it is well settled

that Rule 9(b) applies even when the fraud relates to matters within the knowledge of the

defendant and that allegations based on information and belief do not satisfy Rule 9(b) unless the

complaint sets forth the facts upon which the belief is founded." Driscoll, 758 F. Supp. at 52.

Plaintiffs' allegations of mail and wire fraud are insufficient to suggest that Wal-Mart

engaged in these predicate acts.  It is unclear to this Court what facts could or would be proven at

a later date in order to establish that Wal-Mart engaged in fraud through use of the mails or

wires.  As Wal-Mart points out, it is unclear what false representations were made to the

plaintiffs, or what representations, in furtherance of any fraud, were made by means of mail or

wire.  (Def. Br. at 21.)

Although Rule 9(b) applies to RICO predicate acts based on fraud, courts have differed

"concerning the harshness of the outcome when Rule 9(b) is not satisfied." See Cayman

Exploration Corp. v. United Gas Pipe Line Co., 873 F.2d 1357, 1362 (10th Cir. 1989).  In Alan

Neuman Prods. Inc. v. Albright, 862 F.2d 1388, 1392 (9th Cir. 1988), the court dismissed the

RICO count.  In Saporito v. Combustion Eng'g Inc., 843 F.2d 666, 675 (3d Cir. 1988), vacated

on other grounds, 489 U.S. 1049 (1989), the Third Circuit Court of Appeals granted leave to

amend.  In New England Data Servs. v. Becher, 829 F.2d 286, 289-90 (1st Cir. 1987), the First

Circuit Court of Appeals held that, where information is in the defendant's exclusive control, the

25

court should determine whether the claim as presented warrants further discovery and amendment.  See also Shapo v. O'Shaughnessy, 246 F. Supp. 2d 935, 955-56 (N.D. Ill. 2002) (stating that the Seventh Circuit Court of Appeals may "loosen" the Rule 9 requirements in cases where discovery is needed to acquire the requisite specificity to state a claim sounding in fraud).[14]

"Rule 9(b) requires specific allegations of fraud in civil RICO cases, but the court should make a second determination as to whether the claim as presented warrants the allowance of discovery and if so, thereafter provide an opportunity to amend the defective complaint."  See Saporito, 843 F.2d at 675-76 (internal quotations omitted).  Permitting a plaintiff to conduct some discovery prior to filing an amended complaint may be appropriate where the complaint merely lacks "sufficient detail" but otherwise states a cause of action.  See State Farm Mut. Auto. Ins. Co. v. Makris, No. 01-5351, 2002 WL 826431, at *3 (E.D. Pa. Apr. 29, 2002); Parish v. Beneficial Illinois, Inc., No. 94-4156, 1996 WL 172127 (N.D. Ill. Apr. 10, 1996) (following Saporito, 843 F.2d at 675-76, among other circuit court decisions, for the view that limited discovery may be allowed when a complaint fails for want of the requisite particularity).

The mail and wire fraud predicates are pleaded on information and belief.  As a general matter, such allegations are insufficient for purposes of Rule 9(b).  See Kimmel v. Peterson, 565 F. Supp. 476, 482 (D.N.J. 1983).  Although the particularity requirement should be "relaxed" when facts may be "peculiarly within the defendant's knowledge or control," a conclusory declaration to this effect still does not satisfy Rule 9(b).  In re Am. Travelers Corp. Secs. Litig.,

_____

[14] In addition, the "equity of permitting a re-pleading is heightened where they did not expect [the] full weight of [a] RICO claim to rest on allegations of fraud."  Karris, 780 F.2d 636 at 645.

26

806 F. Supp. 547, 554 (E.D. Pa. 1992).

Even under a more lenient application of Rule 9, a plaintiff "must accompany such an allegation with a statement of the facts upon which their allegation is based" and, although information and belief pleading is permissible, the complaint should set forth "the nature and scope of plaintiffs' efforts to obtain, before filing the complaint, the information needed to plead with particularity." Id. (quoting Shapiro v. UJB Fin. Corp., 964 F.2d 272, 285 (3d Cir. 1992)) (internal quotations omitted). Plaintiffs continue to bear "the obligation to provide allegations indicating why the charges are not baseless." In re Am. Travelers Corp. Secs. Litig., 806 F Supp. at 554.

As stated above, this Court concludes that Count 1 should be dismissed without prejudice, and that Plaintiffs should be afforded leave to amend. This conclusion is consistent with this Circuit's view that plaintiffs typically should be granted leave to amend claims that otherwise are dismissed for lack of particularity. Plaintiffs, however, shall not take preliminary discovery prior to re-pleading this claim. Based on this Court's review of the complaint, this Court cannot discern the factual basis underlying Plaintiffs' information-and-belief pleading. This Court is not persuaded that discovery, prior to amendment, is appropriate here because the deficiencies in the complaint do not amount to a mere lack of detail, but rather appear to fail to state a cause of action. State Farm Mut. Auto. Ins. Co., 2002 WL 826431, at *3 (permitting discovery because a cause of action was apparent and the complaint lacked "sufficient detail").

### 4. Money Laundering

Plaintiffs' allegations concerning the money laundering predicates are based on the following provisions: 18 U.S.C. § 1956(a)(1)(A)(i); § 1956(a)(1)(B)(i); § 1956(a)(1)(B)(ii); §

27

1956(a)(3)(A); § 1956(a)(3)(B); and § 1956(a)(3)(C).[15]

In the complaint, Plaintiffs allege that money laundering "directly harmed plaintiffs inasmuch as it shielded the enterprise from detection and thereby continued its existence." (RAC ¶ 41.) Plaintiffs further claim that, in the Forfeiture Action, involving maintenance or janitorial contractors ostensibly not implicated in this action at this time, the United States has alleged "Wal-Mart maintenance contractors engaged in money laundering of the proceeds of a variety of

---

[15] 18 U.S.C. § 1956(a)(1)(A)(i) provides that:

[w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

Sections 1956(a)(1)(B)(i) and (ii) provide the same penalties for:

[w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . [and] knowing that the transaction is designed in whole or in part (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, or (ii) to avoid a transaction reporting requirement under State or Federal law.

Sections 1956(a)(3)(A), (B), and (C) provide that:

[w]hoever, with the intent (A) to promote the carrying on of specified unlawful activity; (B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or (C) to avoid a transaction reporting requirement under State or Federal law, conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be fined under this title or imprisoned for not more than 20 years, or both.

28

criminal acts [including, among other things, transporting, harboring and encouraging

undocumented aliens]." (RAC ¶ 58.)  The gist of the money laundering scheme is as follows:

> On information and belief, contractors who joined with Wal-Mart in the Wal-Mart
> Enterprise maintain (or maintained) books, records, ledgers, receipts, or notes
> relating to the purchase of financial instruments or the transfer of funds and other
> papers relating to the proceeds of the unlawful employment of the janitors and the
> profit derived therefrom.  On information and belief, contractors who joined with
> Wal-Mart in the Wal-Mart Enterprise used electronic equipment such as computers,
> facsimile or telex machines, pagers and telephone answering machines to generate,
> record, or store information concerning their operations and associated finances.  On
> information and belief, contractors who joined with Wal-Mart in the Wal-Mart
> Enterprise attempted to legitimize their profits from the illegal scheme through
> money laundering activities involving banks and their attendant services, brokers,
> professionals such as attorneys or accountants . . . The documents and specific
> information as to all of these materials is within the exclusive possession and control
> of Wal-Mart and the contractors at this time (and possibly federal law enforcement
> officials in connection with the ongoing grand jury proceedings), and plaintiffs'
> counsel was unsuccessful in efforts to [obtain] these data and documents despite
> interviews with numerous named plaintiffs and members of the plaintiff class both
> in the United States and abroad.  Thus, specific allegations as to that information by
> plaintiffs will have to await some discovery in this case.

(RAC ¶ 59.)

Plaintiffs' allegations of money laundering are similarly vague and insufficient to support

a RICO claim.[16]  This Court cannot conclude that Plaintiffs have stated predicate acts of money

laundering sufficient to sustain a RICO claim.  The allegations largely recite the elements of

different money laundering provisions, but do not identify the relevant financial transactions or

---

[16] Courts appear to be divided on the question of whether allegations of money laundering
are subject to Rule 9 requirements of particularity.  See Shapo, 246 F. Supp. at 957 n.4
(comparing Mezzonen v. Wright, No. 97-9380, 1999 WL 1037866, at *8 (S.D.N.Y. Nov. 16,
1999) (not applying a Rule 9(b) standard), with Wight v. Bankamerica Corp., 219 F.3d 79, 92
(2d Cir. 2000) (applying the 9(b) standard); Paycom Billing Servs., Inc. v. Payment Res. Int'l,
212 F. Supp. 2d 732, 736 (W.D. Mich. 2002) (same)).  Because Plaintiffs' allegations of money
laundering fail under even the more lenient Rule 8 pleading standards, they have failed to state
the predicate act of money laundering.

conduct by Wal-Mart, or describe more particularly the contractors' "money laundering activities" that allegedly involved banks, accountants, attorneys, and others. Thus, Plaintiffs have failed to allege sufficient facts to state predicate acts of money laundering.

### 5.    Summary

Plaintiffs have not alleged sufficient facts to state claims that Wal-Mart committed the predicate acts necessary to support a RICO claim under 18 U.S.C. § 1962(c), but this Court cannot determine, without doubt, that it would be futile to grant Plaintiffs the opportunity to amend their pleadings. Accordingly, Count 1 is dismissed without prejudice, and Plaintiffs, if they so choose, may amend Count 1 within 45 days of the entry of this Opinion.

## II.    Count 2 – RICO Conspiracy Claim

Plaintiffs also have alleged that, in violation of 18 U.S.C. § 1962(d), Wal-Mart and its contractors conspired to violate 18 U.S.C. § 1962(c), "that is, [they] agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the aforementioned enterprise through a pattern of racketeering activity . . . ." (RAC ¶ 78.)  For the following reasons, Defendant's motion is granted, and Count 2 shall be dismissed without prejudice. Because this Court cannot conclude that amendment of this claim would be futile, Plaintiffs are hereby granted 45 days from the entry of this Opinion, if they so choose, to amend their RICO conspiracy claim.

Under 18 U.S.C. § 1962(d), it is "unlawful for any person to conspire" to violate § 1962(c). Thus, section 1962(d) liability attaches where a defendant conspires to operate or manage an enterprise prohibited under § 1962(c). See Smith v. Berg, 247 F.3d 532, 536 (3d Cir. 2001) (discussing United States v. Antar, 53 F.3d 568 (3d Cir. 1995)). A violation of § 1962(c),

however, is not a prerequisite for liability under § 1962(d), i.e., "a RICO conspiracy defendant

need not himself commit or agree to commit predicate acts." <u>Smith</u>, 247 F.3d at 537 (following

<u>United States v. Salinas</u>, 522 U.S. 52, 65 (1997)).  Rather, to establish liability for a RICO

conspiracy, "all that is necessary for such a conspiracy is that the conspirators share a common

purpose." <u>Smith</u>, 247 F.3d at 537 (reading <u>Salinas</u>).  Therefore, if some conspirators agree to a

plan in which some conspirators will commit crimes and others will provide support, "the

supporters are as guilty as the perpetrators." <u>Salinas</u>, 522 U.S. at 64.  As the Third Circuit Court

of Appeals explained:

> [O]ne who opts into or participates in a conspiracy is liable for the acts of his co-
> conspirators which violate section 1962(c) even if the defendant did not personally
> agree to do, or to conspire with respect to, *any* particular element . . . [A] defendant
> may be held liable for conspiracy to violate section 1962(c) *if he knowingly agrees
> to facilitate a scheme which includes the operation or management of a RICO
> enterprise.*

<u>Smith</u>, 247 F.3d at 538 (emphasis added).  For purposes of establishing a RICO conspiracy

claim, therefore, it is sufficient that the defendant "adopt the goal of furthering or facilitating the

criminal endeavor." <u>Id.</u> at 537 (quoting <u>Salinas</u>, 522 U.S. at 65).  "[A] defendant must agree only

to the commission of the predicate acts, and need not agree to commit personally those acts."

<u>See</u> <u>United States v. Adams</u>, 759 F.2d 1099, 1116 (3d Cir. 1985); <u>see also</u> <u>United States v.</u>

<u>Traitz</u>, 871 F.2d 368, 396 (3d Cir. 1989) (same); <u>United States v. Phillips</u>, 874 F.2d 123, 128 n.4

(3d Cir. 1989) (reading <u>Adams</u> to mean that the "defendant need only agree to commission of

two or more racketeering acts, not to personally commit them").

    Assuming the truth of Plaintiffs' allegations, this Court concludes that they fall short of

stating a RICO conspiracy claim against Wal-Mart.  To state a claim under § 1962(d) for

31

violations of § 1962(c), a defendant must "knowingly agree[] to facilitate a scheme which includes the operation or management of a RICO enterprise." Smith, 247 F.3d at 538.  First, this Court already has reviewed the insufficiencies of Plaintiffs' allegations in Count 1, and determined that Plaintiffs have failed to allege the existence of an unlawful enterprise involved in a pattern of racketeering, i.e., the commission of at least two predicate acts.  See 18 U.S.C. § 1961(1).

Second, this Court is not persuaded that Plaintiffs have alleged adequate facts to claim that Wal-Mart agreed to the commission of at least two predicate acts.  Adams, 759 F.2d at 1116. Even if this Court were to assume, for example, that Wal-Mart's contractors committed predicate acts of encouraging or transporting undocumented aliens, Plaintiffs argue that, because Wal-Mart knew of their undocumented status, it also agreed to the commission of these predicate acts.  Plaintiffs, however, have not alleged, other than in conclusory fashion, adequate facts for this Court to reasonably infer that Wal-Mart agreed with co-conspirators to the commission, by co-conspirators and others, of RICO predicate acts, in furtherance of an unlawful enterprise. Thus, even though Plaintiffs have alleged that Wal-Mart hired undocumented workers, and in many instances, knew that these workers were not authorized to work, these allegations are insufficient not only to state a predicate act of racketeering, but also for purposes of claiming that Wal-Mart agreed to the commission of predicate acts of racketeering.

Therefore, Count 2 is dismissed without prejudice.

32

III.   **Count 3 – Section 1985 Claim**[17]

Plaintiffs allege that Wal-Mart, in violation of 42 U.S.C. § 1985(3) ("section 1985"),

conspired with its contractors to "hinder[ ] and prevent[ ] federal and state officials from

performing their affirmative obligations" to protect Plaintiffs' right not to be "subjected to

involuntary servitude" and their right to enjoy equal protection of the laws.  (RAC ¶ 84.)

In order to establish a Section 1985 claim, a plaintiff must allege: (1) a conspiracy; (2)

motivated by racial or class based discriminatory animus, designed to deprive, directly or

indirectly, any person or class of persons to the equal protection of the laws; (3) an act in

furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any

right or privilege of a citizen of the United States.   See Griffin v. Breckenridge, 403 U.S. 88,

102-03 (1971); Lake v. Arnold, 112 F.3d 682, 685 (3d Cir. 1997).

Wal-Mart asserts that, in light of these elements, Plaintiffs fail to state a claim under

section 1985 for three reasons: (1) Plaintiffs, as they have been defined in the complaint, are not

---

[17] In pertinent part, 42 U.S.C. § 1985(3) provides:

> If two or more persons in any State or Territory conspire or go in disguise on
> the highway or on the premises of another, for the purpose of depriving,
> either directly or indirectly, any person or class of persons of the equal
> protection of the laws, or of equal privileges and immunities under the laws;
> or for the purpose of preventing or hindering the constituted authorities of
> any State or Territory from giving or securing to all persons within such State
> or Territory the equal protection of the laws; . . . in any case of conspiracy set
> forth in this section, if one or more persons engaged therein do, or cause to
> be done, any act in furtherance of the object of such conspiracy, whereby
> another is injured in his person or property, or deprived of having and
> exercising any right or privilege of a citizen of the United States, the party so
> injured or deprived may have an action for the recovery of damages
> occasioned by such injury or deprivation, against any one or more of the
> conspirators.

33

members of a class protected under section 1985; (2) Plaintiffs cannot allege that Wal-Mart acted with the requisite intent; and (3) Plaintiffs have not alleged the deprivation of a constitutional right that can be vindicated under section 1985.

Plaintiffs argue that they constitute the type of class of persons protected under section 1985. Plaintiffs contend that the Third Circuit Court of Appeals has construed the protections of section 1985 broadly, so as to permit claims based on "irregular" status. (Pl. Br. at 39.)[18] In addition, to the extent that the history of discrimination against a particular class has been relevant to this Circuit's analysis of whether a particular class merits protection under section 1985, Plaintiffs assert that undocumented workers have faced a history of discrimination, largely in the form of social and political isolation, due to their undocumented status. (Pl. Br. at 40) (citing Ken Gormley, Private Conspiracies and the Constitution: A Modern Vision of 42 U.S.C. § 1985(3), 64 TEX. L. REV. 527, 575 (1985) (advocating that "[r]ather than limiting section 1985(3) to instances of racial discrimination . . . it is important that the conspiracy statute should be read with the same latitude as the fourteenth amendment, from whose mold it was cast")).

Having considered the parties' submissions and oral argument, as well as relevant law, this Court concludes that Plaintiffs have not alleged the type of "class based discriminatory animus" protected under section 1985, and for the reasons set forth below, grants Wal-Mart's motion to dismiss count 3 for failure to state a claim.

While "there is some legislative history to support the view that § 1985(3) has a broader

---

[18] Plaintiffs allege in the complaint that they are "recent immigrants, including undocumented persons." (RAC ¶ 84.) Plaintiffs describe themselves as individuals of "irregular status" in their opposition brief, not in the complaint. For purposes of resolving the instant Rule 12(b)(6) motion, this Court shall adhere to the definition of the class, as it has been alleged in the complaint.

34

reach," according to the Supreme Court, "it is a close question" whether section 1985 "was intended to reach any class-based animus" other than race-based animus.  See United Bhd. of Carpenters & Joiners of Am. v. Scott, 463 U.S. 825, 837 (1983) (rejecting the proposition that section 1985 reaches private conspiracies motivated by bias towards others on account of their economic views, status, or activities).

While circuit courts of appeal have permitted other classes to seek relief under section 1985, not surprisingly, the issue of whether a particular "class based discriminatory animus" falls within the reach of section 1985 remains unclear, and the "best that can be said of the § 1985(3) jurisprudence thus far is that it has been marred by fits and starts, plagued by inconsistencies, and left in flux by the Supreme Court." Lake, 112 F.3d at 685 (quoting Trautz v. Weisman, 819 F. Supp. 282, 291 (S.D.N.Y. 1993)).  For example, in this Circuit, private conspiracies motivated by discriminatory animus towards others based on mental disability are cognizable under section 1985, see Lake, 112 F.3d at 686, but, as already mentioned, class based discriminatory animus towards others on account of their economic status or activities is not.  See Scott, 463 U.S. at 837.  In addition, some courts have decided that politically motivated private conspiracies are cognizable under section 1985, while others have expressed doubt on the subject.[19]

---

[19] Compare Perez v. Cucci, 725 F. Supp. 209, 249-50 (D.N.J. 1989) (cataloging cases examining whether politically based classes were protected under section 1985 and concluding that a majority held that section 1985 covers politically motivated conspiracies), with Hauptmann v. Wilentz, 570 F. Supp. 351, 386 n.37 (D.N.J. 1983), aff'd mem. 770 F.2d 1070 (3d Cir. 1985), cert. denied, 474 U.S. 1103 (1986), to which Perez cites as an example of a court "expressing doubt" as to whether section 1985 reached "nonracial, politically motivated conspiracies." Perez was affirmed in a table decision. See 898 F.2d 142 (3d Cir. 1990).

Other asserted bases for protection also have been rejected as falling outside the ambit of protection of section 1985.  For example, section 1985 could not provide relief to abortion clinics that had sued an association and individuals demonstrating outside their clinics.  See Bray v.

35

At least three general principles appear to guide this Circuit's determinations of what might constitute "other class based discriminatory animus" for purposes of stating a claim under section 1985: (1) the immutability of, or the person's "responsibility" for, the particular trait; (2) whether there is a history of pervasive discrimination against the person or class based on the trait; and (3) whether there has been "an emerging rejection" of such discrimination. See Lake, 112 F.3d at 688 (relying on these three grounds for its conclusion that section 1985 reaches civil conspiracies against individuals with mental disabilities); see also Sunkett v. Misci, 183 F. Supp. 2d 691, 706 (D.N.J. 2002) (stating that Supreme Court and Third Circuit case law suggest that section 1985 protects against discriminatory animus based on "relatively immutable, highly identifiable, and discrete group identification"). As a general consideration, "the scope of section 1985(3) is not fixed as of any given point in time, but must be subject to reinterpretation as times and circumstances required." Lake, 112 F.3d at 687.

Based on these guideposts, it is difficult for this Court to conclude that a class defined as "recent immigrants, including undocumented persons" (RAC ¶ 84) can seek relief under section 1985. In particular, the fact that Plaintiffs bear "responsibility" for their status – whether defined as "recent immigrants" or as "undocumented persons" – strongly suggests that this sort of class based discriminatory animus is not covered under section 1985. In Lake, the Third Circuit Court

---

Alexandria Women's Health Clinic, 506 U.S. 263 (1993). In Bray, the abortion clinics had asserted that anti-abortion demonstrators' opposition to abortion, which had been directed not just to "women seeking abortions" but towards "women in general," qualified as an "otherwise class-based, invidiously discriminatory animus" under section 1985. The Supreme Court disagreed. It cast the clinics' argument as an approach that incorrectly equated opposition to an activity that can be engaged in by women only with opposition to women, and vacated the judgment that had been awarded to the abortion clinics under section 1985.

of Appeals examined, in the first instance, the party's "responsibility" for the asserted class trait – "mental retardation" – and determined that this was an "immutable" trait for which the plaintiff bore no responsibility.  112 F.3d at 686.  Here, Plaintiffs assert that they are all "recent immigrants, including undocumented persons." (RAC ¶ 84.)  Plaintiffs are decidedly different from the parties who sought relief pursuant to section 1985 in Lake.

Plyler v. Doe, 457 U.S. 202 (1982), is especially instructive and persuasive.  In Plyler, the Supreme Court expressed its view that an undocumented immigration status is the result of the alien's own actions.  Id. at 219 n.19.  The Court stated that, unlike "most of the classifications that we have recognized as suspect, entry into this class, by virtue of entry into this country, is the product of voluntary action . . . entry into the class is itself a crime."  Id. at 219 & n.19.  The Court further observed that "[a]t the least, those who elect to enter our territory by stealth and in violation of our law should be prepared to bear the consequences, including, but not limited to, deportation."  Id. at 220.

Although Plyler recognized that children of undocumented aliens were entitled to some degree of protection under the fourteenth amendment, this largely rested on the significance of public education, which was at issue in that case, and the fact that undocumented children in the United States are "not comparably situated" to illegal entrants like their parents.  Id. at 220.  In addition to the Court's concern that the Texas law implicated education, which plays a "pivotal role . . . in sustaining our political and cultural heritage," id. at 221, the state law deprived the *minor children* of undocumented aliens, *not their adult parents*, of a basic education "for so long as they are present in this country *through no fault of their own*."  Id. (emphasis added).

The Supreme Court, as Plaintiffs correctly suggest, was not unsympathetic in Plyler to the

37

arguments that Plaintiffs advance here.  For example, in <u>Plyler</u>, the Court recognized the

existence of a "shadow population" of illegal immigrants in the United States, and noted that its

growth:

> [R]aises the specter of a permanent caste of undocumented resident aliens, encouraged
> by some to remain here as a source of cheap labor, but nevertheless denied the benefits
> that our society makes available to citizens and lawful residents.  The existence of
> such an underclass presents most difficult problems for a Nation that prides itself on
> adherence to principles of equality under law.

<u>Id.</u> at 219.

Even assuming the truth of Plaintiffs' assertions – namely, that they comprise a socially,

culturally, linguistically and politically isolated group – this Court cannot conclude that

Plaintiffs, as defined in the complaint, are victims of the sort of invidious discrimination

proscribed by section 1985(3).  Plaintiffs' status as "recent immigrants" or as "undocumented

workers," and the concomitant political and social isolation that they encounter is, at least in part,

the result of their own voluntary conduct.  While they *now* may not be able to regularize their

status, such that their undocumented status is immutable, this is traceable to their decision, at the

outset, to enter and remain unlawfully in the United States.

Accordingly, Plaintiffs have failed to allege sufficient facts to state a claim for relief

under section 1985.  Because they cannot state an essential element of a section 1985 claim, Wal-

Mart's motion to dismiss Count 3 of the complaint is granted.

## IV.   <u>Count 4 – Fair Labor Standards Act Claim</u>

Plaintiffs allege that Wal-Mart denied them minimum wage and overtime pay, as required

by the Fair Labor Standards Act ("FLSA" or "the Act").  (RAC ¶¶ 85-90.)  The Act establishes

minimum wage, overtime pay, record keeping, and child labor standards affecting full-time and

part-time workers in the private and public sector. The "prime purpose of the [FLSA] was to aid the unprotected, unorganized and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum substance wage." Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 707 n.18 (1945).

In this action, Plaintiffs seek relief under the minimum wage (section 206) and overtime pay (section 207) provisions of the Act. The minimum wage provision requires every employer to pay "to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at . . . not less than $5.15 an hour beginning September 1, 1997." 29 U.S.C. § 206(a)(1). The overtime provision states that, unless otherwise provided:

> [N]o employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).

In support of its motion to dismiss Plaintiffs' FLSA claim, Wal-Mart suggests that, as a preliminary matter, undocumented workers cannot seek relief under the Act. In addition, Wal-Mart argues that this claim should be dismissed because: (1) Plaintiffs have sued the wrong party, since the "employer," for purposes of seeking relief under the FLSA, is the contractor, not Wal-Mart; and (2) Plaintiffs were paid above the minimum wage in all cases and in excess of the required overtime pay in most cases.

39

In response, Plaintiffs assert that: (1) undocumented aliens are entitled to relief under the FLSA; (2) Wal-Mart easily falls within the broad definition of "employer" under the Act; and (3) the complaint sufficiently alleges claims for both minimum wage and overtime pay violations. This Court agrees, and addresses each of these issues below.

### A.   Undocumented Status

Wal-Mart suggests that undocumented workers may not be able to seek relief for unpaid minimum wages under the FLSA.  It contends that the Supreme Court's decision in Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. 137 (2002), casts substantial doubt on the notion that undocumented workers are entitled to seek back pay for minimum wage and overtime under the FLSA.  (Def. Br. at 31.)

In Hoffman, the Supreme Court set aside an NLRB order requiring the employer to compensate the plaintiffs for back pay from the date they were terminated, in violation of the National Labor Relations Act, until the date that the employer discovered that the plaintiffs were undocumented aliens who were not authorized to work in the United States. 535 U.S. at 142. The Court concluded that "awarding back pay to illegal aliens runs counter to policies underlying [the Immigration Reform and Control Act of 1986]." Id. at 149.  Because the Board did not have authority to "enforce or administer" the nation's immigration policies, its order could not stand. Id.  Despite the Board's broad discretion to fashion appropriate, remedial relief, the Supreme Court concluded that the order conflicted with the policies underlying IRCA, and accordingly, had to be set aside.  Id.  Based on Hoffman, Wal-Mart claims that Plaintiffs, who are alleged to be undocumented workers, may not be able to obtain relief under the Act.

Plaintiffs rebut this suggestion with several persuasive arguments.  First, Plaintiffs

40

correctly point out that, in contrast to the undocumented plaintiffs in Hoffman who sought back pay, in this case, they are seeking unpaid wages for work that already has been performed. In addition, the definition of "employee" under the FLSA is extremely broad, i.e., does not limit relief to citizens.[20] Furthermore, the Department of Labor, which enforces the FLSA, interprets the FLSA to cover undocumented workers, even post-Hoffman. (Pl. Br. at 13 & n.4.) Finally, post-Hoffman decisions have construed the FLSA to cover undocumented workers. (Pl. Br. at 13 (citing several district court decisions)).

This Court agrees that Plaintiffs, by virtue of their undocumented status, are not barred from seeking relief under the Act. First, the statutory text does not define covered employees according to immigration or citizenship status. An "employee" under the FLSA is "any individual" employed by the employer. See 29 U.S.C. § 203(e)(1). Furthermore, as Plaintiffs point out, the term "employee" has been interpreted broadly. In Nationwide Mut. Ins. Co. v. Darden, the Supreme Court observed:

> The definition of "employee" in the FLSA evidently derives from the child labor statutes and, on its face, goes beyond its ERISA counterpart. While the FLSA, like ERISA, defines an "employee" to include "any individual employed by the employer," it defines the verb "to employ" expansively to mean "suffer or permit to work." This latter definition, whose striking breadth we have previously noted, stretches the meaning of "employee" to cover some parties who might not qualify as such under a strict application of traditional agency law principles.

503 U.S. 318, 326 (1992) (internal citations omitted).

Second, in light of the factual distinctions between Hoffman and the instant case, this

---

[20] Plaintiffs also assert that nothing in the text of FLSA appears to limit relief to individuals like Plaintiffs, who allege that they were hired largely through maintenance contractors. (Pl. Br. at 12 n.3 (citing Donovan v. DialAmerica Mktg., Inc., 757 F.2d 1376, 1382 (3d Cir. 1985)).

41

Court cannot infer that <u>Hoffman</u> precludes Plaintiffs from relief. In <u>Hoffman</u>, the plaintiffs sought recovery for the hours that they would have, but had not, worked, had they not been terminated for engaging in protected, union-related activities. Here, Plaintiffs hope to recover under the FLSA for work that they already have performed.

The distinction is significant, because the Court's concern in <u>Hoffman</u> – that recognizing a cause of action under the NLRA for undocumented persons for work not performed would undermine the purposes of the Immigration Reform and Control Act ("IRCA"), which "forcefully made combating the employment of illegal aliens central to the policy of immigration law," <u>see</u> <u>Hoffman</u>, 535 U.S. at 147 – is not implicated here in the same respect.

Indeed, IRCA enjoys a decidedly different relationship to the FLSA. <u>See Patel v. Quality Inn S.</u>, 846 F.2d 700 (11th Cir. 1988) (concluding that the plaintiff, an undocumented maintenance and janitorial worker at a hotel, was an "employee" within the FLSA). For one thing, "nothing in the IRCA or its legislative history suggests that Congress intended to limit the rights of undocumented aliens under the FLSA." <u>Id.</u> at 704. "To the contrary, the FLSA's coverage of undocumented aliens is fully consistent with the IRCA and the policies behind it." <u>Id.</u> (citing H. R. REP. NO. 99-682 (II), 99th Cong., 2d Sess. 8-9, <u>reprinted in</u> 1986 U.S.C.C.A.N. 5649, 5757, 5758). In particular, Congress' specific authorization, at section 111(d) of IRCA, of additional funds for the enforcement of FLSA, on behalf of undocumented workers, was sufficient for the <u>Patel</u> court to dispel suggestions that Congress had intended to exclude undocumented aliens from coverage under the FLSA. <u>Id.</u> The court explained:

> We recognize the seeming anomaly of discouraging illegal immigration by allowing undocumented aliens to recover in an action under the FLSA. We doubt, however, that many illegal aliens come to this country to gain the protection of our labor laws.

42

Rather it is the hope of getting a job – at any wage – that prompts most illegal aliens to cross our borders. By reducing the incentive to hire such workers the FLSA's coverage of undocumented aliens helps discourage illegal immigration and is thus fully consistent with the objectives of the IRCA. We therefore conclude that undocumented aliens continue to be "employees" covered by the FLSA.

Id. at 705-06; see also Singh v. Jutla & C.D. & R's Oil, Inc., 214 F. Supp. 2d 1056, 1058-59 (N.D. Cal. 2002) (following Patel, concluding that undocumented aliens are covered by the FLSA, and concurring that recognizing a right of action for undocumented workers under FLSA is not inconsistent with IRCA); Flores v. Albertsons, Inc., No. 100515, 2002 WL 1163623, at *5 (C.D. Cal. Apr. 9, 2002) (stating that "Hoffman does not establish that an award of unpaid wages to undocumented workers for work actually performed runs counter to IRCA").[21]

Additionally, this Court only joins the growing chorus acknowledging the right of undocumented workers to seek relief for work already performed under the FLSA. See Albertsons, Inc., 2002 WL 1163623, at *5 ("Federal courts are clear that the protections of the FLSA are available to citizens and undocumented workers alike."). All of the district court decisions cited by Plaintiffs in their brief apparently were not challenged on appeal, and therefore, remain intact as persuasive authority.[22]

Aside from Patel, which was decided by the Eleventh Circuit Court of Appeals, no other

---

[21] But cf. Renteria v. Italia Foods, Inc., No. 02-495, 2003 WL 21995190, at *6 (N.D. Ill. Aug. 21, 2003) (holding that, in light of Hoffman, undocumented workers are entitled to compensatory damages under FLSA, but not other remedies like back or front pay which would contravene the policies underlying IRCA and otherwise assume the continued and unlawful employment of undocumented workers).

[22] The district court decisions cited by Plaintiffs in their brief include: Renteria, 2003 WL 21995190 at *6; Albertsons, Inc., 2002 WL 1163623, at *5; Liu v. Donna Karan Int'l, Inc., 207 F. Supp. 2d 191 (S.D.N.Y. 2002); Singh, 214 F. Supp. 2d 1056; Cortez v. Medina's Landscaping, No. 00-6320, 2002 WL 31175471, at *1 (N.D. Ill. Sept. 30, 2002); and Flores v. Amigon, 233 F. Supp. 2d 462 (E.D.N.Y. 2002).

43

circuit court of appeals appears to have addressed, in a substantial respect, the issue of whether

undocumented workers are entitled to back pay awards under the FLSA, although at least one

other court of appeals has expressed skepticism as to the reach of <u>Hoffman</u> as a general matter.

<u>See</u> <u>Rivera v. NIBCO, Inc.</u>, 364 F.3d 1057, 1067 (9th Cir. 2004).  <u>Rivera</u> was a national origin

discrimination case brought under Title VII by employees who sought back pay from their

defendant employer.  The employer had argued unsuccessfully before the district court that it was

entitled to the immigration records of the plaintiff employees, and filed an interlocutory appeal.

The court of appeals, in affirming and remanding the matter, responded to the defendant's

assertion that <u>Hoffman</u> "precludes an award of back pay to an illegal immigrant, no matter what

federal statute the employer may have violated," by stating that it "seriously doubt[ed] that

<u>Hoffman</u> is as broadly applicable as [the defendant] contends."  <u>See</u> <u>id.</u> at 1067.  While this

comment was not the holding of the case, which, in any event is not binding upon this Court,

<u>Rivera</u> adds to the increasing number of courts who have expressed doubt as to the proposition

that <u>Hoffman</u> suggests that undocumented workers are precluded entirely from seeking relief

under the FLSA.

Finally, the position of the Labor Department on the instant issue of whether

undocumented workers are barred from seeking relief under the FLSA is another persuasive basis

for rejecting Wal-Mart's suggestion that Plaintiffs cannot state a claim under FLSA by virtue of

their undocumented status.  The Labor Department's interpretation of the FLSA, both before and

after <u>Hoffman</u>, is that undocumented workers should be permitted to recover under the Act for

work already performed.[23]  See Patel, 846 F.2d at 700, 702-03 (acknowledging, and granting

"considerable deference" to, the position of the Labor Department and also noting that the

Supreme Court "consistently has refused to exempt from coverage employees not within a

specific exemption").  The fact that the Department of Labor, which is charged with enforcing

the FLSA, construes the statute to protect undocumented workers, even after Hoffman, further

convinces this Court that Plaintiffs' undocumented status should not bar them from seeking relief

under the Act.  Moreover, Wal-Mart has not advanced a good reason to overlook the

Department's view that Hoffman does not tread upon the right of undocumented workers to

obtain relief under the Act.

Indeed, Wal-Mart has not addressed the text, legislative history, or agency interpretations

of the Act, in support of its motion.  Its silence on these basic considerations of statutory

construction, see Dukes v. US Healthcare, Inc., 57 F.3d 350, 357 (3d Cir. 1995), is revealing.

Furthermore, this Court does not find Wal-Mart's other arguments in support of its view -

that Hoffman might preclude Plaintiffs from obtaining relief under the Act – particularly

compelling.  Wal-Mart relies on a New York state court decision, specifically from a Nassau

County district court, to support the view that Hoffman precludes recovery of back pay to

undocumented workers.  See Ulloa v. Al's All Tree Svc. Inc., 768 N.Y.S.2d 556, 557 (Nassau

Cty. Dist. Ct. 2003).  Setting aside the fact that the Nassau County District Court of the New

---

[23]  See Department of Labor, Employment Standards Administration, Wage and Hour Division, "Fact Sheet #48: Application of U.S. Labor Laws to Immigrant Workers: Effect of Hoffman Plastics decision on laws enforced by the Wage and Hour Division," available at http://www.dol.gov/esa/regs/compliance/whd/whdfs48.htm (stating that the "Supreme Court's concern [in Hoffman] with awarding back pay 'for years of work not performed, for wages that could not lawfully have been earned,' does not apply to work actually performed").

York state court system is a lower court from another state, the decision does not reveal

considerable insight into whether Plaintiffs can state a claim under FLSA.[24]

Wal-Mart further argues that the post-Hoffman decisions cited by Plaintiffs addressed the

issue of whether the plaintiffs' immigration status was the proper subject of discovery in

determining liability under the FLSA, not whether, or the extent to which, an undocumented

alien is entitled to relief under the FLSA.

Notwithstanding the fact that these post-Hoffman decisions arose in the context of

discovery disputes, they remain probative.[25]  In these cases, employer-defendants sought

discovery of the immigration status of employee-plaintiffs, presumably in order to assert that

---

[24] In Ulloa, the court barred an undocumented worker from recovering unpaid overtime from his employer, a landscaper, but permitted him to collect unpaid minimum wage pay for work already performed, under the FLSA.  768 N.Y.S.2d at 557.  Although the court concluded that federal district courts had not "squarely confronted the precise question" before it, see id., it agreed with their reasoning "up to a point" and therefore, allowed the plaintiff to collect on unpaid minimum wages.  Id.  Ulloa precluded the plaintiff from recovering overtime pay, however, because the employment contract was "tainted with illegality."  Id. at 558.  Even though the court specifically noted that there was no evidence that the plaintiff had obtained his employment by fraud, it presumed that the agreement was "tainted" because, as observed by the Supreme Court in Hoffman, it "'is impossible for an undocumented alien to obtain employment in the United States without some party directly contravening explicit congressional policies.'"  Id.

It is difficult to discern how the Ulloa court concluded that the Hoffman presumption of illegality precluded relief in the form of overtime pay but not unpaid minimum wages, or at what "point" the court parted ways from federal district courts who have addressed, in one way or another, the question of whether undocumented workers may recover under the FLSA.

[25] See, e.g., Liu, 207 F. Supp. 2d at 192 (concluding that "courts addressing the issue of whether defendants should be allowed to discover plaintiff-workers' immigration status in cases seeking unpaid wages brought under the FLSA have found such information to be undiscoverable") (citing In re Reyes, 814 F.2d 168 (5th Cir. 1987), which overturned a district court order permitting such inquiry for purposes of determining coverage under the FLSA); Albertsons, Inc., 2002 WL 1163623, at *5.

46

plaintiffs of undocumented status were not entitled to relief under the FLSA.  See supra note 23.

Thus, courts implicitly or expressly resolved the issue of whether the FLSA even provided relief

to undocumented workers before determining whether evidence pertaining to the plaintiffs'

immigration status might be relevant.  Only after concluding that undocumented workers were

covered by the FLSA could courts then determine, as they have, that the immigration status of

the plaintiffs was non-relevant information, and ultimately, that the employer defendants in

FLSA actions were not entitled to discovery of the employees' immigration status.

 In sum, the persuasive force of the broad language of the statute, the decisions of other

federal courts, and the Labor Department's interpretation of the Act, leads this Court to conclude

that Plaintiffs should not be precluded, as a matter of law, from obtaining relief under the FLSA

for work already performed, merely by virtue of their undocumented status.

### B.   Wal-Mart's Status as an "Employer" or Plaintiffs' Status as Wal-Mart's "Employees"

 Wal-Mart contends that Plaintiffs' FLSA claim should be dismissed because, to the

extent Plaintiffs can state a claim under the Act, they should have asserted such claim against

Wal-Mart's maintenance contractors, not Wal-Mart.  (Def. Br. at 33-34.)  Wal-Mart argues that,

as alleged, Wal-Mart is not the relevant "employer" within the meaning of the FLSA.

Furthermore, to the extent that Plaintiffs have alleged that Wal-Mart is an "employer" within the

meaning of the Act, such allegations should not be accepted as true for purposes of deciding this

motion because they are conclusory, and contradicted by other factual allegations in the

complaint.  (Def. Br. at 33-34.)

 Plaintiffs allege that Wal-Mart acted as an "employer or joint employer" within the

47

meaning of the FLSA. (RAC ¶¶ 52, 88.) They contend that, in addition to satisfying the FLSA's definition of employer, Wal-Mart is also a joint employer with the various maintenance contractors, and therefore, a proper defendant. They argue that the Act in fact was intended to reach joint employment relationships like the one that allegedly existed between Wal-Mart, the contractors, and the plaintiffs, because joint employment is one of the mechanisms by which the Act holds employers who "sweat" labor through contractors liable. (Pl. Br. at 12 n.3.)

This Court concludes that Plaintiffs have alleged sufficient facts to suggest an employment relationship between Plaintiffs and Wal-Mart, and therefore, that Wal-Mart is a proper defendant to this action. Based on the Act's expansive definitions of the terms "employee" and "to employ" as well as the relevant regulations and case law governing whether an entity is a "joint employer" for purposes of stating an FLSA claim, Plaintiffs have alleged facts from which to infer that Wal-Mart qualifies as an "employer" under the Act.

### 1.    Applicable Law – Whether a Party is an Employer

Under the Act, an "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). A "person" includes associations, corporations, or "any organized group of persons." 29 U.S.C. § 203(a). An "employee" is "any individual employed by an employer." 29 U.S.C. § 203(e)(1).

To "employ" means "to suffer or permit to work." 29 U.S.C. § 203(g). This expansive definition of "employ" can be traced back to laws prohibiting child labor:

> In order to put an end to prohibited child labor, state statutes were designed to avoid circumvention. The well-established meaning and application of the "suffer or permit to work" language in state child labor statutes provided that work performed by minors was prohibited, not just the employment of minors. Such statutes did not presuppose a common-law master-servant relationship. It sufficed, as [one court]

48

noted, that the child was permitted "to work as if an employee" . . . *Any person in control of the business or business premises where the work was performed was held accountable for violations.* The business owner was held liable if the work of minors was suffered or permitted, without regard to his knowledge of the violation, i.e., that the minor was underage.

Bruce Goldstein et al., Fair Labor Standards in the Modern American Sweatshop: Rediscovering the Statutory Definition of Employment, 46 U.C.L.A. L. REV. 983, 1039-40 (1999) (emphasis added).

Courts generally agree that "an entity 'suffers or permits' an individual to work if, as a matter of 'economic reality,' the entity functions as the individual's employer." Zheng v. Liberty Apparel Co. Inc., 355 F.3d 61, 66 (2d Cir. 2003); see also Johnson v. The Unified Gov't of Wyandotte County, 371 F.3d 723, 729 (10th Cir. 2004). The Supreme Court specifically has observed that this broad definition of employ "whose striking breadth we have previously noted, stretches the meaning of 'employee' to cover some parties who might not qualify as such under such a strict application of traditional agency principles." Nationwide Mut. Ins. Co., 503 U.S. at 326; see also Falk v. Brennan, 414 U.S. 190, 195-96 (1973) (holding that maintenance workers were employees of not only the apartment building owners but also the real estate management company); Greenberg v. Arsenal Bldg. Corp., 144 F.2d 292 (2d Cir. 1944), rev'd on other grounds sub nom. Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697 (1945).

These broad definitions have been considered consistent with the remedial purposes of the FLSA. See United States v. Rosenwasser, 323 U.S. 360, 363 & n.3 (1945). They were aimed, in part, at eliminating the practices of companies who sought to reduce their labor costs (and to avoid their obligations under federal labor laws) by using illegitimate contractors. See Richard J. Burch, A Practitioner's Guide to Joint Employer Liability under the FLSA, 2 HOUS.

Bus. & Tax. L.J. 393, 406 (2002).

Accordingly, courts have construed the employment relationship under the FLSA broadly.

For example, in <u>Rutherford Food Corp. v. McComb</u>, 331 U.S. 722, 730 (1947), the

Administrator of the Wage and Hour Division of the Labor Department at that time brought suit

against two companies, one of which owned and operated a slaughterhouse, seeking to enjoin the

companies from continuing to violate, <u>inter alia</u>, the Act's record keeping and overtime pay

provisions.  The district court had denied the Administrator's motion for a preliminary injunction

on the basis that the meat boners working in the slaughterhouse were independent contractors,

not employees, of the slaughterhouse, but the Tenth Circuit Court of Appeals disagreed, citing

the "underlying economic realities" of the relationship between the meat boners and the operators

of the slaughterhouse.  331 U.S. at 727.  The companies appealed, and the Supreme Court of the

United States addressed the question of whether meat boners in a slaughterhouse were employees

of the companies, if they had been recruited, and at times paid hourly, by separate individuals or

companies.

The Supreme Court agreed with the Court of Appeals, and held that the meat boners were

employees of the slaughterhouse, notwithstanding the fact that they had been recruited and

organized by (initially) one of the employees of the slaughterhouse, or (later) by separate

individuals or companies.  331 U.S. at 730.  The Court concluded that the determination of the

relationship depended "upon the circumstances of the whole activity."  <u>Id.</u>  Accordingly, the

Court noted the fact that the meat boners worked in the slaughterhouse, that the manager of the

slaughterhouse "kept close touch"on the operation, and that the work of the meat boners "was

more like piecework" rather than "an enterprise that actually depended for success" upon their

50

"initiative, judgment or foresight." Id. The fact that the meat boners owned some of the tools that they used in the slaughterhouse did not outweigh these considerations. The fact that the employee who initially brought in the first group of meat boners exercised "complete control" over them also did not dissuade the Court. In considering the entirety of the relationship, the Court concluded that the meat boners should be considered "employees" of the defendants for purposes of the FLSA. Id.

The Third Circuit Court of Appeals set forth the standard for determining "employee" status in Donovan v. DialAmerica Mktg., Inc., 757 F.2d 1376, 1382 (3d Cir. 1985) (adopting the six-factor test for determining whether a worker is an "employee" as set forth by Donovan v. Sureway Cleaners, 656 F.2d 1368, 1371 (9th Cir. 1981), and stating that Sureway Cleaners "refined" the test originally laid out in Rutherford). Sureway Cleaners considered the following issues in determining "employee" status:

> 1) the degree of the alleged employer's right to control the manner in which the work is to be performed; 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; 3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; 4) whether the service rendered requires a special skill; 5) the degree of permanence of the working relationship; 6) whether the service rendered is an integral part of the alleged employer's business.

DialAmerica, 757 F.2d at 1382 (quoting Sureway Cleaners, 656 F.2d at 1370). The Third Circuit Court of Appeals also added that "Sureway Cleaners instructs that neither the presence nor absence of any particular factor is dispositive" and "courts should examine the 'circumstances of the whole activity.'" DialAmerica, 757 F.2d at 1382 (internal citations omitted).

In DialAmerica, the Court confronted the issue of whether home researchers, who compiled telephone contact information about individuals, and distributors, who disseminated

51

telephone-research work to other home researchers, were "employees" subject to the protections of the FLSA.  The Secretary of Labor had filed suit against DialAmerica Marketing, a company that primarily sold renewal magazine subscriptions by telephone, for violating certain record keeping and minimum wage provisions, but the district court had concluded that both the home researchers and the distributors were not employees for purposes of the FLSA and granted summary judgment to DialAmerica.

The Court of Appeals concluded that the district court should have followed Sureway Cleaners and conducted a broader inquiry in determining whether the workers constituted "employees" for FLSA purposes.  Applying Sureway Cleaners, the Court of Appeals affirmed the district court's determination that the distributors were not "employees" but remanded the issue of whether the home researchers were "employees" protected under the Act.  With respect to its remand of the question of whether the home researchers were DialAmerica's employees, the Court of Appeals concluded that the district court had over emphasized the fact that home researchers worked at home, while neglecting to lend sufficient weight to certain other factors, including the "degree of permanence of the working relationship" and "whether the service rendered is an integral part of the alleged employer's business."  Id. at 1384.  Home researchers likely were "employees" of DialAmerica because, among other reasons, they generally worked only for DialAmerica.  Id. at 1385.  They did not transfer their services from place to place like independent contractors.  Id.  Home researchers worked continuously for DialAmerica, often for extended periods of time, and they were dependent upon this particular business for their continued employment.  See id. at 1384-85.  These factors, along with its consideration of the "economic realities" of the work relationship, led the court of appeals to conclude that the matter

52

had to be remanded to the district court. Id. at 1383.

### 2.    Applicable Law – Whether a Party is a Joint Employer

An entity may be a "joint employer" according to federal regulations, which provide that:

> A single individual may stand in the relation of an employee to two or more
> employers at the same time under the [FLSA] . . . A determination of whether the
> employment by the employers is to be considered joint employment or separate and
> distinct employment for purposes of the act depends upon all the facts in the
> particular case.

29 C.F.R. § 791.2(a).  Furthermore, in cases where:

> the employee performs work which simultaneously benefits two or more employers,
> or works for two or more employers at different times during the work week, a joint
> employment relationship generally will be considered to exist in situations such as:
> . . . (2) [w]here one employer is acting directly or indirectly in the interest of the other
> employer (or employers) in relation to the employee.

29 C.F.R. § 791.2(b).

Analysis of whether a party is a "joint employer" boils down to determining whether an

employment relationship exists at all.  See, e.g., Zheng, 355 F.3d at 69.  "Whether a person or

corporation is an employer or joint employer is essentially a question of fact."  Wirtz v. Lone Star

Steel Co., 405 F.2d 668, 669 (5th Cir. 1968).  At this stage, this Court need only examine

whether allegations of relevant facts are sufficient to state an employment or joint employment

relationship under the FLSA.

Various cases have recognized a joint employment relationship in the context of an FLSA

claim.  A manufacturing company and the contractors through which they secured the labor of

garment workers in New York City's Chinatown were considered joint employers.  See Zheng,

355 F.3d at 64, 69.  In another case, contractors were found to be joint employers, along with

supermarket and drugstore corporations, of delivery workers.  See Ansoumana v. Gristede's

53

Operating Corp., 255 F. Supp. 2d 184 (S.D.N.Y. 2003).

Consistent with the Supreme Court's analysis in Rutherford, 331 U.S. at 711, courts have

emphasized that the totality of the circumstances, rather than any particular factor, should govern

the determination of whether joint employment exists.  See Johnson, 371 F.3d at 729; Zheng, 355

F.3d at 71; DialAmerica, 757 F.2d at 1382; Ansoumana, 255 F. Supp. 2d at 192.

Courts have not reached a uniform agreement on the relevant factors to be considered.

Although the Third Circuit Court of Appeals has not specifically addressed the circumstances

that courts should consider in determining whether a joint employment relationship exists, some

of its sister circuits have identified what factors might be pertinent to such an analysis.  For

example, courts in the Second Circuit examine:

> (1) whether the premises and equipment of the purported joint employer are used for
> the plaintiffs' work; (2) whether the contractors had a business that could or did shift
> as a unit from one putative joint employer to another; (3) the extent to which
> plaintiffs performed a discrete line-job that was integral to the process of production
> for the purported joint employer; (4) whether responsibility under the contracts could
> pass from one subcontract to another without material changes; (5) the degree to
> which the purported joint employer or their agents supervised the plaintiffs' work;
> and (6) whether plaintiffs worked exclusively or predominantly for the purported
> joint employer.

Zheng, 355 F.3d at 72 (also construing Rutherford to mean that "in certain circumstances, an

entity can be a joint employer under the FLSA even when it does not hire and fire its joint

employees, directly dictate their hours, or pay them").  The Fifth and Ninth Circuit Courts of

Appeal also have delineated certain relevant criteria for courts considering whether a joint

employment relationship might exist.[26]

---

[26] The Fifth Circuit Court of Appeals has established its own five-prong test: (1) whether
employment takes place on the premises of the company; (2) how much control the company
exerts over the employees; (3) the company's power to hire/fire or modify the terms/conditions

3.     **Analysis – Employer or Joint Employer Allegations are Sufficient**

Both parties suggest that this Court look to the standard agreement between Wal-Mart

and its maintenance contractors in order to determine the nature of the relationships between the

parties.  (Exhibit 1 to Declaration of Tim Wamsley in Support of Def.'s Opp. to Pl.'s Mot. for

Facilitated Notice.)  The Floor Service Cleaning Contract provides:

> Neither Wal-Mart nor Contractor has the right, and shall not seek, to exercise any
> control over the other party, its employees, or its agents.  Contractor shall control the
> methodology for performing the Services to meet Wal-Mart's specifications and
> Contractor's service proposal . . . Each party shall be solely responsible for hiring,
> firing, promoting, demoting, rates of pay, benefits, and other terms and conditions in
> regard to its own employees.  Neither Contractor nor any of its employees or agents
> may be considered Wal-Mart's agents or employees for any purpose and have no
> authority to act or purport to act on Wal-Mart's behalf.

As a preliminary matter, this Court doubts whether there is any mechanism for reviewing

the Contract in the context of a Rule 12(b)(6) motion to dismiss.  Plaintiffs have not referred to

the Contract or its terms in the complaint, even if they have alleged facts concerning the

relationship between Wal-Mart and its various maintenance contractors.  Although neither party

has objected to this Court's consideration of this document, Wal-Mart has not sought to convert

this motion into one for summary judgment, and this Court declines to consider the Contract in

its resolution of the instant motion, insofar as the Contract was not attached to the complaint, the

---

of employment; (4) whether the employees perform a "specialty" job within a production line;
and (5) whether the employee may refuse to work for the company or work for others.  See
Wirtz, 405 F.2d at 669-70.

    In Bonette v. Cal. Health & Welfare Agency, 704 F.2d 1465, 1470 (9th Cir. 1983), the
Ninth Circuit considered whether the proposed employer: (1) had the power to hire/fire the
employees; (2) supervised/controlled employee work schedules or conditions of employment; (3)
determined the rate/method of payment; and (4) maintained employment records.

complaint does not refer to the Contract, and the parties have not engaged in discovery.[27]

This Court is satisfied that Plaintiffs have alleged sufficient facts concerning the employment relationship for purposes of stating an FLSA claim. Based on the relevant law, the determination of whether Wal-Mart is an employer or joint employer depends upon a consideration of a range of factors. Here, all of the named plaintiffs have worked at various Wal-Mart stores. (RAC ¶¶ 7-27.) Plaintiffs allege that Wal-Mart exercised the power to hire and fire plaintiffs, controlled their wages, hours and working conditions, as well as the quality standards governing their work. (RAC ¶¶ 52-53.) Given the allegations that the plaintiffs worked seven days a week, and that they worked, in some cases, at least 70 hours each week, it is reasonable to infer that the plaintiffs did not work for any entities other than Wal-Mart in any significant capacity. (RAC ¶¶ 7-15, 18, 20-21, 23-24, 26-27). Plaintiffs also allege that on-site managers recorded the time and costs associated with maintenance functions, and forwarded along such information "on a regular and periodic basis to Wal-Mart headquarters." (RAC ¶ 55.)

Based upon these allegations, and assuming their truth, as this Court must, pursuant to Rule 12(b)(6), and in light of the FLSA's broadly defined terms concerning the employment relationship, this Court concludes that Plaintiffs have stated sufficient facts to state an employment relationship for purposes of stating an FLSA claim against Wal-Mart. Wal-Mart's

---

[27] In any event, the Contract would not resolve necessarily the question of whether Wal-Mart is an employer or joint employer of Plaintiffs. Contract disclaimers, which provide that a particular entity is/is not an employer or is/is not an independent contractor or employee, generally do not decide the issue. See 73 A.L.R. FED. 609 at § 7 (2004). "An employer's characterization of an employee is not controlling . . . for otherwise there could be no enforcement of any minimum wage or overtime law." Ansoumana, 255 F. Supp. 2d at 190; Sec'y of Labor v. Lauritzen, 835 F.2d 1529, 1545 (7th Cir. 1987) ("The FLSA is designed to defeat rather than implement contractual arrangements . . . 'economic reality' rather than contractual form is indeed dispositive.").

56

motion to dismiss Count 4, on the grounds that Wal-Mart is not an employer or joint employer, is denied.

### C.   Minimum Wage and Overtime Claims

Wal-Mart presents one other basis in support of its motion to dismiss Plaintiffs' FLSA claim in Count 4 of the complaint.  Wal-Mart argues that Plaintiffs' FLSA claim should be dismissed because Plaintiffs have failed to state minimum wage and overtime pay claims under the Act.  This Court disagrees, and thus, Wal-Mart's final basis for dismissing Plaintiffs' FLSA claim is denied.

At Count 4 of the complaint, Plaintiffs seek relief under the FLSA for failure to pay Plaintiffs minimum wage and overtime.  Wal-Mart seeks to have Plaintiffs' entire FLSA claim dismissed because some of the plaintiffs may have been paid above the minimum wage.  First, the notion that some plaintiffs may have been paid minimum wage, while others have not, is not fatal to the minimum wage claim.  Second, the argument that this claim should fail because some of the plaintiffs (but again, not all plaintiffs named thus far) were deprived of overtime under the FLSA, according to Wal-Mart's calculations, lacks merit.  Therefore, Wal-Mart's motion to dismiss Count 4 is denied.

Wal-Mart's own math, which purports to adopt Plaintiffs' factual allegations as true, as they must for purposes of a motion to dismiss, reveals that at least some of the plaintiffs have stated legally sufficient minimum wage and overtime pay claims under the FLSA.  While asserting that "thirteen of the seventeen Plaintiffs were paid *above* minimum wage plus overtime" (Def. Br. at 32), Wal-Mart also admits, on the next page of its brief, that the "remaining four Plaintiffs received near the lawful minimum wage based on their pleadings."

(Def. Br. at 33.) "Near" is not enough. Simply put, payment of "near" the lawful minimum wage is not payment of the minimum wage. Plaintiffs either were paid at least the statutory minimum wage, or they were not. The potential failure of some plaintiffs' claims for minimum wage pay does not preclude the survival of the entire claim, so long as some of the plaintiffs allege facts reasonably suggesting that they were not paid minimum wage.

Furthermore, Wal-Mart essentially concedes that Plaintiffs at least have stated a claim for overtime pay for work already performed. It contends that "[d]espite all of the hyperbole of the Amended Complaint . . . this case essentially involves an alleged denial of some overtime pay to these four Plaintiffs." (Def. Br. at 33.) Wal-Mart has no adequate rejoinder to Plaintiffs' argument that it alleges claims of unpaid overtime. Plaintiffs are not obligated to allege claims of egregious deprivations of overtime -- they only need to allege, as Wal-Mart has described the issue, deprivation of "some" overtime pay. In reply, Wal-Mart concedes that, while the amounts it paid "exceeded the minimum wage *in all cases*," it paid "the required overtime . . . *in most cases*."[28] It does not assert that, in all cases, it paid the required overtime. Having paid overtime in *most* cases and *near* minimum wage in others still leaves a claim for *some* unpaid minimum wage and overtime.

For the foregoing reasons, Wal-Mart's motion to dismiss Count 4 is denied.

## V.   Count 5 – False Imprisonment Claim

Wal-Mart asserts that, despite the inflammatory allegations at Count 5, Plaintiffs have not alleged sufficient facts to state a claim for false imprisonment.

---

[28] Wal-Mart's contention that there are no claims for minimum wage stated in the complaint appears to depart from its previous theory, which was that most, but not all, plaintiffs had failed to state a claim for unpaid minimum wage.

This Court disagrees.  Assuming the truth of Plaintiffs' allegations and granting all favorable inferences to the non-moving party, as this Court must in deciding a Rule 12(b)(6) motion, this Court concludes that Plaintiffs have stated a claim for false imprisonment. Accordingly, the motion to dismiss with respect to Count 5 is denied.

Plaintiffs allege that Wal-Mart intentionally engaged in a widespread, systematic practice of locking janitors into their stores during their shifts, against their will, causing them physical and emotional harm.  (RAC ¶¶ 92-93.)  The complaint further asserts that Wal-Mart:

> [C]ompelled the labor of the janitors through its widespread and systematic practice of intentionally locking these vulnerable workers into its stores during its shifts.  The [plaintiffs] knew they were so confined to the stores by Wal-Mart.  Such confinement was against their will and resulted in physical and emotional injury of plaintiffs and coerced plaintiffs to work for Wal-Mart whether they wanted to or not.

(RAC ¶ 45.)[29]

As a preliminary matter, this Court should address the issue of which state's law should provide the standard against which the sufficiency of Plaintiffs' allegations are measured.  The named plaintiffs reside in eight different states: Alabama, Florida, Georgia, Michigan, Mississippi, New Jersey, Texas, and Virginia.  In their briefs, Wal-Mart largely relied on New

---

[29] Plaintiffs further allege that Wal-Mart contractors "used the threat of deportation to frighten undocumented janitors into acquiescence," and that their "employment . . . in the face of these threats constitutes forced or involuntary servitude prohibited by 18 U.S.C. § 1584." (RAC ¶ 47.)  Although the threats of deportation plainly are proffered in support of allegations of involuntary servitude, one of the predicate acts underlying their RICO claim, Plaintiffs contend in their opposition brief that these threats of deportation also support their allegations of false imprisonment.  Wal-Mart correctly points out that none of the 11 "lock in" plaintiffs have alleged that they were threatened with deportation. (Reply at 18.)  Furthermore, because the sufficiency of this claim should be assessed according to how it has been alleged, and not how it has been presented through argument, this Court shall proceed on the notion that Plaintiffs' false imprisonment claim arises from their allegations of being "locked in" by Wal-Mart store managers "against their will." (RAC ¶¶ 92-93.)

59

Jersey law, to which Plaintiffs did not object, and Plaintiffs referred to the Restatement definition of this claim.  For purposes of deciding this motion, this Court shall apply New Jersey law.

When a district court sits in diversity jurisdiction over state law claims, it should apply the choice of law rules of the forum in which it sits.  See Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941).  In this Circuit, this same principle applies when a district court has federal question jurisdiction over an action, and is exercising pendent jurisdiction over state or common law claims.  See Sys. Operations, Inc. v. Scientific Games Dev. Corp., 555 F.2d 1131, 1136 (3d Cir. 1977) (stating that Klaxon "holds true with respect to pendent jurisdiction claims" even though the subject matter jurisdiction in that action was based on diversity); Rohm & Haas Co. v. Adco Chem. Co., 689 F.2d 424, 429 (3d Cir. 1982) (stating that "a federal court whose jurisdiction over a state claim is based on diversity or on pendency to a federal claim must apply the conflicts of law principles of the forum state") (internal citations omitted).

New Jersey applies the "governmental-interest" choice-of-law test for tort claims, applying the law of "the state with the greatest interest in governing the particular issue" in the underlying litigation.  See Marks v. Struble, No. 03-6225, 2004 WL 2785264, at *2 (D.N.J. Nov. 18, 2004) (citing Veazey v. Doremus, 510 A.2d 1187, 1189 (N.J. 1989)).  Under this test, a court first must consider whether a conflict exists between the laws of the interested jurisdictions.  See Marks, 2004 WL 2785264, at *2.  If an actual conflict exists, the court then must "identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties."  See id.

Where an examination of the various state laws lead to the same outcome – thereby creating a "false conflict" – the conflict of law rules of this state permit this Court to resolve the

60

case without choosing between the laws of various states. See Rohm & Haas Co., 689 F.2d at

429; see Marks, 2004 WL 2785264, at *2 (finding a false conflict where the laws of New Jersey

and New York governing claims of tortious interference with contract are "in accord");

Williamson v. Lazeration, No. 88-1456, 1988 WL 142409, at *3 (D.N.J. Dec. 20, 1988) (finding

a false conflict and applying New Jersey law). Therefore, a determination as to whether an actual

conflict of laws exists must be made by considering how claims for false imprisonment have

been defined or understood by each of these states.

     In reviewing the law from the states in which the named plaintiffs reside, as well as New

Jersey law, this Court concludes that, at this time, there is no conflict of laws, false or otherwise,

requiring resolution. Each state's definition of false imprisonment is consonant with New Jersey

law.[30] Accordingly, this Court is permitted to apply the state law of the forum in which it sits,

New Jersey, in determining the viability of Count 5.

     In New Jersey, a person "is falsely imprisoned when that person's freedom of movement

is constrained . . . by force or by threats of force communicated through conduct or words. But

for threats to be held to be a constraint, they must be such as would 'induce a reasonable

apprehension of force and the means of coercion [must be] at hand.'" See Maietta v. United

---

[30] The following cases set forth the elements required to state a false imprisonment claim in the relevant jurisdictions. None of these elements is sufficiently distinct from New Jersey law to require a separate analysis. See Gonzales v. Motel 6 Operating, L.P., No. 04-384, 2004 WL 2757918, at *2 (W.D. Tex. Nov. 23, 2004) (citing Randall's Food Mkts., Inc. v. Johnson, 891 S.W.2d 640, 644 (Tex. 1995)); LoSacco v. Young, 564 A.2d 610, 617 (Conn. App. Ct. 1989); Walsh v. Taylor, No. 246059, 2004 WL 2113388, at *4 (Mich. Ct. App. Sept. 23, 2004); Williams v. Smith, 348 S.E.2d 50, 52 (Ga. App. Ct. 1986); Alpha Gulf Coast, Inc. v. Jackson, 801 So. 2d 709, 720 (Miss. 2001); Spears v. Albertson's Inc., 848 So. 2d 1176, 1177 (Fla. Dist. Ct. App. 2003); Crown Cent. Petroleum Corp. v. Williams, 679 So. 2d 651, 653 (Ala. 1996) (citing ALA. CODE § 6-5-170 (1975)); Frazier v. Strobel, No. 19117, 2002 WL 31431546, at *1 (Va. Cir. Ct. Apr. 19, 2002).

Parcel Serv., Inc., 749 F. Supp. 1344, 1367 (D.N.J. 1990) (quoting Earl v. Winne, 101 A.2d 535 (N.J. 1953)). Earl explains:

> The essential thing is the constraint of the person. This constraint may be caused by threats as well as by actionable force, and the threats may be by conduct or by words. If the words or conduct are such as to induce a reasonable apprehension of force and the means of coercion is at hand, a person may be as effectually restrained and deprived of liberty as by prison bars.

101 A.2d at 539.

Physical force does not amount to an actionable restraint if there is a safe avenue of escape through an exit, but in the absence of a "reasonable means of escape," there may be an actionable restraint. See Richardson v. Costco Wholesale Corp., 160 F. Supp. 2d 56, 61-62 (D. Conn. 2001) (citing RESTATEMENT (SECOND) OF TORTS § 36 (1965)). According to the Restatement, walking through an emergency exit door is a reasonable means of escape even if such exit sounds off an alarm, but requiring an individual to use an exit that would cause material damage to the person's clothing, would constitute an unreasonable method of escape.

In order for allegations of threats of force to support a claim for false imprisonment, the threat of force must be sufficient for a person to be placed in reasonable apprehension of force, in order to state a claim. For example, the fact that an alarm might sound if a plaintiff exits through an employee exit, or that there is moral pressure, or that one's job is being threatened, is not sufficiently adequate to constitute an actionable constraint by threat of force. Id.

Plaintiffs' claim of false imprisonment appears to be rooted in their allegation that some of them were locked into their stores during their shifts, as part of a widespread practice and

Tags

policy – against their will.[31]  (RAC ¶ 92.)  While the matters of public record, such as published news articles on this alleged policy are not undisputed, this Court, at this stage of the proceedings, must grant all reasonable inferences in favor of Plaintiffs, the non-moving party. See, e.g., Steven Greenhouse, Workers Assail Night Lock-ins by Wal-Mart, N.Y. Times, January 18, 2004, at A1 (stating that "[f]or more than 15 years, Wal-Mart Stores, Inc., the world's largest

---

[31] As stated earlier, Plaintiffs allege that some of them were threatened with deportation. Setting aside the fact that these threats allegedly came from Wal-Mart contractors, these alleged threats are proffered in support of their claim that Wal-Mart was involved in a pattern of racketeering activity that involved involuntary servitude (not in support of their claim for false imprisonment).  (RAC ¶ 47.)  Nevertheless, the parties briefed the issue of whether or not the alleged threats of deportation are sufficient to state a claim for false imprisonment.

Although there are few cases construing the import of threats of deportation to a false imprisonment claim, courts have considered such threats in the context of claims of involuntary servitude, and both parties in the instant matter, to some degree, borrowed upon the concepts developed in this area of the case law in their briefs and argument with respect to whether Count 5 should be dismissed.

In this Court's view, the authority is not decisive, one way or the other, in this matter. The Supreme Court has stated that "it is possible that threatening . . . an immigrant with deportation could constitute the threat of legal coercion that induces involuntary servitude, even though such a threat made to an adult citizen of normal intelligence would be too implausible to produce involuntary servitude."  See Kozminski, 487 U.S. at 947, 949 (citing with approval Shackney, 333 F.2d at 486, which held that "[w]hile a credible threat of deportation may come close to the line, it still leaves the employee with a choice, and we do not see how we could fairly bring it within § 1584 without encompassing other types of threat").  Of course, Kozminski ultimately concluded that psychological coercion was insufficient to establish a claim of involuntary servitude. Id. at 949.  Subsequently, the Victims of Trafficking and Violence Protection Act of 2000 added 18 U.S.C. § 1589 to the involuntary servitude provisions, making it a crime for anyone to obtain the labor of another "by means of any scheme . . . intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."  See United States v. Bradley, 390 F.3d 145, 150 (1st Cir. 2004) vacated, 125 S. Ct. 2543 (2005) (stating that "section 1589 was intended expressly to counter United States v. Kozminski").  By reaching the intent to cause a particular subjective belief in the victim, section 1589 may be based on conduct that amounts to psychological coercion, a proposition that the Court had rejected in Kozminksi.  The relevance of these authorities is limited, at best, in the instant case.  Plaintiffs have argued, but not alleged, threats amounting to psychological coercion in support of their false imprisonment claim.

63

retailer, has locked in overnight employees at some of its Wal-Mart . . . stores" but also stating that, according to Wal-Mart, the lock-ins "secure these stores just as any other business does that has any employees working overnight"); see also W. Penn Power Co., 147 F.3d at 259; see also 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1357 (2d ed. 1990) (stating that courts deciding Rule 12(b)(6) motions may consider matters of public record).   Accordingly, based on the allegations and granting all reasonable inferences therefrom in favor of Plaintiffs, Defendant's motion to dismiss Count 5 is denied.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss the complaint is granted as to Counts 1, 2 and 3, and denied as to Counts 4 and 5.   Counts 1 and 2 shall be dismissed without prejudice, and Plaintiffs shall have the opportunity to amend these claims, if they so choose, within 45 days of the entry of this Opinion.   Count 3 shall be dismissed with prejudice.


DATED:  October 7, 2005

S/Joseph A. Greenaway, Jr.
JOSEPH A. GREENAWAY, JR., U.S.D.J.