James L. Linsey
Thomas N. Ciantra
Oriana Vigliotti
COHEN, WEISS AND SIMON LLP
330 West 42nd Street
New York, New York 10036
(212) 563-4100

Gilberto Garcia
Mary Ann Kricko
GARCIA AND KRICKO
ATTORNEYS AT LAW
560 Sylvan Avenue
Englewood Cliffs, NJ 07632
(201) 894-1998

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

---------------------------------------------------------------- x
                                            :

| | |
|---|---|
| VICTOR ZAVALA, EUNICE GOMEZ, ANTONIO FLORES, OCTAVIO DENISIO, HIPOLITO PALACIOS, CARLOS ALBERTO TELLO, MAXIMINO MENDEZ, ARTURO ZAVALA, FILIPE CONDADO, LUIS GUTIERREZ, DANIEL ANTONIO CRUZ, PETR ZEDNEK, TERESA JAROS, JIRI PFAUSER, HANA PFAUSEROVA, PAVEL KUNC and MARTIN MACAK, on behalf of themselves and all others similarly situated, | Civil Action No. 03-Civ.-5309 (JAG) |

                                 Plaintiffs, :

                - against - :

WAL-MART STORES, INC., :

                            Defendant. :

---------------------------------------------------------------- x

**SECOND AMENDED
CLASS ACTION
COMPLAINT AND
JURY DEMAND**

## SECOND AMENDED CLASS ACTION
## COMPLAINT AND JURY DEMAND

Plaintiffs Victor Zavala, Eunice Gomez, Antonio Flores, Octavio Denisio, Hipolito Palacios, Carlos Alberto Tello, Maximino Mendez, Arturo Zavala, Filipe Condado, Luis Gutierrez, Daniel Antonio Cruz, Petr Zednek, Teresa Jaros, Jiri Pfauser, Hana Pfauserova, Pavel Kunc and Martin Macak, on behalf of themselves and all others similarly situated, by and through their attorneys Cohen, Weiss and Simon LLP, and Garcia and Kricko, for their Second Amended Class Action Complaint state as follows:

## INTRODUCTION

1.      This is an action by plaintiffs on their own behalf and on behalf of all others similarly situated under the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961, *et seq*., the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §201, *et seq*., and the common law of false imprisonment to seek redress for damages directly caused by the exploitative criminal enterprise created by defendant Wal-Mart Stores, Inc. ("Wal-Mart") who, acting in combination with its various janitorial contractors, systematically violated immigration and protective wage and hour laws and other laws for its own profit and benefit.

2.      Beginning in no later than March 1997, senior Wal-Mart management, realizing that Wal-Mart could substantially reduce costs and substantially increase profits were it to rely on the labor of undocumented migrants to clean its thousands of stores, created a criminal enterprise that involved conspiracies to violate, as well as substantive violations, of federal immigration law and other laws.  Because of their undocumented status, migrants are unable to organize themselves collectively to demand lawful compensation and humane working

conditions.  And because basic janitorial labor is largely unskilled, undocumented migrant janitors are easily replaceable.  For these reasons, undocumented migrants are readily and easily exploited by unscrupulous employers.

3.     The federal Immigration Reform and Control Act, 8 U.S.C. §1324 *et seq*., ("IRCA") and accompanying regulations, require employers to verify, under penalty of perjury, that they have examined documents produced by each employee which establish the individual's authorization for employment in the United States.  To avoid and evade responsibility under IRCA and to profit from illegal activity, Wal-Mart created an association-in-fact criminal enterprise, through which it conspired with various cleaning contractors who it knew would provide janitors to clean its stores who were not legally authorized to work in the United States.  These migrants worked well in excess of 40 hours a week and received no overtime compensation.  In some cases migrants were paid less than the minimum wage.  To shield its reliance on undocumented labor, Wal-Mart senior management instructed and encouraged contractors to create a web of alter ego companies that permitted Wal-Mart to continue to do business with the principals and allowed the migrant hiring scheme to flourish despite repeated law enforcement actions.  The contractors did so, associating with Wal-Mart in the enterprise.  Wal-Mart well knew and intended that maintenance contractors it relied upon routinely and systematically encouraged, harbored and transported unlawful migrant labor in violation of IRCA, and Wal-Mart itself both aided and abetted the encouraging, transporting and harboring of its contractors and committed certain such offenses as a principal.

4.     This action is directed at compensating plaintiffs for the harm caused to them by this criminal enterprise.

## JURISDICTION AND VENUE

5.      This Court's jurisdiction is based upon 28 U.S.C. §§1331 and 1337; 29 U.S.C. §216(b); 18 U.S.C. §1964(c), and applicable principles of supplemental jurisdiction under 28 U.S.C. §1367(a).

6.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§1391(b) and (d) and 18 U.S.C. §1965.

## THE PARTIES

### Plaintiffs And Class Representatives

7.      Plaintiffs Victor Zavala, Eunice Gomez, Antonio Flores, Octavio Denisio, Hipolito Palacios, Carlos Alberto Tello, Maximino Mendez, Arturo Zavala and Filipe Condado are (or were at material times) residents of the State of New Jersey and are nationals of Mexico.  Plaintiffs Luis Gutierrez and Daniel Antonio Cruz are (or were at material times) residents of the State of Texas and nationals of Mexico.  Plaintiff Petr Zednek was at material times a resident of the States of Connecticut, Michigan, Georgia and other states and is a national of the Czech Republic.  Plaintiff Teresa Jaros was at material times a resident of the States of Connecticut, Michigan, Georgia and other states and is a Polish national.  Plaintiffs Jiri Pfauser and Hana Pfauserova were at material times residents of Florida and nationals of the Czech Republic.  Plaintiff Martin Macak was at material times a resident of Virginia and a national of Slovakia.  Plaintiff Pavel Kunc was at material times a resident of Virginia and is a Czech national.  These plaintiffs (the "Class Representatives") seek to represent a class consisting of thousands of undocumented and recently documented immigrants, currently, formerly, or in the future to be, employed as janitors to clean Wal-Mart stores.  Each of the Class Representatives

3

worked for Wal-Mart through one or more of its various co-employer maintenance contractors without legal authorization to do so under federal immigration law.  At material times, plaintiffs Victor Zavala, Eunice Gomez, Antonio Flores, Octavio Denisio, Hipolito Palacios, Carlos Alberto Tello, Maximino Mendez, Arturo Zavala and Filipe Condado were employed within the jurisdiction of this Court.

       8.      Victor Zavala is a native of Mexico and at material times a resident of New Jersey.  He was born on May 9, 1975 and speaks little or no English.  On October 23, 2003, as part of its investigation dubbed "Operation Rollback", Zavala was arrested in a raid by U.S. Immigration Control and Enforcement ("USICE"), the successor agency to the Immigration and Naturalization Service ("INS"), at the Wal-Mart store located in Piscataway, New Jersey.  Zavala has been granted deferred action status from deportation by USICE.  He performed cleaning services for Wal-Mart for approximately 36 months.  During that time, he was paid weekly a lump sum of approximately $500 and was obligated to work seven days a week.  He worked at least 60 hours per week but did not receive overtime pay.  Wal-Mart management locked him in the store at night, and he was not able to leave unless and until a Wal-Mart manager appeared with a key.  Zavala was not provided with workers' compensation, health insurance coverage, sick leave pay, or disability benefits and did not have payroll taxes withheld from his pay.

       9.      Eunice Gomez is a native of Mexico and at material times a resident of New Jersey.  She was born on August 30, 1977 and speaks little or no English.  Gomez was arrested in USICE's October 23, 2003 raid of the Wal-Mart store in Old Bridge, New Jersey and has been granted deferred action status from deportation by USICE.  Gomez performed cleaning services for Wal-Mart for 29 months.  She was paid weekly a lump sum of approximately $500

and was obligated to work seven days a week. She worked at least 60 hours per week but did not receive overtime pay. Wal-Mart management locked her in the store at night, and she was not able to leave unless and until a Wal-Mart manager appeared with a key. Gomez was not provided with workers' compensation or health insurance coverage, sick leave pay, or disability benefits and did not have payroll taxes withheld from her pay.

10.     Antonio Flores is a native of Mexico and at material times a resident of the State of New Jersey. He was born on June 13, 1978 and speaks little or no English. Flores was arrested in USICE's October 23, 2003 raid in Piscataway, New Jersey and was granted deferred action status from deportation by USICE but has now returned to this native town of Atlixco, Puebla, Mexico. Flores performed cleaning services for Wal-Mart for the 24 months preceding his arrest at Wal-Mart stores in New Jersey. He was paid weekly a lump sum of approximately $400 and was obligated to work seven days a week. He worked at least 60 hours per week but did not receive overtime pay. Wal-Mart management locked him in the store at night, and he was not able to leave unless and until a Wal-Mart manager appeared with a key. On one occasion, Flores, a diabetic, cut his hand severely while working at a Wal-Mart store, but because he was locked in, he was forced to wait until the next morning to seek necessary medical attention at a hospital. Flores did not have workers' compensation or health insurance benefits, was not entitled to receive sick leave disability benefits, and did not have payroll taxes withheld from his pay.

11.     Octavio Denisio is a native of Mexico and at material times a resident of New Jersey. He was born on November 11, 1984 and speaks little or no English. Denisio was arrested in USICE's October 23, 2003 raid of the Wal-Mart store in Old Bridge, New Jersey and

has been granted deferred action status from deportation by USICE.  Denisio performed cleaning services for Wal-Mart during the time period relevant to this lawsuit.  Denisio was paid weekly a lump sum of approximately $350 and was obligated to work seven days a week.  He worked at least 60 hours per week but did not receive overtime pay.  Wal-Mart management locked him in the store at night, and he was not able to leave unless and until a Wal-Mart manager appeared with a key.  Denisio was not provided with workers' compensation or health insurance coverage, sick leave pay or disability benefits and did not have payroll taxes withheld from his pay.

　　　　12.　　　Hipolito Palacios is a native of Mexico and at material times a resident of New Jersey.  He was born on August 13, 1979 and speaks little or no English.  Palacios was arrested in USICE's October 23, 2003 raid of the Wal-Mart store located in Piscataway, New Jersey and is presently in deportation proceedings.  Palacios performed cleaning services for Wal-Mart for 42 months during the time period relevant to this lawsuit.  He was paid weekly a lump sum of approximately $350 and was obligated to work seven days a week.  He worked at least 60 hours per week but did not receive overtime pay.  Wal-Mart management locked him in the store at night, and he was not able to leave unless and until a Wal-Mart manager appeared with a key.  Palacios was not provided with workers' compensation or health insurance coverage, sick leave pay or disability benefits and did not have payroll taxes withheld from his pay.

　　　　13.　　　Carlos Alberto Tello is a native of Mexico and at material times a resident of New Jersey.  He was born on September 9, 1979 and speaks little or no English.  Tello was arrested in USICE's October 23, 2003 raid of the Wal-Mart store in Old Bridge, New Jersey and has been granted deferred action status from deportation by USICE.  Tello has now returned to his native Mexico.  Tello performed cleaning services for Wal-Mart for one year

prior to his arrest.  He was paid weekly in a lump sum of $350 and was obligated to work seven days a week.  He worked at least 60 hours per week but did not receive overtime pay.  Wal-Mart management locked him in the store at night, and he was not able to leave unless and until a Wal-Mart manager appeared with a key.  Tello was not provided with workers' compensation or health insurance coverage, was not provided with sick leave or disability insurance coverage and did not have payroll taxes withheld from his pay.

14.     Maximino Mendez is a native of Mexico and at material times a resident of New Jersey.  He was born on May 11, 1984 and speaks little or no English.  Mendez was arrested in USICE's October 23, 2003 raid of the Wal-Mart store in Old Bridge, New Jersey and has been granted deferred action status from deportation by USICE.  Mendez performed cleaning services for Wal-Mart for one year prior to his arrest.  He was paid weekly in a lump sum of approximately $350 and was obligated to work seven days a week.  He worked at least 60 hours per week but did not receive overtime pay.  Wal-Mart management locked him in the store at night, and he was not able to leave unless and until a Wal-Mart manager appeared with a key.  Mendez did not have workers' compensation or health insurance coverage, was not provided with sick leave pay or disability benefits and did not have payroll taxes withheld from his pay.

15.     Arturo Zavala is a native of Mexico and at material times a resident of New Jersey.  He was born on February 10, 1974.  Zavala was arrested in USICE's October 23, 2003 raid of the Wal-Mart store in Old Bridge, New Jersey and has returned to his native Mexico.  He performed cleaning services for Wal-Mart for two months prior to his arrest.  Zavala was paid weekly in lump sum of $350 and was obligated to work seven days a week.  He worked at least 60 hours per week but did not receive overtime pay.  Wal-Mart management

7

locked him in the store at night, and he was not able to leave unless and until a Wal-Mart manager appeared with a key.  Zavala did not have workers' compensation or health insurance benefits, was not entitled to receive sick leave or disability benefits and did not have payroll taxes withheld from his pay.

16.     Felipe Condado is a native of Mexico and at material times a resident of New Jersey.  He was born on April 20, 1974 and speaks little or no English.  Condado was arrested in USICE's October 23, 2003 raid of the Wal-Mart store in Old Bridge, New Jersey and has been granted deferred action status from deportation by USICE.  Condado performed cleaning services for Wal-Mart for six months prior to his arrest.  He was paid weekly a lump sum of $350 and was obligated to work seven days a week.  Wal-Mart management locked him in the store at night, and he was not able to leave unless and until a Wal-Mart manager appeared with a key.  He worked at least 60 hours per week but did not receive overtime pay.  Condado did not have workers' compensation or health insurance benefits, was not entitled to receive sick disability benefits and did not have payroll taxes withheld from his pay.

17.     Plaintiffs Victor Zavala, Gomez, Flores, Denisio, Palacios, Tello, Mendez, Zavala and Condado worked for Wal-Mart through a variety of shell companies owned or controlled by Kenneth Clancey or members of his immediate family.  These entities included Facility Solutions Incorporated; Facility Solutions International, Mitchell Industries, LLC; Ruth and Sons LLC; JWM Commercial Cleaning; and RT Cleaning.

18.     Luis Gutierrez is a native of Mexico and at material times a resident of Texas.  He speaks little or no English.  His immigration status is that of an undocumented alien who may be subject to deportation from the United States at the initiative of USICE.  Gutierrez

was arrested in USICE's October 23, 2003 raid of a Wal-Mart store in San Antonio, Texas, and

is presently released under his own recognizance.  He has performed cleaning services at various

Wal-Mart stores in San Antonio, Round Rock, Cedar Park, Marble Falls and Kerrville, Texas,

beginning in November 2001 and continuing through December 2003.  He was paid weekly a

lump sum of $500 and was obligated to work at least six days a week and often seven days a

week.  He worked at least 48 hours per week but did not receive overtime pay.  Gutierrez did not

have workers' compensation or health insurance benefits, was not entitled to receive sick leave

or disability benefits and did not have payroll taxes withheld from his pay.

19.     Daniel Antonio Cruz is a native of Mexico and at material times a

resident of Texas.  He speaks little or no English.  His immigration status is that of an

undocumented alien who may be subject to deportation from the United States at the initiative of

USICE.  Cruz was arrested in USICE's October 23, 2003 raid of a Wal-Mart store in San

Antonio, Texas, and is presently released under his own recognizance.  He performed cleaning

services at Wal-Mart stores in San Antonio beginning in May 2003 and continuing through

December 11, 2003.  He was paid weekly a lump sum of $325 and was obligated to work seven

days a week.  He worked approximately 60 hours per week but did not receive overtime pay.

Cruz was not provided with workers' compensation or health insurance coverage, sick leave pay

or disability benefits and did not have payroll taxes withheld from his pay.

20.     Plaintiffs Gutierrez and Cruz worked for Wal-Mart through firms owned

or controlled by Tom Parker.  These included Alamo National Service and Alamo Cleaning

Services, Inc.

21.     Petr Zednek is a national of the Czech Republic and at material times a

9

resident of Connecticut, Michigan, Georgia and other states.  He speaks little English.  Zednek

performed cleaning services at Wal-Mart stores in Bristol, Connecticut; Alma, Michigan; and

Monroe, Georgia at times between September 2002 and December 2003.  His immigration status

is that of an undocumented alien who may be subject to deportation from the United States at the

initiative of USICE.  He was promised compensation of approximately $1,500 per month and

was obligated to work seven days a week.  He worked approximately 70 hours per week but did

not receive overtime pay.  In Alma, Michigan, Zednek's contractor refused to pay him in

retaliation for his refusal to purchase a fraudulent social security number from the contractor.  In

addition, one of his paychecks (for $1,492) was returned for "insufficient funds," and he was not

paid at all for that month's work.  Wal-Mart management in Michigan and Georgia knew of this

situation and of Zednek's undocumented status yet continued to use him to clean their stores.

While working as a janitor at Wal-Mart, he was repeatedly abused and told that he could be

deported if he complained.  Except for only five days when the store at Alma, Michigan was

open 24 hours per day for the Christmas holiday season, Zednek was locked in at night at all of

the Wal-Mart stores where he worked, and could not leave unless and until a Wal-Mart manager

appeared with a key.  Zednek was not provided with workers' compensation or health insurance

coverage, sick leave pay or disability benefits and did not have payroll taxes withheld from his

pay.

　　　　　22.	Teresa Jaros is a Polish national and at material times a resident of

Connecticut, Michigan, Georgia and other states.  She speaks little or no English.  Her

immigration status is that of an undocumented alien who may be subject to deportation from the

United States at the initiative of USICE.  Jaros performed cleaning services at Wal-Mart stores in

10

Bristol, Connecticut; Alma, Michigan; and Monroe, Georgia at times between September 2002 and December 2003.  She was promised compensation of $1,500 per month and was obligated to work seven days a week.  She worked approximately 70 hours per week but did not receive overtime pay.  In Alma, Michigan, Jaros' contractor refused to pay her in retaliation for her refusal to purchase a fraudulent social security number from the contractor.  Also, one of her paychecks (for $1,306.40) was returned for "insufficient funds," and she was not paid at all for that month's work.  Wal-Mart management in Michigan and Georgia knew of this situation and Jaros' undocumented status yet continued to use her to clean in their stores.  While working as a janitor at Wal-Mart, Jaros was repeatedly abused and told that she could be deported if she complained.  Except for only five days when the Wal-Mart store at Alma, Michigan, was open for 24 hours per day for the holiday season, Jaros was locked in at night at all of the Wal-Mart stores where she worked, and could not leave unless and until a Wal-Mart manager appeared with a key.  Jaros did not have workers' compensation or health insurance benefits, was not entitled to receive sick leave or disability benefits and did not have payroll taxes withheld from her pay.

23.    Plaintiffs Zednek and Jaros worked for Wal-Mart through a variety of firms including: Daniel's Cleaning Service; SCSI or Southern Cleaning Services Inc.; United Services Sources; Proline Management, Inc.; KK Unlimited, and Kina Cleaning.

24.    Jiri Pfauser is a national of the Czech Republic and was at material times a resident of Florida.  He speaks little or no English.  His immigration status at material times was that of an undocumented alien who may be subject to deportation from the United States at the initiative of USICE.  Pfauser performed cleaning services at Wal-Mart stores in Starkville,

Mississippi and West Palm Beach, Florida at times between February 2001 and June 2002. He was promised compensation of $1,500 per month and was obligated to work seven days a week. He worked a minimum of 56 hours per week but did not receive overtime pay. He was required to pay a "security deposit" of $500 to ensure that he did not leave his work at Wal-Mart without permission. He was never paid this $500 nor was he paid at all for six weeks' work at Wal-Mart in May and June, 2002. Pfauser did not have workers' compensation or health insurance benefits, was not entitled to receive sick leave or disability benefits and did not have payroll taxes withheld from his pay.

25.     Hana Pfauserova is a national of the Czech Republic and was at material times a resident of Florida. She speaks little or no English. Her immigration status was at material times that of an undocumented alien who may be subject to deportation from the United States at the initiative of USICE. Pfauserova performed cleaning services at Wal-Mart stores in Starkville, Mississippi and West Palm Beach, Florida at times between February 2001 and June 2002. She was promised compensation of $1,400 per month and was obligated to work seven days a week. She worked a minimum of 56 hours per week but did not receive overtime pay. She was required to pay a "security deposit" of $500 to ensure that she did not leave her work at Wal-Mart without permission. She was never paid this $500 nor was she paid at all for six weeks' work at Wal-Mart in May and June, 2002. Pfauserova did not have workers' compensation or health insurance benefits, was not entitled to receive sick leave or disability benefits and did not have payroll taxes withheld from her pay.

26.     Pfauser and Pfauserova worked at Wal-Mart through an individual named Walter Budniak.

27.     Martin Macak is a national of Slovakia and at material times a resident of Virginia.  He speaks little or no English. Between 1996 and October 23, 2003 he was a resident of the United States and performed cleaning services at Wal-Mart stores in Winchester, Alexandria and Sterling, Virginia.  At relevant times until he was arrested in USICE's October 23, 2003 raid of the Wal-Mart store in Sterling, Virginia, Macak's status was that of an undocumented alien subject to deportation from the United States at the initiative of USICE.  On October 23, 2003 he was arrested and given a notice to appear by USICE and is presently released upon his own recognizance.  He was promised compensation of between $1,300 and $2,000 per month for his work at Wal-Mart and was obligated to work seven days a week.  He worked approximately 56 hours per week but did not receive overtime pay.  In approximately 1999, one of Macak's janitor co-workers, also from Slovakia and an undocumented migrant, was summarily fired on false charges of misconduct by Chuck Richards, the Wal-Mart store manager in Winchester, Virginia.  Richards ordered Macak's co-worker to stop work immediately and permanently leave the Wal-Mart store and parking lot within 60 seconds' time.  Macak did not have workers' compensation or health insurance benefits, was not entitled to receive sick leave or disability benefits and did not have payroll taxes withheld from his pay.  Macak worked at Wal-Mart through a variety of cleaning contractors:  Crystal Clear; Handy Man Cleaning Service; Floor Magi; and Bright Management.

28.     Pavel Kunc is a national of the Czech Republic and was at material times a resident of Virginia.  He speaks little or no English.  Between February 2003 and October 23, 2003 he was a resident of the United States and performed cleaning services at a Wal-Mart store in Madison Heights, Virginia.  At relevant times until he was arrested in

USICE's October 23, 2003 raid of the Wal-Mart store in Madison Heights, Virginia, Kunc's status was that of an undocumented alien subject to deportation from the United States at the initiative of USICE. His employment at Wal-Mart was arranged for him in the Czech Republic before his entry to the United States. He was promised compensation of approximately $1,500 per month and was obligated to work seven days a week. Sometimes he did not receive any pay at all for as much as one month's work. He worked approximately 70 hours per week but did not receive overtime pay. One of Kunc's co-workers, also undocumented, specifically advised the Wal-Mart store manager that the cleaners, including Kunc, did not have work authorization. Despite this knowledge, the Wal-Mart store manager continued using Kunc and the others to clean the Wal-Mart store. Kunc did not have workers' compensation or health insurance benefits, was not entitled to receive sick leave or disability benefits and did not have payroll taxes withheld from his pay.

**Defendant**

29.      Wal-Mart is a corporation formed under the laws of the State of Delaware with its principal corporate offices in Bentonville, Arkansas. Wal-Mart has aggressively followed a low-cost, labor-hostile, high-volume sales strategy that has led it to become the largest employer in the United States and the largest retailer in the world. Wal-Mart operates thousands of stores in all fifty states, including locations where Class Representatives and other members of the plaintiff class were employed.

## CLASS ACTION ALLEGATIONS

30.      Class Representatives bring this action for back pay, damages, including treble and punitive damages, injunctive, declaratory and other relief on their own behalf and on

behalf of a class comprised of immigrant janitors who have been, are, or will be employed as janitors at Wal-Mart stores in the United States and who were denied the wages, benefits or other protections to which they are entitled by law.  In addition, Victor Zavala, Eunice Gomez, Antonio Flores, Octavio Denisio, Hipolito Palacios, Carlos Alberto Tello, Maximino Mendez, Arturo Zavala, Felipe Condado, Petr Zednek and Teresa Jaros (Subclass Representatives) bring this action on behalf of a subclass comprised of all class members who were falsely imprisoned or otherwise confined by Wal-Mart and its agents' widespread practice of locking employees inside Wal-Mart stores while they worked.

31.     The size of the class makes a class action both necessary and efficient. The class consists of thousands of immigrant janitors employed at Wal-Mart stores throughout the United States and an indefinite number of immigrant janitors who were employed or are to be employed in Wal-Mart stores.  The size of the subclass is unknown but, on information and belief, consists of at least one hundred janitors.  Members of the class and subclass are ascertainable but are so numerous as to make joinder inherently impossible.

32.     This case involves common questions of law and fact affecting the rights of all class members, including but not limited to:  (a) the status of plaintiffs as employees of Wal-Mart under applicable federal laws; (b) whether Wal-Mart employed plaintiffs or suffered or permitted plaintiffs to be employed in its retail stores; (c) whether Wal-Mart formed an association-in-fact criminal enterprise with its maintenance contractors to exploit plaintiffs; (d) whether Wal-Mart and its contractors participated in the affairs of that criminal enterprise by committing predicate acts of racketeering and; (f) the relief necessary to remedy Wal-Mart's unlawful conduct as alleged in this Second Amended Complaint.

15

33.     The claims of the Class Representatives are typical of the claims of the class as a whole.  Wal-Mart's illegal wage and labor practices alleged in this Second Amended Complaint concerning the named plaintiffs are typical of the practices that Wal-Mart applies to class members nationwide.  The claims of the Subclass Representatives are typical of the claims of the subclass as a whole.  The policy and practice of locking these employees in at Wal-Mart Stores has had a detrimental effect on other members of the subclass nationwide.

34.     The Class and Subclass Representatives can adequately and fairly represent the interests of the class and subclass as defined above, because their individual interests are consistent with, not antagonistic to, the interests of the class and subclass.

35.     Counsel for plaintiffs possess the requisite resources and ability to prosecute this case as a class action and are experienced labor and employment attorneys who have successfully litigated other cases involving similar issues.

36.     Wal-Mart and its contractors have implemented a scheme and associated to form an enterprise which is generally applicable to the plaintiff class, making it appropriate to issue final injunctive relief and corresponding declaratory relief with respect to the class as a whole.  Class certification is also appropriate because the common questions of law and fact predominate over any questions affecting only individual members of the class.  Further, the prosecution of separate actions against Wal-Mart by individual class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Wal-Mart.  For all these and other reasons, a class action is superior to other available methods for the fair and efficient adjudication of the controversy set forth in this Second Amended Complaint.

## FACTUAL BASIS FOR CLAIMS

### Wal-Mart's Role as Employer

37.     At all material times Wal-Mart acted as an employer or joint employer of its janitorial services personnel, including plaintiffs and the class they represent, within the meaning of FLSA §3(d), 29 U.S.C. §203(d), and 29 C.F.R. §791.2, and federal immigration law. Wal-Mart exercised meaningful control over the work performed by plaintiffs; the hiring and firing of plaintiffs; the amount paid to them as wages; their hours and working conditions; and the tasks they performed, including quality and quantity standards, speed, scheduling and sequence.  Wal-Mart required plaintiffs to perform work that is an integral part of Wal-Mart's business, such that all members of the class are or were dependent upon Wal-Mart as a matter of economic reality.  Indeed, Wal-Mart controlled the hours and working conditions of members of the subclass to such a degree that it locked these janitors in the stores during their work hours until their shifts were over and frequently longer.  Wal-Mart, together with the contractors, shared the power to set the plaintiffs' wages and determine their working conditions and jointly reap the benefits from the underpayment of plaintiffs' wages and non-compliance with other statutory provisions governing their employment.  Wal-Mart dictates the price it will pay associated contractors for janitorial services; these prices are set below the amount Wal-Mart would expect to pay were it to employ the janitors directly and to meet all wage and hour, tax, workers' compensation and other employment-related costs and even lower because sub-contractors have to make a profit.

38.     Thus, Wal-Mart retains control over the essential elements of the employment relationship, namely the power to hire and fire, the direction of personnel in the

tasks they are to perform, the standards of their performance and the hours and terms of their work.

39.     Moreover, the work of the janitors is integral to Wal-Mart's retail operations and was traditionally performed by direct employees until Wal-Mart embarked upon the criminal scheme to exploit the labor of undocumented workers.  Maintenance is coordinated with Wal-Mart's sales operations and other necessary functions such as merchandising and related stock functions.  Wal-Mart is aware of the number of man-hours necessary to clean its facilities to its standards, the staffing levels, the hours worked by the plaintiffs on their premises, and of the number of janitors employed at each location to do so.  This knowledge comes in part from first-hand supervision and observation by on-site managers and in part based on per-square foot payroll costs of direct janitorial employees.  These costs are recorded and reported on a regular and periodic basis to Wal-Mart headquarters.

40.     The only commodity furnished to Wal-Mart by the contractors is plaintiffs' labor.  Since Wal-Mart and the contractors do not provide the plaintiffs with health, retirement, insurance, vacation, sick or bereavement benefits in connection with their employment, and do not withhold or remit social security or income taxes to federal and state governments, nearly all of the monies paid by Wal-Mart to the contractors goes to pay the plaintiffs, with the remainder profiting the contractors.  The amounts paid to the contractors for plaintiffs' labor were so low that Wal-Mart knew from this alone that the plaintiffs were routinely underpaid in violation of law.

**The Wal-Mart RICO Enterprise**

41.     Wal-Mart and various maintenance contractors identified in this Second Amended Complaint and others presently unknown to plaintiffs have created, engaged in and profited from a nationwide criminal enterprise which exploits the plaintiffs and those similarly-situated through wide-scale violation of protective federal and state labor and employment laws. Essential to the scheme is the systematic violation of federal law criminalizing the employment, encouragement, harboring and transporting of undocumented workers.  At material times various contractors were acting as co-conspirators or agents of Wal-Mart to pursue the scheme through an association-in-fact enterprise comprised of Wal-Mart and its various maintenance contractors (the "Wal-Mart Enterprise").  The Wal-Mart Enterprise secured and maintained, by illegal means, the labor of easily-exploitable immigrant janitors for the mutual profit and benefit of its constituents.  The participants in the Wal-Mart Enterprise conducted its affairs by employing, encouraging, harboring, and trafficking in the labor of the plaintiff immigrants, failing to pay their wages and overtime and benefits as required by federal and state law, and concealing their profits and practices from detection.  All of the acts of Wal-Mart and the contractors were in furtherance of this conspiracy and, in so acting, each contractor and Wal-Mart were acting within the scope of its agency and thus with the authorization of the others.

42.     The essential elements of the Wal-Mart Enterprise's activities are these. Wal-Mart has an on-going and, indeed, permanent need for maintenance services to clean the floors and other public spaces of its thousands of retail establishments.  Were Wal-Mart to hire its maintenance staff directly, it, at a minimum, would be required to comply with IRCA verification procedures as well as federal and state tax and labor laws.  The irreducible costs of lawful employment, however, can be avoided through sham contracting arrangements and

19

undocumented migrant labor.  Wal-Mart routinely made use of the labor of migrants unauthorized to work in the United States to perform necessary janitorial services at its stores nationwide.  Wal-Mart and the contractors targeted these migrants who speak little or no English, and have little or no money or mobility to escape work at Wal-Mart.  These workers come from across the globe and present a ready pool of easily exploited labor.  Driven by poverty and the lack of economic opportunities at home, they enter the United States where they become part of a labor force Wal-Mart has fostered and from which it benefits.  To facilitate and shelter the illegal employment of the undocumented janitors and to protect the financial gain from its practice of underpaying all janitors, Wal-Mart and its various contractors established the Wal-Mart Enterprise.

43.     The Wal-Mart Enterprise was established and directed as follows.  Wal-Mart is organized hierarchically in divisions, with Wal-Mart Stores comprising a division of the corporation responsible for Wal-Mart's Supercenter retail stores.  Each separate store has a manager and various assistant managers.  Several stores are grouped geographically into various districts with individual store managers reporting to a District Manager.  Districts are, in turn, organized into regions with District Managers reporting to Regional Vice Presidents.  Executives at the regional level report to Divisional Vice Presidents who operate from Wal-Mart's Bentonville, Arkansas headquarters.

44.     The Wal-Mart Enterprise was directed by Divisional Vice Presidents within the Wal-Mart Stores Division with responsibility for in-store cleaning and procurement of services.  As outlined *infra,* senior-level Wal-Mart executive Leroy Schuetz (Divisional Vice President of Operations in the Stores Division who worked from Wal-Mart's Bentonville

headquarters) directed maintenance contractors whom he and Wal-Mart knew were systematically relying upon the labor of undocumented migrants, to structure their business operations in multiple shell corporations so as to shield the continued employment of the migrants from detection.  Senior Wal-Mart executives Mark Schultz and Steven Bertschy knew of the scheme, supported it and permitted it to flourish.

45.     In 1997 federal agents conducted immigration raids at several Wal-Mart stores in the St. Louis, Missouri, area, arresting a number of undocumented migrant janitors employed through IMC, Inc. ("IMC").  IMC's principal was Christopher Walters.  At the time of the 1997 raids, IMC cleaned the majority of Wal-Mart's stores with crews comprised of aliens unauthorized to work in the United States.  In excess of one thousand undocumented migrants were then working in hundreds of Wal-Mart stores through IMC at the time of the 1997 raids. At the time, Wal-Mart also utilized (in different parts of the United States) maintenance contractors Enviro-Cleen,  a company based in Texas whose principal George Bingham had secured the initial outside cleaning contract for a Wal-Mart hypermarket in Texas; Building One Services, which was the largest contractor besides IMC; and Southern Cleaning.

46.     Immediately following the raids, in March 1997 Walters had a series of three telephone conversations with Schuetz.  Walters' discussions with Schuetz are outlined in the Affidavit of Patricia Mullin, Special Agent in Charge in the ASAC Philadelphia Office of USICE, which was executed in connection for an application for a warrant to search the Bentonville headquarters office of Steven Bertschy, a Wal-Mart Divisional Vice President with responsibility for services procurement (including maintenance contracts).  A copy of that affidavit is attached hereto as Exhibit A.  Walters was treated by the government as a

21

cooperating witness at times driving its investigation of Wal-Mart.  Walters and others have also

provided that same, and additional, information directly to plaintiffs' counsel here.

          47.      Schuetz was employed at Wal-Mart's Bentonville, Arkansas,

headquarters and exercised responsibility over Wal-Mart's in-store cleaning operations.  In a

telephone conversation immediately following the 1997 St. Louis raids (which Walters placed

from a mobile telephone while driving), Schuetz threatened that Wal-Mart would no longer deal

with IMC.  Because of his position in the Wal-Mart hierarchy, Schuetz exercised the effective

authority to terminate Walters' services as a Wal-Mart contractor.  Walters pleaded for Schuetz

to reconsider, arguing that he had invested considerable sums in his business which would be lost

if Wal-Mart terminated his services.  During this conversation Schuetz stated that he "like[d]

those Polocks" Walters provided as janitors at Wal-Mart's stores.  (Of course, Wal-Mart knew,

even independent of the 1997 law enforcement raids, that its stores were cleaned by

undocumented labor, as its cleaning crews were comprised of foreigners who spoke little or no

English, worked seven days a week and typically lived together in housing provided by the

maintenance contractor).  Schuetz told Walters that Wal-Mart would continue to use IMC if

Walters created and provided undocumented janitorial labor through different shell corporations

so that if one firm were caught using undocumented labor Wal-Mart could fire that company but

Walters could continue to supply the undocumented migrants to Wal-Mart through other front

companies.  As Schuetz explained, Walters should not place all of his eggs in one basket as Wal-

Mart would not do so.  Schuetz knew and intended that the use of the front companies would

shield the scheme and its profits from detection by law enforcement authorities.  Thus, Wal-Mart

and the contractors also encouraged the continued presence of the undocumented migrants in the

United States.  This was due both to the manipulation of the corporate form and because Wal-Mart previously determined not to independently verify whether personnel supplied through its contractors were authorized to work in the United States.

48.     Immediately following the 1997 raids, IMC received calls from a number of Wal-Mart store managers demanding that their cleaning crews be restaffed because of the arrests of their janitors.  IMC arranged for replacement crews, and it undertook to interview a number of the janitors who had been detained.  Shortly thereafter, Walters traveled to Bentonville and discussed the matter with Schuetz's immediate superior, Mark Schwartz.  At that time Schwartz was the Divisional Vice President in charge of all of Wal-Mart's Supercenter stores.  Schwartz was then Schuetz's superior at Wal-Mart.  Schwartz had been informed of the raids and the need to obtain replacement crews and told Walters that he did not want that information to "go downstairs."  Walters understood this to mean that Schultz did not want Wal-Mart's very top executives, including (among others) then-President and Chief Executive Officer David Glass, whose offices were on lower floors of the building, to be advised.

49.     But the information was not kept from "downstairs".  By at least 1999 Wal-Mart's Chief Executive Officer was aware of the scheme.  In November 1999, David Glass, then President and Chief Executive Officer of Wal-Mart and a member of its Board of Directors since 1977 (presently the Chairman of the Executive Committee of the Wal-Mart Board of Directors) was sent correspondence that advised him that one of Walters' sub-contractors, Stanislaw Kostek, had transported and sheltered undocumented migrants who were cleaning the Lexington, Virginia Wal-Mart store.  As discussed, *infra,* Kostek's company, CMS of Queensbury, was prosecuted and has plead guilty to various crimes committed with its work as a

23

Wal-Mart maintenance contractor.  That correspondence was written by Greta McCaughrin, a professor of Russian at Washington and Lee University in Lexington, Virginia, who had been called upon to translate for police who arrested two of the janitors for theft of merchandise from Wal-Mart.  A copy of that correspondence is attached hereto as Exhibit B.

50.    McCaughrin wrote to Glass telling him that the Lexington Wal-Mart store manager requested a replacement crew, that "five additional Russians and Georgians were put on a bus from NYC" to Lexington, that "all TEN Russians are now housed at the same apartment E-33 at Willow Springs" and that the apartment was "being rented out in the name of their New York 'boss' Mr. Kostek[.]"  Wal-Mart acknowledged receipt of McCaughrin's correspondence.  Wal-Mart did nothing to remedy the situation.  Instead, Wal-Mart hired a former employee of the Federal Bureau of Investigation to conduct an investigation of McCaughrin.

51.    Walters followed Wal-Mart's instructions and created a plethora of front companies through which he continued to supply Wal-Mart with the cleaning services of undocumented migrant janitors.  At times from 1997 those janitors have numbered in many thousands of unauthorized migrants at any given time.  Walters incorporated Comet Floor Care, Ironman Maintenance, Inc., Pinnacle Floor Care Associates, Inc., Pinnacle Floor Care System, Inc., Mercury Floor Maintenance, Inc., and Champion Floor Services, Inc. all on July 16, 1997. He incorporated American Floor Care Associates, Inc. on September 16, 1997.  Walters incorporated Precision Cleaning, Inc. on October 14, 1998.  He incorporated Champion Floor Care Associates, Inc., Comet Floor Care Associates, Ironman Maintenance Associates, Inc., National Cleaning Management, Inc., Pinnacle Floor Care Associates, Inc., Mercury Floor Care

24

Associates, Cleanmax Associates, and World Clean Associates all on December 14, 1998.  With

the knowledge and cooperation of Wal-Mart, Walters used separate postal service addresses for

these firms in an effort to shield their interrelationships.  Also with the knowledge and

cooperation of Wal-Mart, Walters made a practice of having multiple shell companies bid for the

same cleaning work and, on occasions, would use one of his shell companies to bid for work lost

by others.  These various firms were thus used as a vehicle to provide janitorial services to Wal-

Mart using the labor of undocumented migrants, including plaintiffs, in this action.

   52.  Thereafter, once the Wal-Mart Enterprise was established, Wal-Mart

managed the affairs of the enterprise as follows.  Headquarters management, specifically Schuetz

and Steven Bertschy, a Wal-Mart Divisional Vice President in charge of procurement for the

Wal-Mart Stores division, functioned in a supervisory capacity, acting directly themselves or

through subordinate Regional and District management to manage and control overall

maintenance contracting costs.  As outlined *infra,* Wal-Mart management periodically demanded

price concessions from maintenance contractors in an effort to reap even greater profits from the

operation of the Wal-Mart Enterprise.  As outlined elsewhere in this Second Amended

Complaint, management at the store level made arrangements with individual contracts (which in

many cases were not reduced to writing) and functioned to insure the undocumented janitorial

labor was supplied by the contractors and that it performed necessary maintenance to Wal-Mart's

specifications and demands.  Payment was made by Wal-Mart to the separate shell companies to

further shield the scheme from detection.

   53.  Beyond senior executives Schuetz, Schwartz and Bertschy, Wal-Mart

was well-aware of the inter-related nature of these firms.  For example, Walters' companies used

the same personnel interchangeably.  Thus, the very same personnel in Walters' sales staff interacted with Wal-Mart management on behalf of multiple contractors.  Wal-Mart's internal insurance department was aware (because the Walters' companies supplied the information) that all of Walters' various companies were covered by the very same insurance policies.  And as noted *infra,* Wal-Mart also knew that the Walters' controlled companies all used the same St. Louis bank, as Wal-Mart checks were consistently deposited or negotiated at this same bank.

54.     Thereafter, despite enforcement raids at multiple Wal-Mart stores in 2000 and 2001 that led to the detention of many janitors employed through Walters-controlled companies, Wal-Mart chose to continue its association with Walters through the various shell companies.

55.     Similarly, in New Jersey, Wal-Mart contractor Kenneth Clancey created and used multiple firms through which undocumented migrant labor was provided to clean Wal-Mart stores.  These entities include Facility Solutions Incorporated; Facility Solutions International, Mitchell Industries, LLC; Ruth and Sons LLC; JWM Commercial Cleaning; and RT Cleaning. On information and belief, while Clancey's companies served as Wal-Mart maintenance contractors, Clancey supplied in excess of 100 aliens unauthorized to work in the United States to Wal-Mart, including plaintiffs in this action.

56.     On information and belief, Wal-Mart similarly instructed or encouraged its other maintenance contractors to establish separate firms to provide undocumented janitorial labor, and they did so as well.  At this time the precise structure, operation and identity of each and every one of the many additional shell corporations and fronts used by the contractors in the scheme with Wal-Mart are known only by defendant and the contractors (and possibly federal

law enforcement officials in connection with their various investigations), and plaintiffs' counsel

was unable to obtain that information despite numerous interviews with named plaintiffs,

members of plaintiff class and others both in the United States and abroad.  Thus, complete

information on each and every one of the many additional shell companies will require some

discovery in this case.

57.     With the scheme established, Wal-Mart further sought to screen itself

from liability by permitting store managers to enter into contracts with maintenance contractors

covering their particular location.  In many cases these arrangements were not reduced to

writing, in others form arrangements supplied by Wal-Mart were used.  Copies of written

arrangements that were made were not typically provided to Wal-Mart headquarters.  But control

over the Wal-Mart Enterprise was maintained at the headquarters level as the underlying

economics of the relationship, the standards of contractor performance and the form agreements

(when used) were determined by Wal-Mart at the headquarters level.  Critically, on information

and belief, Wal-Mart approved contractors' invoices and paid all the various shell maintenance

companies from Bentonville.

58.     Wal-Mart paid the various front companies with the knowledge that the

monies paid constituted the proceeds of the illegal hiring, encouraging, harboring and

transporting of undocumented migrant labor.  Wal-Mart knew and intended (because of the inter-

relationship of the shell companies) that payments to the various corporate shells would

necessarily, in turn, engender multiple financial transactions between the shell corporations and

their principals.  Wal-Mart also knew that its payment of the proceeds of unlawful activity

through the multiple shell contractors would function to shield the operations of the Wal-Mart

Enterprise from detection by federal law enforcement authorities thus facilitating its

continuation.

59.     These decisions structuring the Wal-Mart Enterprise were made or

instigated by Shuetz and continued by Bertschy.  Bertschy moved into his position in charge of

procurement in either 2000 or 2001.  Wal-Mart placed minimal responsibility with individual

store managers to hire and supervise janitorial contractors.  Schuetz designed the Wal-Mart

Enterprise to function in this way (and Bertschy so continued it) to further shield Wal-Mart from

liability.  With the selection of contractors ostensibly made at the store level, Wal-Mart

management believed it would be able to claim (falsely), in the event of law enforcement action,

that the hiring of undocumented aliens was an unusual event attributable to the activities of a few

rogue managers.  In addition, with the use of multiple front companies, Wal-Mart would be able

to shield the aliens from detection because Wal-Mart could claim (falsely) that the

undocumented janitors were employed by a particular contractor.  Both factors were intended to

and did perpetuate the use of undocumented migrant labor that was the intent and goal of the

Wal-Mart Enterprise.

60.     Wal-Mart management at both the headquarters and store level were

aware that maintenance contractors who joined the Wal-Mart Enterprise systematically relied

upon and would in the future continue to rely upon, undocumented migrant labor that had been

encouraged to reside in the United States, and was transported and harbored by the contractors.

Indeed, their intent was to facilitate the employment of undocumented migrants unauthorized to

work in the United States.  As Shuetz told Walters in 1997, Wal-Mart "like[s] those Polocks"

who cleaned their stores at costs that could not possibly be matched by lawful labor.  Wal-Mart's

relentless desire to reduce costs led Wal-Mart senior management to structure the Wal-Mart

Enterprise through multiple contractors to evade IRCA verification requirements and to provide

a basis for false claims that Wal-Mart was unaware that it suffered or permitted undocumented

migrants to work as janitors in its stores.

    61. On April 23, 2003, Walters met with Bertschy at Bertschy's Wal-Mart

office in Bentonville, Arkansas.  At the time Bertschy had responsibility for floor maintenance at

Wal-Mart headquarters.  Their conversation was monitored and tape recorded by a federal law

enforcement agent who was present in an undercover capacity.  During that meeting Walters told

Bertschy "I mean, I know of at least 400 stores that have illegal aliens in them."  Bertschy

responded, "Don't repeat that."  Walters offered to remove the illegal aliens from Wal-Mart

stores where he knew them to be employed and quickly replace them with legal workers, but

Bertschy did not accept the offer.  Bertschy refused to do so because Wal-Mart financially

benefits from the use of illegal alien janitorial labor because paying for documented labor would

be far more expensive to Wal-Mart.

    62. At the same April 23, 2003 meeting described in paragraph 61 *supra*

Bertschy acknowledged that store managers were aware that their contract cleaning crews were

composed of unlawful aliens based on their reports to him.  Bertschy stated in that conversation

with Walters which was recorded and transcribed by federal agents:

> So, then the store managers say I've got eight people,
> they're here, seven days a week every night and I say to
> them, okay, you've got eight people and they're there seven
> nights a week and they're all living in the same apartment.
> You know how much their weekly pay is, and you know
> how many hours they're spending in your store.  Does it
> add up?  No, normally it doesn't because sub-contractors
> have taken advantage of people and families once they

come to the United States.

.   .   .   .

And they load them up into one or two apartments and they
take a family of five and pay them $1,000.00 a week, that's
probably a dollar an hour if they're there seven days a week
and they're not paying taxes because they're not getting
paid a fair rate compared to U.S. standards, then they start
stealing from the store to make up the difference.

This is reflected at pages 58 - 59 of Exhibit A.  Bertschy also complained during this

conversation that Wal-Mart wanted to eliminate the layer of sub-contractors that its maintenance

contractors had come to rely upon to shield themselves from detection.  If contractors could be

forced to curtail subcontracting, Bertschy indicated that Wal-Mart could further reduce its costs

for janitorial labor because then there would not be "so many companies making profit" off the

undocumented workforce.

63.      On May 21, 2003, Walters had a similar conversation with Schuetz in

Sumpter, South Carolina, at the opening of a Wal-Mart Supercenter there.  Wal-Mart assigned

Schuetz to preside over the grand opening festivities.  In their discussion, Walters told Schuetz,

as he earlier told Bertschy, that he knew of hundreds of stores where there were illegal aliens

working as janitors.  Walters offered to remove the illegal aliens from Wal-Mart stores where he

knew them to be employed and quickly replace them with legal workers, but Schuetz (like

Bertschy) did not accept the offer.  He refused Walters' offer for the same reason as Bertschy

refused:  Wal-Mart financially benefits from the use of illegal alien janitorial labor.

64.      In May 2002, following further law enforcement raids on April 10,

2002, Walters decided to shut down operations at his cleaning companies and go out of business.
Following the April raids, Walters' employees placed telephone calls to various Wal-Mart store
managers to advise them of the decision. Those telephone conversations were taped and
transcribed and excerpts from them appear at pages 49-55 of the Mullin Affidavit, attached
hereto as Exhibit A.

      65.      On April 26, 2002, Walters' employee Curt Fowler spoke with Terry
Williams the manager for the Wal-Mart store in Greensburg, Indiana. Fowler reminded
Williams that his cleaning crews were sub-contractors and that they no longer worked for IMC
or other Walters companies. Williams responded by stating: "You're all in one big, it's one big
racket. I'm not an idiot." Williams added: "I may be blond, but I'm not stupid[.]" and indicated
that he understood "a little about how it works 'cause one of my assistant managers married one
of the Russian floor crew, so she told me about how it works." Williams indicated that he had I-
9 forms for everyone in his crew and that he was, thus, "covered." Fowler told Williams:

> And, you know, if you're going to deal with them directly that's
> your decision. I'm not going to talk you out of it, but it's going to
> have to be at your own peril because we did this to protect
> ourselves from liability and to protect Wal-Mart from liability.

Williams responded "Okay" and "Well, we contacted the home office and got approval for the,
for them to come back in there so," and "I mean, they're aware of it. They're working on that
problem."

      66.      At the store level, Wal-Mart management was aware, at a minimum, that
janitors who spoke no English were working seven days a week for as much as 70 or more hours
per week. Those janitors who were paid by personal check (as some were) frequently cashed

these checks at the Wal-Mart stores they cleaned. From this alone, Wal-Mart knew that no provision was made for deduction and payment of payroll taxes by the contractors. In each location where migrants were employed as janitors, local Wal-Mart management acted in reckless disregard of their status as undocumented labor.

67.     The operation of the Wal-Mart Enterprise is uniform nation-wide: employment of immigrant janitors under similar (and illegal) terms and conditions of employment to cleaning specifications determined and overseen by Wal-Mart. Migrant janitors are: (1) paid in cash or personal checks without appropriate withholding of payroll taxes; (2) obligated to work hours in excess of the FLSA's statutory maximum; (3) obligated to work up to seven days per week; (4) not paid for overtime work as required by law; (5) not given time off; and (6) not provided with workers' compensation benefits, health insurance, sick leave, meal or break time, notwithstanding state law protections. The terms of employment and amounts paid (or promised) to plaintiffs were consistent. Plaintiffs worked in crews of from two to seven janitors, depending on the size of the store to be cleaned. Crew members were paid between $325 and $350 per week with crew leaders receiving slightly more, approximately $500 per week. Crew leaders typically received a single check from which all members of their crew were to be paid. Communal lodging was in many cases arranged for migrants by the contractors (as Bertschy acknowledged and Glass was advised) to both shelter them from detection, control their activities and encourage them to continue to reside in the United States. Contractors also in many cases transported undocumented migrant labor across the United States to different Wal-Mart stores where they joined cleaning crews. Plaintiffs worked under these illegal circumstances described herein for all times relevant to this lawsuit.

68.     As specified *infra*, the parties who make up the Wal-Mart Enterprise participated in its affairs through the commission of widespread and systematic violations of the FLSA and multiple criminal acts, including, but not limited to, transporting undocumented aliens, in violation of 8 U.S.C. §1324(a)(1)(A)(ii); harboring undocumented aliens in violation of 8 U.S.C. §1324(a)(1)(A)(iii); encouraging undocumented aliens to reside in the United States in violation of 8 U.S.C. §1324(a)(1)(A)(iv); conspiring to transport, harbor and encourage illegal aliens to reside in the United States in violation of 8 U.S.C. §1324(a)(1)(A)(v)(I); aiding and abetting the transportation, harboring and encouraging of illegal aliens to reside in the United States in violation of 8 U.S.C. §1324(a)(1)(A)(v)(II); committing the above offenses for financial gain in violation of 8 U.S.C. §1324(a)(1)(B)(i); involuntary servitude in violation of 18 U.S.C. §1584; and conspiracy to launder money in violation of  18 U.S.C. §§1956(h) of the proceeds of the aforesaid criminal acts.

69.     The Wal-Mart Enterprise operates in and has an effect on interstate commerce.

**RICO Predicate Acts**

**Commission of RICO Predicate Acts By Contractors**

70.     Contractors associated with the Wal-Mart Enterprise participated in its affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §1961(5).

71.     Section 274 of IRCA, 8 U.S.C. § 1324, provides:

(a) (1)(A) Any person who -

    (i) knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of

33

whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien;

(ii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law;

(iii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation;

(iv) encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law; or

(v)(I) engages in any conspiracy to commit any of the preceding acts, or

(II) aids or abets the commission of any of the preceding acts, shall be punished as provided in subparagraph (B).

72.     Section 274(a)(1)(3)(A), 8 U.S.C. § 1324(a)(1)(3)(A) provides:

(3)(A) Any person who, during any 12-month period, knowingly hires for employment at least 10 individuals with actual knowledge that the individuals are aliens described in subparagraph (B) shall be fined under title 18 or imprisoned for not more than 5 years, or both.

(B) An alien described in this subparagraph is an alien who- (i) is an unauthorized alien (as defined in section 1324a(h)(3) of this title), and

(ii) has been brought into the United States in violation of this subsection.

73.     A violation of any of the provisions cited *supra* constitutes a predicate

act of racketeering under 18 U.S.C. §1961(1)(F).

74.     Beginning no later than March 1997 Wal-Mart, acting through Leroy

34

Schuetz and others, conspired with Christopher Walters (and the various companies Walters controlled and sub-contracted with) to transport, harbor and encourage illegal aliens to reside in the United States.  In particular, the understanding Wal-Mart reached with Walters at that time was that Wal-Mart would continue to employ illegal aliens as janitors, so long as Walters set up multiple front companies to formally employ the janitors and thus relieve Wal-Mart of the responsibility to verify the janitors' authorization to work in the United States.

75.     Wal-Mart also knew that the companies Walters then controlled (or Walters' various sub-contractors) routinely encouraged aliens to reside in the United States unlawfully, transported undocumented migrants across the United States to facilitate their work at various Wal-Mart stores and harbored undocumented janitors who worked at Wal-Mart by, among other things, providing them with lodging.  Wal-Mart knew from the 1997 raid at the very least, and intended in entering in the conspiracy, that Walters and the companies he controlled would continue to encourage aliens to reside in the United States unlawfully, transport undocumented migrants across the United States to work at Wal-Mart, and/or harbor undocumented janitors who worked at Wal-Mart.  The use of front companies was intended, and did, shield, harbor and perpetuate Wal-Mart's illegal employment of the janitors from detection by the authorities, and it thus facilitated and encouraged the continued presence of the migrants in the United States and their employment by Wal-Mart.  The conspiracy was entered into by all participants for their own financial gain.

76.     On information and belief, at or about the time it entered into its conspiracy with Walters, Wal-Mart entered into similar conspiracies with other maintenance contractors to transport, harbor and encourage illegal aliens to reside in the United States.  These

35

conspirators include, on information and belief, Kenneth Clancey.  In particular, the understanding Wal-Mart reached with Clancey and other contractors was the same as that reached with Walters: Wal-Mart would continue to employ illegal aliens as janitors, so long as the contractors set up multiple front companies to formally employ the janitors and thus relieve Wal-Mart of the responsibility to verify the janitors' authorization to work in the United States and evade detection by federal law enforcement authorities of multiple criminal violations of federal immigration law.

### Acts in Furtherance of the Conspiracy

### Wal-Mart

77.      In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were committed.  Wal-Mart acted in furtherance of the conspiracy by its acts described in this Second Amended Complaint, including but not limited to using Walters' firms interchangeably, switching ostensible contractors in response to law enforcement actions to continue the scheme.  Wal-Mart also furthered the conspiracy by mailing checks payable to various Walters entities and other contractors as compensation for the work performed by the undocumented migrant cleaning crews and to cover contractors' overhead costs.

### Contractors

78.      As outlined elsewhere in this Second Amended Complaint, Walters acted in furtherance of the conspiracy by establishing a plethora of front companies (on the dates indicated in paragraph 51, *supra*) all controlled by him and continuing to knowingly supply undocumented migrant janitorial labor to Wal-Mart thereafter.  Walters, and on information and

belief other contractors, purposefully decided not to require that sub-contractors they used verify that their personnel were authorized to work in the United States to shield the scheme from detection.

79.      Those various maintenance contractors thereafter engaged in systematic violations of federal immigration law in furtherance of the conspiracy including separate conspiracies among themselves to violate immigration law and to launder the proceeds of the scheme they received from Wal-Mart.

**Inter-related Conspiracies to Violate Immigration Law and Commit Money Laundering**

80.      On April 25, 2005, Walters entered a plea of guilty on behalf of contractors IMC Associates, Inc., Cleanmax Associates, Inc., Comet Floor Care Associates Inc., Ironman Maintenance Associates, Inc., Precision Cleaning, Inc., Champion Floor Care Associates, Inc., National Cleaning Management, Inc., Mercury Floor Care Associates, Inc., Allied Floor Care Service, Inc., and World Clean Associates, Inc., to a single count felony information alleging a conspiracy to transport and encourage illegal aliens to reside in the United States for the purpose of commercial advantage and private financial gain in violation of 8 U.S.C. §§1324(a)(1)(A)(v), (a)(1)(A)(ii), (a)(1)(A)(iv), and (a)(1)(B)(i) between 1998 and 2002. All of these contractors supplied undocumented migrant janitorial labor to Wal-Mart.  In connection with that guilty plea these defendants agreed to forfeit $4 million to the United States. A copy of the information charging IMC and the other Walters related companies and their plea agreement are attached hereto as Exhibits C and D respectively.  The federal government had previously brought multiple forfeiture actions including the action known as *United States v. Express Corporate Servs., Inc., et al.*, No. 3 CV 02-982 (M.D. Pa.), seeking forfeiture of the property of these defendants and outlining their actions as Wal-Mart janitorial contractors.  A

copy of the verified complaint in the *Express Corporate Serv.* case is attached hereto as Exhibit E.

81.     The guilty plea of a number of the Walters'-controlled firms followed prosecutions of Walters' associates and Wal-Mart contractors Stanislaw Kostek and Miroslaw Dryjak and associated firms.  On March 12, 2003, Kostek's company, CMS of Queensbury, plead guilty pursuant to a January 2003 Plea Agreement to a federal information charging it with a conspiracy to transport and encourage and induce aliens to reside in the United States for commercial advantage and financial gain connected with Kostek's activities as a Wal-Mart contractor.  A copy of the CMS of Queensbury Plea Agreement is attached hereto as Exhibit F. On that same date in a related criminal prosecution, Kostek's associate (and Wal-Mart maintenance contractor) Miroslaw Dryjak plead guilty to bringing in and harboring of undocumented aliens.  Charges against Kostek individually in that case were dismissed on June 4, 2005.

82.     Most recently the government succeeded in criminal prosecutions relating to Vincent Romano, a Walters associate and Wal-Mart contractor.  On October 17, 2005, DJR Cleaning Enterprises("DJR"), a Wal-Mart cleaning contractor which subcontracted with various of the Walters-controlled companies, plead guilty pursuant to a Plea Agreement to a superseding felony information brought by the U.S. Attorney for the Middle District of Pennsylvania.  A copy of the Plea Agreement is Exhibit G and a copy of the Information is Exhibit H.  Vincent Romano was president and owned or controlled DJR.  Specifically DJR plead guilty to engaging in a conspiracy between 1996 and 2002 with various Walters-controlled companies and its own sub-contractor CMS of Queensbury, Inc., to transport and encourage and

38

induce aliens to reside in the United States knowing or in reckless disregard of the fact that the aliens came into or remained in the United States in violation of law.

83.     On June 22, 2005, Walter J. Truszkowski entered a guilty plea in the U.S. District Court for the Northern District of Illinois to a two-count federal information charging a conspiracy to conceal aliens and to encourage aliens to reside in the United States for the purpose of financial gain in knowing or reckless disregard of the fact that such aliens have come to, entered, or remained in the United States in violation of law, under 8 U.S.C. §1324(a)(1)(A)(v), and a conspiracy to conduct financial transactions that involved proceeds of encouraging aliens to remain in the United States for the purpose of financial gain, with the intent to promote the carrying on of such specified unlawful activity under 18 U.S.C. §1956(h). A copy of the plea agreement between Truszkowski and the United States is attached hereto as Exhibit I.

84.     Truszkowski created, owned and operated Crystal Clear Nationwide Management, Inc., and DeLuxe Cleaning, Inc.  Through Vincent Romano, a sub-contractor of Walters and IMC, Truszkowski obtained subcontracts to clean various Wal-Mart stores in Illinois and Indiana.  As recited at page 3 of the Plea Agreement, Exhibit I, Truszkowski recruited and hired persons from Russia and Eastern Europe to clean these stores.  Most of these migrants came to the United States on visas that did not authorize work here.  As with other victims of the Wal-Mart Enterprise, Truszkowski's janitors were (in the words of the plea agreement) "a highly mobile work force, willing to work the night shift, cleaning the stores, many for below minimum wage, and without receiving overtime."

85.     On or about August 18, 1998, acting on Truszkowski's suggestion,

Algimantas Kondratavicius, one of the aliens Truszkowski recruited who worked in a Wal-Mart cleaning crew, incorporated A.K. Professional Cleaning Inc. ("A.K."). In the words of the plea agreement, this shell company was created "[i]n order to insulate [Truszkowski] and to shield from detection the alien employees working on the crews[.]" On or about September 6, 1998, Truszkowski assigned Kondratavicius to clean the Wal-Mart store in Valpariso, Indiana. (The INS arrested Kondratavicius with other aliens cleaning this Wal-Mart store on June 7, 2000). Truszkowski received the criminal proceeds of the conspiracy "in the form of Wal-Mart's payments[] through an intermediate subcontractor knows as Intensive Maintenance Care Inc." These actions were also in furtherance of the conspiracy between Walters and Schuetz, as IMC used Romano and his affiliated contractors as corporate shells intended to shield Wal-Mart's employment of the undocumented migrant cleaning crews.

86.     Consistent with the conspiracy, Wal-Mart's maintenance contractors operating as part of the Wal-Mart Enterprise systematically violated federal criminal provisions by encouraging unauthorized aliens to enter the United States and then harboring or transporting them once here.

**Encouraging Unauthorized Aliens to Reside in the U.S.**

87.     Wal-Mart contractors placed advertisements in publications in the Czech Republic (and on information and belief elsewhere) promising work in America in exchange for amounts typically equal to a month's wages. Contractors placed these advertisements knowing that they would encourage and induce foreign nationals without work authorization in the United States to enter the United States unlawfully for the purpose of obtaining work at Wal-Mart stores in violation of 8 U.S.C. § 1324(d)(i)(A)(iv). When persons not authorized to work in the United States responded to the advertisements and traveled to the United States (typically on tourist

visas that did not authorize them to work here) contractors met them and transported them to their final destinations in the United States where the migrants would work at Wal-Mart stores. The contractors typically arranged lodging for the unauthorized migrants near their worksites once they arrived in the United States.

88.     For example, in early 2003, plaintiff Kunc responded to an advertisement promising employment in the United States by calling a broker in Brno, Czech Republic.  The broker told him he could arrange employment in the United States for $1,500 and directed Kunc to enter the United States on a tourist visa.  The broker told Kunc that upon arrival in the United States he would be employed at a Wal-Mart store in Madison Heights, Virginia. Kunc then traveled to the United States on a tourist visa and arrived on February 7, 2003 in Washington, D.C.  Thereafter, on February 8, 2003, Kunc was immediately transported by a Wal-Mart contractor to lodging in Virginia, his final destination in the United States, where he began his first cleaning job at the Wal-Mart store in Madison Heights.

**Harboring and Transporting**

89.     In the United States, Wal-Mart contractors sheltered the undocumented migrants by arranging or providing lodging for them and routinely transporting them across the United States to work at different Wal-Mart locations facilitating and encouraging their presence here.  Kostek, for example, made a practice of rotating janitorial crews between Wal-Mart stores every few months, transporting undocumented migrants to different Wal-Mart stores across the country.

90.     Wal-Mart contractors also sheltered or attempted to shelter and conceal the undocumented migrants' presence in the United States by obtaining falsified work

41

authorization papers or permanent resident cards.  For example, Wal-Mart's contractor in New

Jersey, Kenneth Clancey, never required any of the New Jersey resident plaintiffs to verify their

employment authorization although that is required of any employer by federal law.  Shortly

before the Operation Rollback raids in October 2003, Clancey asked plaintiff Victor Zavala to

accompany him to New York City to obtain fraudulent work authorization documents.  Plaintiff

Zavala refused.

 91. The Wal-Mart contractor who employed Plaintiffs Zednek and Jaros,

Adam Daniel of Daniel's Cleaning Service, provided lodging for them in his name in Alma,

Michigan.  Daniel told them told in late 2002 that they were required to purchase fraudulent

Social Security numbers from him for $300 each to continue working.  Zednek and Jaros refused

Daniel's demand, and the contractor refused to pay them for their work.  Zednek and Jaros

complained that they were not paid to a Wal-Mart manager in Alma who knew that they were

undocumented.  They still were not paid, and their continued complaints of non-payment led

Daniel to contact the local police who evicted Zednek and Jaros from the apartment in which

they lived that was rented in Daniel's name, but whose rent was paid by these plaintiffs.  (When

Daniel finally delivered paychecks to these plaintiffs for work they had performed, the checks

bounced.)

 92. On June 4, 2001, Miriam Klackova Facemyer, a maintenance contractor

who provided undocumented aliens (most from the Czech Republic, Slovakia and Poland) to

work as janitors for Wal-Mart stores, plead guilty in the U.S. District Court for the Eastern

District of Virginia to harboring illegal aliens under 8 U.S.C. §1324(a)(1)(A)(iii) and related

offenses.  Facemyer was sentenced to seven months' imprisonment and/or two years of

supervised release, and was required to pay a $100 special assessment and a $2,000 fine.

**Money Laundering**

93.     Contractors who joined with Wal-Mart in the Wal-Mart Enterprise maintain (or maintained) books, records, ledgers, receipts, or notes relating to the purchase of financial instruments or the transfer of funds and other papers relating to the proceeds of the unlawful employment of the janitors and the profit derived therefrom.  On information and belief, contractors who joined with Wal-Mart in the Wal-Mart Enterprise used electronic equipment such as computers, facsimile or telex machines, pagers and telephone answering machines to generate, record, or store information concerning their operations and associated finances.  Contractors who joined with Wal-Mart in the Wal-Mart Enterprise attempted to legitimize their profits from the illegal scheme through money laundering activities involving banks and their attendant services, brokers, professionals such as attorneys or accountants, and in violation of 18 U.S.C. §§1956(a)(1)(A)(i), 1956(a)(1)(B)(i), 1956(a)(1)(B)(ii), 1956(a)(3)(A), 1956(a)(3)(B), and 1956(a)(3)(C).  The documents and specific information as to all of these materials are within the exclusive possession and control of Wal-Mart and the contractors at this time (and possibly federal law enforcement officials in connection with their various investigations), and plaintiffs' counsel was unsuccessful in efforts to these data and documents despite interviews with numerous named plaintiffs and members of the plaintiff class both in the United States and abroad.  Thus, specific allegations as to that information by plaintiffs will have to await some discovery in this case.

94.     Over the years of operation of the Wal-Mart Enterprise, Wal-Mart contractors received checks drawn on Wal-Mart bank accounts payable to the contractor as payment for janitorial labor.  Each separate payment received by a contractor who participated in

the Wal-Mart Enterprise was the proceeds of the illegal conspiracy and the transporting,

harboring or and encouraging the migrants to remain in the United States in violation of 8 U.S.C.

§1324(a) (1)(A)(ii), (iii), and (iv).  Wal-Mart made these payments and the contractors received

them knowing them to be the proceeds of unlawful activity.  Contractors then conducted a host

of further money laundering financial transactions intended to promote the unlawful activities of

the Wal-Mart Enterprise or knowing that that the transaction was intended to conceal or disguise

the ownership or control of the proceeds of the Wal-Mart Enterprise.

95.    For example, as outlined in paragraph 85 *supra* and in Exhibit E at pages

5-7, criminal proceeds in the form of Wal-Mart payments for cleaning services were laundered

through IMC, companies controlled by Truszkowski and, ultimately A.K.  The scale and scope

of the money laundering scheme is outlined in Exhibit E at pages 98-131.  Specifically and as

outlined there, records subpoenaed from Wal-Mart by the United States reveal that between 1999

and 2001 Wal-Mart paid in excess of $77 million to a subset of the Walters' companies.

Specifically, Wal-Mart paid $26 million to IMC, $14.5 million to Comet Floor Care, 21 million

to Ironman Maintenance, $10 million to Precision Cleaning Services, $1.8 million to Champion

Floor Care Services, $3.5 million to National Cleaning Management and $12.5 million to

Pinnacle for cleaning services during that period.  These payments were the proceeds of the

unlawful criminal immigration violations of the above-noted contractors.  The above-noted

contractors received these payments knowing them to be the proceeds of their criminal

immigration violations and caused these payments to be deposited in bank accounts they

maintained, a financial transaction within the meaning of 18 U.S.C. §1956(a)(1).  As set out at

pages 4-12 of Exhibit E, a number of the Walters-controlled companies maintained accounts at

Normandy Bank in St Louis.  Between 1999 and 2001 there were multiple transfers of funds

between and among the companies who received payments from Wal-Mart as identified above

(and with other Walters-controlled companies).  Those transactions involved in excess of $20

million.  As outlined at pages 101-102 of Exhibit E, Walters-controlled companies also

transferred millions of dollars by check, wire transfer and credit memo to DJR, Romano's

company that provided undocumented migrant cleaning crews to Wal-Mart including through

Truszkowski.

   96.  The contractors thus conducted financial transactions intended to

promote the unlawful activities of the Wal-Mart Enterprise or knowing that each such transaction

was intended to conceal or disguise the ownership or control of the proceeds of the Wal-Mart

Enterprise.  Specifically, the above indicated contractors paid for undocumented janitorial labor

from the above-noted proceeds thus encouraging the undocumented migrants to continue to

provide their services and thereby promoting the continuation of the Wal-Mart Enterprise, in

violation of  18 U.S.C. §1956(a)(1)(A)(i).  Without the pool of illegal migrant labor which the

contractors had to maintain (albeit at below legally mandated levels), the contractors would not

have been able to secure or fulfill the contracts with Wal-Mart.

   97.  On information and belief, the same patterns of money laundering

transactions occurred with respect to Kenneth Clancey and others and the various corporate

shells through which he and others provided undocumented migrant labor to Wal-Mart and other

contractors presently unknown to plaintiffs.

   98.  All of the foregoing acts in paragraphs 41-97 *supra* were in furtherance

of the conspiracy to violate Section 1324(a)(1)(A)(v)(I) initiated by Walters and Schuetz and in

so acting, each contractor was acting within the scope of its agency and thus with the authorization of the others including Wal-Mart.  In addition, they constitute predicate acts of racketeering through which the identified contractors participated in the affairs of the Wal-Mart Enterprise.

**Commission of RICO Predicate Acts By Wal-Mart**

### I.  Violations of Section 274

#### (A) Conspiracy to Violate Section 274

99.      Wal-Mart participated in the affairs of the Wal-Mart Enterprise through the commission of multiple predicate acts of racketeering.  As set forth in the preceding paragraphs of this Second Amended Complaint, beginning in no later than March 1997, Wal-Mart, acting through Leroy Schuetz and others, conspired with Christopher Walters and the various companies Walters controlled or sub-contracted with to transport, harbor and encourage illegal aliens to reside in the United States.  In particular, the understanding Wal-Mart reached with Walters at that time was that Wal-Mart would continue to employ illegal aliens as janitors, so long as Walters set up multiple front companies to formally employ the janitors and thus relieve Wal-Mart of the responsibility to verify the janitors' authorization to work in the United States.  The use of front companies was intended, and did, shield and perpetuate the contractors' and Wal-Mart's illegal employment of the janitors from detection by federal law enforcement authorities, and it thus encouraged and facilitated the continued presence of the migrants in the United States and their employment by Wal-Mart.  The conspiracy was entered into by all participants for their own financial gain.

**Acts in Furtherance of the Conspiracy**

100.     In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others set out in this Second Amended Complaint, were committed.  As outlined in paragraph 47, *supra*, Walters acted in furtherance of the conspiracy by establishing a plethora of front companies (on the dates indicated in paragraph 51 *supra*) all controlled by him and by continuing to supply undocumented migrant janitorial labor to Wal-Mart thereafter through these shell companies.  In addition, Walters acted in furtherance of the conspiracy by entering into sub-contracting arrangements with contractors such as Romano and Kostek who furnished undocumented migrant labor for Wal-Mart.  Wal-Mart acted in furtherance of the conspiracy by using Walters' firms interchangeably, switching ostensible contractors following law enforcement actions to continue the scheme.  Wal-Mart furthered the conspiracy by mailing checks payable to various Walters contractors as compensation for the work performed by the undocumented migrant cleaning crews.  Without the pool of illegal migrant labor which the contractors had to maintain (albeit at below legally mandated levels), the contractors would not have been able to secure or fulfill the contracts with Wal-Mart to their mutual benefit.

101.     Wal-Mart management at the store level was well aware of how the Wal-Mart Enterprise functioned and knowingly participated in its operation.  They did so for their own financial gain because their compensation depended on their ability to reduce or control their stores' expenses facilitated by the use of undocumented labor.  They also did so because unauthorized migrant labor was more easily controlled than janitors who were U.S. citizens or otherwise authorized to work in the United States.

102.     In some cases, undocumented janitors complained to Wal-Mart management that they were being cheated by contractors.  Plaintiffs Zednek and Jaros complained that they had not been paid for their work as janitors at Wal-Mart to Wal-Mart officials in Michigan, and in Georgia where they were subsequently employed to clean another Wal-Mart store.  Those officials were fully informed of the fact that these plaintiffs were undocumented.  The Wal-Mart officials failed to help them and continued to employ them as janitors in Wal-Mart stores.

103.     Walters' associate Kostek, operating through Comet Floor Care, supplied undocumented migrants to work at the Wal-Mart store located in Honesdale, Pennsylvania in 2000.  This was known to the Honesdale store manager Dave, l/n/u, who advised a Wayne County, Pennsylvania, probation agent that he believed the cleaning crew was made up of illegal aliens.  Kostek arranged for the Honesdale crew to be lodged in a trailer at a trailer park in Honesdale and at the Wayne Hotel in Honesdale.  Federal agents executing a search warrant on the trailer discovered that the front door of the trailer could not be locked, the trailer had no running water and the aliens slept on the floor in sleeping bags.

104.     On March 20, 2001, INS agents arrested 27 illegal aliens at several Wal-Marts in Pennsylvania, including Honesdale.  Federal agents informed management that the cleaning crews were comprised of undocumented aliens.  Consistent with the workings of the Wal-Mart Enterprise, firms associated with Walters, but not Comet, arranged for a new cleaning crew composed of other undocumented migrants to clean the Honesdale store that Wal-Mart permitted to work.  That replacement crew was similarly sheltered by the contractor.

105.     On October 30, 2001, federal agents again raided the Honesdale Wal-

48

Mart this time arresting five undocumented aliens working in the cleaning crew (three crew members were from Georgia (former Soviet Union) and one from Russia and Estonia). This crew was employed through another cleaning contractor connected to Walters and Kostek. All five were housed in the same apartment in Honesdale.

106.     In the Honesdale apartment shared by the replacement crew federal agents came upon correspondence dated July 29, 2001, to Kostek from Vincent Romano. In that correspondence Romano advised Kostek that Wal-Mart District Managers were dictating budget cuts at four Wal-Mart stores (including Honesdale) for Walters' company IMC effective September 24, 2001. Romano inquired whether Kostek could "handle these new prices" and that, if not Romano would "tell IMC to find someone, or you take stores direct and pay me on the side."

107.     The same use of multiple contractors occurred at the Wal-Mart store in Ticonderoga, New York. On November 1, 2001, INS agents arrested two Georgian and two Lithuanian nationals who comprised a cleaning crew at the Ticonderoga, New York, and Wal-Mart store. The Wal-Mart store manager, Phil Prehoda, advised that the crew was hired through Floor Management Inc., a Walters company, which had replaced IMC. Federal agents advised Prehoda that the crew were all undocumented aliens. In January 2002, federal agents again contacted Prehoda who now advised that the Ticonderoga store was cleaned by a crew from National Floor Management, yet another Walters company. Prehoda advised that National Floor Management had provided I-9 forms for the crew at his request. Review of the forms indicated that (with the exception of the crew leader), all of the janitors were undocumented aliens.

### (B) Harboring

108.     Knowing or acting in reckless disregard of the fact that janitors were aliens in the United States in violation of the law, Wal-Mart knowingly shielded janitors from detection by committing multiple acts of harboring.

109.     Janitors work in Wal-Mart stores on an overnight shift when the stores are either closed or (if they remain open 24 hours a day) have less retail traffic.  In stores which closed overnight, Wal-Mart made a regular and systematic practice of locking janitors whom it knew were in the United Stated illegally in its stores overnight.  By locking janitors in the stores Wal-Mart thus limited the ability of federal law enforcement authorities (and others)  to detect the janitors while they were at work facilitating their continued employment and presence in the United States.  As outlined in paragraphs 8-16, 21-22, *supra* plaintiffs Victor and Arturo Zavala, Gomez, Flores, Denisio, Palacios, Tello Mendez, Condado, Zednek and Jaros all worked in stores where management locked them in during their shifts.  Because Wal-Mart knew (or recklessly disregarded the fact) that each of these plaintiffs was an illegal alien, unauthorized to work in the United States, by locking these plaintiffs in the stores Wal-Mart committed multiple counts of harboring unlawful aliens in violation  of 8 U.S.C. §1324(a)(1)(A)(iii).  On information and belief, hundreds of other janitors were similarly harbored by Wal-Mart from 1997 through to the present.

110.     On November 14, 2001, INS agents arrested four illegal aliens at the Wal-Mart at 9051 Hillcrest Road, Kansas City, Missouri.  The four (Yordan Ivamov Saev, Hristo Pramatarov, Vesela Grankova and Ivona Alexandrova) are Bulgarians who spoke little or no English.  INS agents advised the assistant store manager and invoice manager that the four were

unlawful aliens.  These janitors were provided through Pinnacle Management.  Within an hour of when INS arrested the four Bulgarians, at the request of Wal-Mart management, Pinnacle sent over replacements who were then permitted to work by Wal-Mart.  Two separate crews composed of undocumented aliens worked at this store, one for a 12 hour day shift and one for a 12-hour night shift and thus were in the store 24 hours a day, 7 days a week.  Wal-Mart permitted the undocumented aliens to sleep in a back room in the store and to keep their personal belongings there knowing (or acting in reckless disregard of the fact) that they were undocumented aliens, thus shielding them from detection by federal law enforcement authorities.  In so doing, Wal-Mart knowingly harbored unlawful aliens in thereby committing at least four violations of 8 U.S.C. §1324(a)(1)(A)(iii).  The use of multiple sub-contractors and corporate shells to provide Wal-Mart with undocumented migrant janitorial labor was intended and did shield migrants known by Wal-Mart and its contractors to be unauthorized to work in the United States from detection and thus encouraged the aliens to reside in the United States by prolonging their presence here.  The foregoing conduct by Wal-Mart's maintenance contractors including, but not limited to companies controlled by Walters and Clancey, constitutes encouraging unauthorized aliens to reside in the United States in violation of 8 U.S.C. §1324(a)(1)(A)(iv) and harboring of aliens in violation of 8 U.S.C. §1324(a)(1)(A)(iii)

### (C) Aiding and Abetting

111.    As outlined elsewhere in this Second Amended Complaint, Wal-Mart knew that the janitorial labor its various contractors supplied was encouraged to travel to or remain in the United States, and transported and harbored by the contractors.

112.    Wal-Mart knowingly facilitated and helped to bring about (and thus aided and abetted) that encouraging and harboring by financing the unlawful activity through

payments to the contractors.  Wal-Mart's millions of dollars in payments underwrote not only the labor of the janitors but the overhead costs and thus the criminal activity of the contractors, making their crimes possible and helping to bring them about.

113.     In 1999 the Wal-Mart store in Lexington, Virginia used IMC to provide it with undocumented migrant janitorial cleaning crews.  In November 1999, that crew was comprised of five Russian nationals who were employed through Stanislaw Kostek.  Kostek knew that all five crew members were undocumented migrants unauthorized to work in the United States.  All five lived in a single apartment in the Willow Spring apartment complex in Lexington rented by Kostek.  Kostek's renting of the apartment for the janitors and his placement of them in positions at the Lexington Wal-Mart amount to harboring of illegal aliens under 8 U.S.C. §1324(a)(1)(A)(iii) and encouraging them to continue to reside in the United States in violation of 8 U.S.C. §1324(a)(1)(A)(iv).  On or about November 19, 1999, two of the five janitors were arrested for theft of merchandise from Wal-Mart.  In connection with the arrests, Wal-Mart store manager Jason Taylor was present at the Willow Spring apartment maintained for the janitorial crew when stolen goods were recovered.  Prior to the arrest Taylor knew or acted in reckless disregard of the fact that the janitorial crew were migrants unauthorized to work in the United States.

114.     On November 20, 1999 Taylor contacted IMC and requested that IMC provide a replacement crew for the overnight shift that day.  Taylor knew that IMC would, in response to his request, cause undocumented migrants to be transported from New York to Lexington, Virginia where they would be housed at the Willow Spring complex.  In response to Taylor's request, IMC transported a crew of five Russian migrants unauthorized to work in the

52

United States from New York City to Lexington, Virginia, in time to clean the store the night of November 20.  The transportation of the undocumented migrants was in violation of 8 U.S.C. §1324(a)(1)(A)(ii).  The replacement crew was housed (together with the original crew) as arranged by IMC at the same Willow Spring apartment in Lexington, amounting to harboring of illegal aliens under 8 U.S.C. §1324(a)(1)(A)(iii).  In calling on IMC to supply a replacement janitorial crew on November 20 that it agreed to employ at its Lexington, Virginia, store, Wal-Mart and, on information and belief, in subsequently paying IMC for doing so, facilitated and brought about the transportation and harboring of the replacement crew by IMC and its agent Kostek, amounting to at least five counts of aiding and abetting in violation of 8 U.S.C. §1324(a)(1)(A)(v)(II).

115.   On November 14, 2001, INS agents arrested six undocumented migrants working in the cleaning crew at the Wal-Mart in Lee's Summit, Missouri.  The crew was comprised of three Georgian and three Bulgarian nationals.  The crew was supplied through Pinnacle Management, a Walters company.  Federal agents advised the store manager, Joel Bierbaum, that his Pinnacle cleaning crew was comprised of undocumented aliens.  Following the arrests, Bierbaum arranged for Pinnacle to supply a replacement crew which arrived that evening to clean the store.  In January 2002, Bierbaum advised federal law enforcement agents that the replacement crew was comprised of all foreign nationals.  On information and belief, those foreign nationals were (and Wal-Mart knew them to be) undocumented migrants.  In requesting Pinnacle to supply a replacement crew that it intended to put to work cleaning its store, Wal-Mart caused and thus aided and abetted Pinnacle to transport undocumented aliens in multiple violations of  8 U.S.C. §1324(a)(1)(A)(ii).

116.     Similarly, as outlined above, on November 14, 2001, within an hour of an INS raid that led to the detention of its cleaning crew, Wal-Mart caused Pinnacle to transport undocumented migrants to its store on Hillcrest Road in Kansas City, Missouri when it requested a replacement crew.  Pinnacle's transportation of the replacement crew was in violation of 8 U.S.C. §1324(a)(1)(A)(ii) and Wal-Mart aided and abetted that violation by helping to bring it about by requesting the replacement crew.

## II.  Conspiracy By Wal-Mart to Commit Money Laundering

117.     As specified in paragraph 47, *supra,* Wal-Mart, through Schuetz directed Walters to establish several corporate fronts through which Walters could continue to provide undocumented migrant janitorial labor to Wal-Mart and through which he would be paid.  As part of that agreement and conspiracy and as further described at paragraphs 47, 52, 58, 85, 95-97 *supra* and in Exhibit E at paragraphs 99-100, Wal-Mart agreed to (and did) conduct financial transactions affecting interstate commerce with the shell companies, namely the payment by check or wire transfer of monies intended to compensate the contractors for janitorial labor, involving the proceeds of the illegal activity of harboring, transporting and encouraging illegal aliens to reside in the United States.  In so doing, Wal-Mart knew that its payments to these shell companies would disguise the ownership or control of those proceeds and that those payments would further promote the carrying on of the underlying unlawful activity, as the illegal hiring scheme required that the janitors be financially supported (albeit under unlawful terms) and that the necessary overhead costs of the contractors be met.  On information and belief, similar conspiracies to launder the proceeds of the hiring of undocumented migrant janitors were reached with other Wal-Mart contractors. Information concerning the activities of other Wal-Mart contractors is not presently available to plaintiffs and may be in the possession federal law

54

enforcement officials in connection with their various investigations) and plaintiffs' counsel was unsuccessful in efforts to obtain these data and documents despite interviews with numerous named plaintiffs and members of the plaintiff class both in the United States and abroad. Thus, specific allegations as to that information by plaintiffs will have to await some discovery in this case.

### III.  Forced Labor and False Imprisonment By Wal-Mart

118.    A component of the Wal-Mart Enterprise is the use of compulsory or forced labor by legal or extra-legal coercion. Contractors used or threatened to use coercion (including physical coercion) which caused undocumented plaintiffs and other class members reasonably to believe that, given their vulnerable status, they had no alternative but to continue to work at Wal-Mart. Wal-Mart also compelled the labor of the janitors through its widespread and systematic practice of intentionally locking these vulnerable workers into its stores during their shifts. The Subclass Representatives and subclass members knew they were so confined to the stores by Wal-Mart. Such confinement was against their will and resulted in physical and emotional injury of plaintiffs and coerced plaintiffs to work for Wal-Mart whether they wanted to or not.

119.    Wal-Mart and many of its contractors at times refused to pay class members anything at all for their work. Others forced janitors to pay a "security deposit," withholding all compensation from them for weeks at a time to insure their continued work as janitors. Janitors complained to Wal-Mart store managers that they had not been paid for their services, but Wal-Mart failed or refused to act and instead tolerated and benefited from these practices. Plaintiffs were told that they could leave their assigned cleaning crews and recover the compensation that had been withheld from them only if they found replacement janitors for

Wal-Mart.

120.     Other class members were threatened with deportation or other adverse legal action.  For example, one janitor complained about his crew's wages and working to Clancey.  In response, and in front of a number of other janitors, Clancey threatened this man with arrest and deportation if he continued to complain and in so doing coerced him and the other janitors who worked with him to continue to work for Clancey and his various cleaning firms.  The same threat was made by a Czech contractor known as Michael, l/n/u, at a Wal-Mart store in Bristol, Connecticut to plaintiffs Zednek and Jaros or around October, 2002.  On information and belief, many other Wal-Mart contractors used the threat of deportation to frighten undocumented janitors into acquiescence.  The continued employment of the janitors in the face of these threats constitutes forced or involuntary servitude prohibited by 18 U.S.C. §1584.

**Proximate Causation**

121.     The commission of the predicate acts of racketeering alleged in this Second Amended Complaint were a necessary cause of the harm suffered by plaintiffs. Systematic violation of immigration law – the hiring, harboring, trafficking or transportation of undocumented alien labor – was the necessary means through which plaintiffs were denied proper compensation, and in some cases physically beat up, unlawfully imprisoned and coerced into continuing to work at Wal-Mart.  Systematic violation of immigration law was also the necessary means for participants in the enterprise to profit as they did from exploiting plaintiffs. Use of the mails and wire were, on information and belief, essential to the operation of the scheme. Money laundering also directly harmed plaintiffs inasmuch as it shielded the enterprise from detection and thereby continued its existence.

56

## COUNT ONE

## RICO

122.     Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 121 as if fully set forth herein.

123.     At all relevant times, each of the plaintiffs was a "person" within the meaning of RICO, 18 U.S.C. §§1961(3) and 1964(c).

124.     At all relevant times, Wal-Mart and its various contractors were "persons" within the meaning of RICO, 18 U.S.C. §§1961(3) and 1962(c).

125.     At all relevant times, Wal-Mart and its contractors formed an association-in-fact for the purpose of profiting from a systematic violation of immigration and labor, wage and hour laws and other laws, referred to as the "Wal-Mart Enterprise."  The Wal-Mart Enterprise was an "enterprise" within the meaning of RICO, 18 U.S.C. §1961(4).

126.     At all relevant times, the Wal-Mart Enterprise was engaged in, and its activities affected, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. §1962(c).

127.     At all relevant times, each of the conspirators associated with this enterprise conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. §1961(5), in violation of §1962(c).

128.     Specifically, at all relevant times, Wal-Mart and its various maintenance

57

contractors identified in this Second Amended Complaint (and others presently unknown to plaintiffs) engaged in "racketeering activity" within the meaning of 18 U.S.C. §1961(1) by engaging or aiding and abetting in the acts set forth above.  The acts set forth above constitute a violation of one or more of the following statutes: transporting undocumented aliens, in violation of 8 U.S.C. §1324(a)(1)(A)(ii); harboring undocumented aliens in violation of 8 U.S.C. §1324(a)(1)(A)(iii); encouraging undocumented aliens to reside in the United States in violation of 8 U.S.C. §1324(a)(1)(A)(iv); conspiring to transport, harbor and encourage illegal aliens to reside in the United States in violation of 8 U.S.C. §1324(a)(1)(A)(v)(I); aiding and abetting the transportation, harboring and encouraging of illegal aliens to reside in the United States in violation of 8 U.S.C. §1324(a)(1)(A)(v)(II); committing the above offenses for financial gain in violation of 8 U.S.C. §1324(a)(1)(B)(i); involuntary servitude in violation of 18 U.S.C. §1584; and conspiracy to money launder the proceeds of the aforesaid criminal acts in violation of 18 U.S.C. §§1956(h).  Each of the foregoing acts are "predicate" acts within the meaning of 18 U.S.C. §1961(1).  The conspirators, *i.e.*, each of the contractors identified in this Second Amended Complaint (as well as others presently unknown to plaintiffs) and Wal-Mart, committed themselves, or aided and abetted in the commission of, at least two or more of these predicate acts of racketeering activity over the period of time the Wal-Mart Enterprise has existed.

129.    The acts of racketeering activity referred to in the previous paragraph constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. §1961(5).  The acts alleged were related to each other by virtue of common participants, common victims (the plaintiff class), a common method of commission, a common purpose, and a common result of

denying to the plaintiff class the protections of wage and hour and other labor laws in order to enrich Wal-Mart at the plaintiffs' expense.  The Wal-Mart Enterprise was run through this pattern of predicate acts of racketeering since at least March 1997 and continuing at least through the time of the Operation Rollback immigration enforcement raids in October 2003.

130.    As a result of Wal-Mart's violation of 18 U.S.C. §1962(c), plaintiffs and those similarly situated have suffered damages, and Wal-Mart has profited, in an amount not yet determined, but believed to be hundreds of millions of dollars.

131.    As a result of its misconduct, Wal-Mart is liable to plaintiffs for their losses in an amount to be determined at trial.

132.    Pursuant to RICO, 18 U.S.C. §1964(c), plaintiffs are entitled to recover threefold their damages plus costs and attorneys' fees from Wal-Mart.

## COUNT TWO

## RICO CONSPIRACY

133.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 132 as if fully set forth herein.

134.    At all relevant times, the plaintiffs and those similarly situated were "persons" within the meaning of RICO, 18 U.S.C. §§1961(3) and 1964(c).

135.    At all relevant times, Wal-Mart and its contractors were each a "person" within the meaning of RICO, 18 U.S.C. §§1961(3) and 1962(d).

136.    At all relevant times, Wal-Mart and its contractors formed an

association-in-fact enterprise for the purpose of defrauding and injuring the plaintiffs and those similarly situated to them.  This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. §1961(4).

137.    At all relevant times, this enterprise was engaged in, and its activities affected, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. §1962(c).

138.    As set forth in Count One, at all relevant times, each of the persons associated with this enterprise conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. §1961(5), in violation of 18 U.S.C. §1962(c).

139.    At all relevant times, Wal-Mart and its contractors were each associated with the enterprise and agreed and conspired to violate 18 U.S.C. §1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the aforementioned enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §1962(d).  In particular, Wal-Mart and its contractors agreed to commit two or more of the acts of racketeering specified in the preceding paragraphs of this Second Amended Complaint.

140.    The conspirators committed and caused to be committed a series of overt acts, in furtherance of the conspiracy and to affect the objects thereof, including but not limited to, the acts set forth above.

141.    As a result of the conspirators' violations of 18 U.S.C. §1962(d), the plaintiffs and those similarly situated were damaged in an amount equal to hundreds of millions of dollars.

142.     As a result of the conspiracy, Wal-Mart is liable to plaintiffs for their losses in an amount to be determined at trial.

143.     Pursuant to RICO, 18 U.S.C. §1964(c), plaintiffs are entitled to recover threefold their damages plus costs and attorneys' fees from Wal-Mart.

## COUNT THREE

## CONSPIRACY TO VIOLATE CIVIL RIGHTS UNDER 42 U.S.C. §1985(3)

144.     Plaintiffs' claims for conspiracy to violate civil rights under 42 U.S.C. § 1985(3) were dismissed with prejudice on October 7, 2005.

## COUNT FOUR

## FAIR LABOR STANDARDS ACT

145.     Plaintiffs repeat and reallege paragraphs 1 through 144 hereof as set forth fully herein.

146.     Sections 6 and 7 of the FLSA, 29 U.S.C. §§206 and 207, establish the right of all persons who are "suffered or permitted to work" to be paid a minimum wage for all hours worked and overtime pay at one and one-half times the person's regular rate for all hours worked in excess of forty hours per week.  Section 16(b) of the FLSA, 29 U.S.C. §216(b), entitles such persons to recover all unpaid wages plus interest, an equivalent amount as liquidated damages, and reasonable attorneys' fees and costs.  At all times relevant to this action, Wal-Mart failed and refused to pay plaintiffs minimum wage for all hours worked and failed and refused to pay plaintiffs the overtime premiums required by the FLSA to plaintiffs' damage in

61

amounts to be proven at trial.  The Class Representatives consent to be parties to this action pursuant to 29 U.S.C. §256.

147.    Wal-Mart's failure to provide required compensation for all hours worked by plaintiffs with the knowledge, consent, and expectation of Wal-Mart's supervisors and other managing agents constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. §255(a).

148.    The term "employee" is defined in the FLSA as "any individual employed by an employer."  29 U.S.C. §203(e)(1).  An "employer" is defined broadly as "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. §203(d).  The verb "employ" is defined expansively to mean "suffer or permit to work."  29 U.S.C. §203(g).  All members of the class are or were employees of Wal-Mart, for which they performed services within these definitions.  At all material times, Wal-Mart has acted as plaintiffs' "employer" and is or was "employing" them within the meaning of the FLSA and under principles of common law.

149.    As plaintiffs' employer, Wal-Mart is liable for the plaintiffs' back pay, liquidated damages, and other relief under the FLSA.

150.    By virtue of Wal-Mart's unlawful failure and refusal to pay plaintiffs overtime wages and other wages and benefits to which they are entitled, plaintiffs have lost wages due to them in amounts to be proven at trial.  Wal-Mart is liable to the members of the class for class members' unpaid wages, liquidated damages under FLSA §216(b), attorneys' fees and costs.

## COUNT FIVE

## FALSE IMPRISONMENT

151.     Plaintiffs repeat and allege paragraphs 1 through 150 hereof as if set forth fully herein.

152.     Defendant Wal-Mart intentionally engaged in a widespread and systematic practice of locking janitors in at Wal-Mart stores during their shifts against their will. Subclass representatives and members were aware of their confinement by this practice and suffered severe physical and emotional harm from it.  Wal-Mart thus falsely imprisoned the members of the subclass.

153.     As a proximate result of said conduct, plaintiffs have suffered and continue to suffer bodily injury, extreme mental distress, humiliation and anguish, and other emotional and physical injuries, all to their damage in amounts to be proven at trial.  Defendant committed the acts alleged herein maliciously, fraudulently and oppressively, with the wrongful intention of injuring plaintiffs from an improper and evil motive, amounting to malice and in conscious disregard of plaintiffs' rights.  Subclass Plaintiffs thus are entitled to recover punitive damages from Defendant in amounts to be proven at trial.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby request a jury trial on all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray for relief in their favor:

(1)    Certifying this case as a class action;

(2)    Entering a judgment declaring the rights of the parties;

(3)    Entering appropriate preliminary and permanent injunctive relief

prohibiting Wal-Mart from further violations of law;

(4)    Awarding the plaintiffs back wages and other damages, including

compensatory, treble and punitive damages, in an amount to be

determined at trial;

(5)    Awarding plaintiffs liquidated damages under FLSA §16(b);

(6)    Awarding plaintiffs their reasonable attorneys' fees and costs; and

(7)    Awarding plaintiffs such further relief as the Court may deem appropriate.

Dated: New York, New York
      November 21, 2005

Respectfully submitted,

_____

James L. Linsey
Thomas N. Ciantra
Oriana Vigliotti
COHEN, WEISS AND SIMON LLP
330 West 42nd Street
New York, New York 10036
(212) 563-4100

Gilberto Garcia
Mary Ann Kricko
GARCIA AND KRICKO
ATTORNEYS AT LAW
68 Summit Avenue
Hackensack, New Jersey 07601
(201) 894-1998

Attorneys for Plaintiffs

65

## CERTIFICATE OF SERVICE

This is to certify that on this day of November 21, 2005, true copies of the foregoing

Second Amended Complaint were served on counsel of record for defendant Wal-Mart Stores,

Inc., by dispatching same electronically to all counsel of record and in Federal Express packages,

postage paid, addressed as follows:

Robert H. Bernstein
Reed Smith LLP
The Legal Center
One Riverfront Plaza, First Floor
Newark, NJ 07102-5400

David P. Murray
Willkie Farr & Gallagher LLP
1875 K Street, N.W.
Washington, DC 20006-1238

James L. Linsey